UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2017 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>YI-CHI SHIH,<br>  aka "Yichi Shih,"<br>  aka "Yuqi Shi,"<br>ISHIANG SHIH,<br>  aka "I-Shiang Shih," and<br>KIET ANH MAI,<br><br>        Defendants. | CR No. **CR 18 00050** -JAK<br><br>I N D I C T M E N T<br><br>[50 U.S.C. § 1705(a),(c); 15 C.F.R. §§ 742.4, 744.16, 758.1, 764.2: Conspiracy, Attempt, and Violation of the International Emergency Economic Powers Act; 18 U.S.C. § 1341: Mail Fraud; 18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 371: Conspiracy; 18 U.S.C. § 1030(a)(2)(C), (c)(2)(B)(i)-(iii): Unauthorized Access to a Protected Computer to Obtain Information; 18 U.S.C. § 1956(a)(2)(A): International Promotional Money Laundering; 18 U.S.C. § 2: Aiding and Abetting and Causing an Act to be Done; 18 U.S.C. § 981(a)(1)(C), (a)(2) and 28 U.S.C. § 2461: Forfeiture] |

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

The following was true at all times relevant to this Indictment:

//

//

The International Emergency Economic Powers Act, Export

Administration Regulations, and Foreign Trade Regulations

1.     Pursuant to the International Emergency Economic Powers Act ("IEEPA"), Title 50, United States Code, Sections 1701-1707, the President was granted the authority to declare a national emergency to address unusual and extraordinary threats to the national security, foreign policy, and economy of the United States.  The President declared a national emergency through executive orders that had the full force and effect of law.

2.     Pursuant to IEEPA, on August 17, 2001, the President issued Executive Order 13,222, which declared a national emergency with respect to the unusual and extraordinary threat to the national security, foreign policy and economy of the United States in light of the expiration of the Export Administration Act, 50 App. U.S.C. §§ 2401-2420, which lapsed on August 17, 2001.  66 Fed. Reg. 44,025 (Aug. 22, 2001).  While in effect, the EAA regulated the export of goods, technology, and software from the United States.  Pursuant to the provisions of the EAA, the Department of Commerce ("DOC")'s Bureau of Industry and Security ("BIS") promulgated the Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-774, which contained restrictions on the export of goods outside of the United States, consistent with the policies and provisions of the EAA.  See 15 C.F.R. § 730.2.  In Executive Order 13,222, pursuant to IEEPA, the President ordered that the EAR's provisions remained in full force and effect despite the expiration of the EAA.  Presidents have issued annual Executive Notices extending the national emergency declared in Executive Order 13,222 from the time period covered by that Executive

1  Order through the present.  See, e.g., 82 Fed. Reg. 39,005 (Aug. 18,

2  2017).

3      3.  Pursuant to its authority derived from IEEPA, the DOC

4  reviewed and controlled the export of certain goods and technologies

5  from the United States to foreign countries.  In particular, the DOC

6  had placed restrictions on the export of goods and technologies that

7  it has determined could make a significant contribution to the

8  military potential or nuclear proliferation of other nations or that

9  could be detrimental to the foreign policy or national security of

10 the United States.

11     4.  In addition, the EAR contained a list of names of certain

12 foreign persons -- including businesses, research institutions,

13 government and private organizations, individuals, and other types of

14 legal persons -- that were subject to specific license requirements

15 for the export, re-export and/or in-country transfer of specified

16 items.  These persons comprised the DOC's "Entity List," which was

17 found at Title 15, Code of Federal Regulations, Part 744, Supplement

18 No. 4.  Grounds for inclusion on the Entity List included activities

19 sanctioned by the U.S. State Department and activities contrary to

20 U.S. national security and/or foreign policy interests.  The persons

21 on the Entity List were subject to export licensing requirements and

22 policies supplemental to those found elsewhere in the EAR.

23     5.  Through the EAR, the Department of Commerce ("DOC") imposed

24 license or other requirements before an item (that is, commodities,

25 software, and technology) subject to the EAR could be lawfully

26 exported from the United States or lawfully re-exported from another

27 country.  Items that "are subject to the EAR" included all items in

28 the United States and all U.S.-origin items wherever located,

irrespective of whether a license was required for the export of that item (with certain exceptions described below).  Activities of U.S. or foreign persons prohibited by any order issued under the EAR were also "subject to the EAR."  Items not subject to the EAR were items exclusively controlled for export by other federal agencies and other specified items not relevant here.

6.   The DOC, through the U.S. Census Bureau ("Census") required the filing of electronic export information ("EEI") through the Automated Export System ("AES") pursuant to Title 13, United States Code, Section 305; the EAR; and the Foreign Trade Regulations ("FTR"), Title 15, Code of Federal Regulations, Part 30.  The purpose of these requirements was to strengthen the United States government's ability to prevent the export of certain items to unauthorized destinations and end-users because the AES aids in targeting, identifying, and when necessary confiscating suspicious or illegal shipments prior to exportation.  15 C.F.R. § 30.1(b).  With exceptions not relevant to the exports at issue in this Indictment, EEI was required to be filed for, among other things, the export of commodities valued over $2,500 per the Harmonized Tariff Schedule of the United States of America ("HTSUSA") commodity classification code.  EEI was required to contain, among other things:  the names and addresses of the parties to the transaction; and the description, quantity, and value of the items exported.  15 C.F.R. § 30.6(a).

Defendants and Related Entities

7.   Defendant YI-CHI SHIH, also known as ("aka") "Yichi Shih," aka "Yuqi Shi" ("defendant SHIH"), a dual citizen of Taiwan and the United States, who resided in the Central District of California and

1  in foreign locations including China, was an electrical engineer and

2  former employee of United States defense contractors.

3      8.   Defendant ISHIANG SHIH, aka "I-Shiang Shih" ("defendant

4  ISHIANG"), a native of Taiwan and a citizen of Canada, was an

5  electrical engineer and a professor at Canadian University A.

6  Defendants SHIH and ISHIANG were brothers.

7      9.   Defendant KIET ANH MAI ("defendant MAI"), a United States

8  citizen, who resided in the Central District of California, was an

9  electrical engineer and former employee of a United States defense

10  contractor.

11     10.   Chengdu Gastone Technology Co., Ltd., aka Chengdu Jiashi

12  Technology Company, Ltd. ("CGTC"), was a Chinese entity that

13  established, in Chengdu, China, a semiconductor fabrication plant

14  (also called a foundry or a "fab") in which Monolithic Microwave

15  Integrated Circuits ("MMICs"), a type of integrated circuit ("IC")

16  device, would be manufactured.  From approximately 2011 through at

17  least 2016, defendant SHIH was compensated for his work with CGTC;

18  his positions at CGTC included President and Technical Consultant.

19  Defendant ISHIANG's positions at CGTC included Technical Director.

20  On August 1, 2014, BIS placed CGTC on its Entity List due to its

21  involvement in activities contrary to the national security and

22  foreign policy interest of the United States -- specifically, that it

23  had been involved in the illicit procurement of commodities and

24  technologies for unauthorized military end use in China.  CGTC has

25  remained on the Entity List continuously since August 1, 2014.  As a

26  result of its placement on the Entity List, a license from BIS was

27  required to export, reexport, or transfer (in-country) any item

28  (that is, commodities, software, and technology) subject to the EAR

1  to CGTC, and there was a presumption of denial of a license.  See 79

2  FR 44681, 44684, 8/1/2014; 15 CFR § 744.11.

3      11.  Pullman Lane Productions, LLC ("PULLMAN LANE") was a

4  California limited liability company.  Defendant SHIH held a 90%

5  interest in PULLMAN LANE and was its Manager.  PULLMAN LANE had two

6  U.S. bank accounts; defendant SHIH was an authorized signer on both

7  accounts.  From 2010 to the present, both before and after CGTC was

8  placed on Entity List, the PULLMAN LANE U.S. bank accounts received

9  substantial international wire transfers (up to $1,000,000) from

10  foreign companies, including one located in China that has also been

11  on the Entity List since August 2014.

12      12.  JYS Technologies, Inc. ("JYS TECH") was a Canadian

13  corporation, located in Brossard, Quebec, Canada.  Defendant ISHIANG

14  was its Vice President and one of its Directors.  JYS TECH had a

15  Canadian bank account that was controlled by defendant ISHIANG.  Both

16  before and after CGTC was placed on the Entity List, the JYS TECH

17  bank account wire-transferred substantial funds to the PULLMAN LANE

18  and MICROEX bank accounts.

19      13.  Microex Engineering ("MICROEX") was a dba of

20  L2Kontemporary, Inc., a California corporation.  Defendant MAI was

21  the Chief Executive Officer of MICROEX and L2Kontemporary, Inc.

22  MICROEX had a U.S. bank account; defendant MAI was an authorized

23  signer on the account.  At no time was defendant SHIH an employee or

24  agent or otherwise affiliated with MICROEX.  Both before and after

25  CGTC was placed on the Entity List, the MICROEX bank account received

26  substantial payments from bank accounts held by PULLMAN LANE and JYS

27  Technologies, Inc.

28

6

14.   U.S. Company B was a U.S. company located in the United States in a state other than California that offered foundry services for the custom design and manufacture of MMICs, including GaN (Gallium Nitrade) MMICs.

15.   U.S. University A is located within the Central District of California.

The Grand Jury incorporates by reference and re-alleges these Introductory Allegations into each and every count of this Indictment as though fully alleged therein.

COUNT ONE

[50 U.S.C. § 1705(a), (c);

15 C.F.R. §§ 742.4, 744.16, 758.1, 764.2]

A.   OBJECT OF THE CONSPIRACY

Beginning on a date unknown, but no later than in or about January 2010, and continuing to a date unknown, but no earlier than on or about January 2016, in Los Angeles County, within the Central District of California, and elsewhere, defendant YI-CHI SHIH, also known as ("aka") "Yichi Shih," aka "Yuqi Shi" ("defendant SHIH"), and defendant ISHIANG SHIH, aka "I-Shiang Shih" ("defendant ISHIANG") and defendant KIET ANH MAI ("defendant MAI"), and others known and unknown to the Grand Jury, knowingly and willfully conspired and agreed with each other to export items from the United States to the People's Republic of China ("PRC") and to Chengdu Gastone Technology Co., Ltd., aka Chengdu Jiashi Technology Company, Ltd. ("CGTC"), without having first obtained the required licenses from the United States Department of Commerce and without filing Electronic Export Information ("EEI") through the Automated Export System ("AES").

B.   MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE
     ACCOMPLISHED

The object of the conspiracy was to be accomplished in the manner and by the means described below, among others:

1.   Defendants SHIH and ISHIANG agreed to develop a semiconductor foundry in the PRC in which MMICs having military applications would be manufactured.

2.   Defendant SHIH agreed with defendant MAI to obtain MMICs from U.S. Company B for export to the PRC.

3.     Defendant MAI would make arrangements with U.S. Company B to obtain U.S. Company B's foundry services and MMICs.

4.     To obtain access to U.S. Company B's foundry services and to obtain the MMICs, defendant SHIH would cause defendant MAI to make, and defendant MAI would make, false statements to U.S. Company B about the ultimate end user and country destination of the MMICs.

5.     Defendant MAI would provide defendant SHIH with access to U.S. Company B's foundry services without U.S. Company B's knowledge or authorization.

6.     Using U.S. Company B's foundry services, defendant SHIH would design the integrated circuits for the MMICs.

7.     Defendant MAI would cause MICROEX to pay U.S. Company B for the foundry services and MMICs.

8.     Defendants SHIH and ISHIANG would cause PULLMAN LANE and JYS TECH to pay defendant MAI for the payments MICROEX made to U.S. Company B.

9.     Defendant MAI would receive the shipments of the MMICs from U.S. Company B and provide them to defendant SHIH directly or through Person 6.

10.    Defendant SHIH would cause the MMICs to be shipped from the Central District of California to an address in Hong Kong intending that the MMICs be transported to the PRC.

11.    Defendant SHIH would also cause the MMICs to be provided to U.S. University A for testing for the purpose of providing technology to CGTC.

12.    Defendant SHIH would also cause the MMICs to be shipped from the Central District of California to defendant ISHIANG in Canada for the purpose of providing technology to CGTC.

13.   To obtain the MMICs and export them from the United States to the PRC, defendant SHIH would make and cause to be made false statements to shipping companies about the value and description of the MMICs.

14.   At no time did defendants SHIH, ISHIANG, or MAI, or anyone associated with them, either individually or through MICROEX, PULLMAN LANE, CGTC, or JYS TECH, apply for or obtain an export license from the United States Department of Commerce authorizing the export of the MMICs to the PRC or authorizing the export of technology relating to the MMICs to CGTC.

15.   At no time did defendants SHIH, ISHIANG, or MAI or anyone associated with them, either individually or through MICROEX, PULLMAN LANE, CGTC, or JYS TECH, file EEI through AES for the shipment of the MMICs.

16.   As referenced in this Indictment, defendants SHIH, ISHIANG, and MAI often used electronic mail ("e-mail") to communicate, in the English and Chinese languages, with each other and with other persons.  All direct quotations from e-mails referenced herein are as they appeared in the e-mails in the English language, including any misspellings, and are related in pertinent part.

C.   OVERT ACTS

In furtherance of the conspiracy and to accomplish the object of the conspiracy, defendants SHIH, ISHIANG, and MAI, and others known and unknown to the Grand Jury, committed the following overt acts, among others, within the Central District of California, and elsewhere.

Overt Act #1:  On or about January 27, 2010, defendant ISHIANG sent an e-mail to defendant SHIH that contained two attachments:

(1) the DOC Entity List, dated 1/13/10, and (2) a document titled "Q&As on the Bureau of Industry and Security's China Policy Rule," that discussed, among other topics, export-controlled technologies, questions on "military end-use," and descriptions of major weapons systems and policy review for national security export-controlled items.

Overt Act #2:  On or about February 23, 2010, defendant SHIH sent an e-mail to Person 3 attached to which were documents describing equipment used in the manufacture of MMICs.

Overt Act #3:  On or about June 18, 2010, defendant SHIH signed a check transferring from one PULLMAN LANE bank account to another, $1,000,000 received four days earlier from a Bank of China account held by Qing'an International Trading Co., Ltd., No. 27, Xiaoyun Rd, Beijing, China.

Overt Act #4:  On or about July 22, 2010, defendant ISHIANG caused $239,990 to be wire-transferred from a JYS TECH bank account in Canada to a PULLMAN LANE bank account.

Overt Act #5:  On or about April 7, 2011, defendant ISHIANG caused $199,990 to be wire-transferred from a JYS TECH bank account in Canada to a PULLMAN LANE bank account.

Overt Act #6:  On or about November 10, 2011, defendant ISHIANG caused $199,990 to be wire-transferred from a JYS TECH bank account in Canada to a PULLMAN LANE bank account.

Overt Act #7:  On or about March 5, 2012, defendant SHIH caused a PULLMAN LANE bank account to wire-transfer $500,000 to a JYS TECH bank account in Canada.

Overt Act #8:  On or about April 6, 2012, defendant SHIH sent an e-mail to a family member stating, "My cell phone in China is [number

1  deleted] and Ishiang's is [number deleted].  Also attached is a copy
2  of our business paln [sic] for the project . . . We will be in
3  Chengdu until later part of April.  Please ask your friend to contact
4  us."  Attached to the e-mail was a power point presentation; in the
5  corner of every page was: "Ishiang Shih and Yi-Chi Shih."  The
6  presentation was a business plan for the development of a
7  semiconductor foundry in the PRC to manufacture MMICs.  U.S. Company
8  B and other U.S. companies were referenced in the presentation on a
9  page titled "GaN Device Technology Comparison."

10      Overt Act #9:  On or about May 11, 2012, defendant SHIH caused a
11 PULLMAN LANE bank account to wire-transfer $260,000 to a JYS TECH
12 bank account in Canada.

13      Overt Act #10:  On or about May 30, 2012, defendant ISHIANG sent
14 an e-mail to defendant SHIH, attaching a presentation titled
15 "Development of GaN HEMT for MMICs" that provided engineering data on
16 the performance of GaN devices and listed data on GaN devices from
17 U.S. Company B.

18      Overt Act #11:  On or about June 30, 2012, defendant ISHIANG
19 sent an e-mail to defendant SHIH, attaching a presentation dated 2011
20 titled "GaN Foundry" that provided engineering data on the
21 performance of GaN devices from U.S. companies and included a list of
22 U.S. companies with a GaN foundry, including U.S. Company B.  The
23 header on each page of the presentation was  "CHENGDU GASTONE
24 TECHNOLOGY CO., LTD" (written in English and Chinese).

25      Overt Act #12:  On or about August 21, 2012, defendant ISHIANG
26 sent an e-mail to defendant SHIH attaching a presentation titled "A
27 brief summary on GaN activities."  The presentation included a

28

reference to the SiC (Silicon Carbide) and GaN MMIC foundry services of U.S. Company B.

Overt Act #13:  On or about February 15, 2013, defendant MAI, using a MICROEX e-mail address, sent an e-mail to U.S. Company B, with the subject "Foundry service," stating "I'm interested in the Full-Wafer Service for GaN, 0.25um process.  Please send documents to: Kiet Mai, President, MicroEx Engineering."

Overt Act #14:  On or about February 15, 2013, defendant MAI sent an e-mail to defendant SHIH, stating "Please answer the attached for me, I don't want to make any mistakes."  Attached to the e-mail was a "[U.S. Company B] Export Compliance Questionnaire" that defendant MAI had received from U.S. Company B in response to the e-mail described in Overt Act #13.

Overt Act #15:  On or about February 15, 2013, defendant SHIH sent an e-mail to defendant MAI, attaching the completed U.S. Company B Export Compliance Questionnaire.  The space provided for a "no" response was checked in response to questions as to whether the product would be subject to "U.S. export control regulations, specifically EAR and ITAR."  (The International Traffic in Arms Regulations ("ITAR"), are the implementing regulations for the Arms Export Control Act ("AECA"), and regulate the export of United States defense articles and services.)

Overt Act #16:  On or about February 18, 2013, defendant MAI, using a MICROEX e-mail address, e-mailed U.S. Company B and returned the completed U.S Company B Export Questionnaire.  In the U.S Company B Export Questionnaire, the frequency of the MMICs to be designed and manufactured was listed as "up to 18 GHz."

Overt Act #17:  On or about February 18, 2013, defendant MAI, using a MICROEX e-mail address, sent an e-mail to U.S. Company B answering "yes," in response to the question, "Will your company be doing the design, testing and use of the MMIC's?"

Overt Act #18:  On or about March 19, 2013, defendant MAI sent an e-mail to defendant SHIH advising him that defendant MAI would forward to defendant SHIH the information he had received from U.S. Company B and stating further, "The only issues would be end user and itar and you already are aware of those."

Overt Act #19:  On or about March 19, 2013, defendant MAI sent an e-mail to defendant SHIH, stating "Here's design access," that provided to defendant SHIH the internet address for the design portal on U.S. Company B's computer, as well as the user name and password necessary to access that design portal.

Overt Act #20:  On or about August 29, 2013, defendant MAI sent an e-mail to defendant SHIH informing defendant SHIH that U.S. Company B wanted to know when they would place a purchase order, and that defendant MAI told U.S. Company B, "we're finalizing the layout and [would] get back to them early next week."

Overt Act #21:  On or about August 29, 2013, defendant SHIH sent an e-mail to defendant MAI, responding to the e-mail in Overt Act #20, writing, "Good answer!  We do plan to release the PO [purchase order] next week."

Overt Act #22:  On or about September 3, 2013, defendant MAI e-mailed U.S. Company B, attaching a purchase order from MICROEX that listed payment milestones totaling $130,000 for "Delivery of 4 good wafers [MMICs]."

1    Overt Act #23:  On or about September 6, 2013, defendant MAI
2    caused a MICROEX invoice to be issued that billed PULLMAN LANE for
3    milestone payment 1 -- $28,750 -- for the "NPN, Wideband, High Power
4    GaN MMIC Design, Analysis, Layout & Test Support" provided by U.S.
5    Company B.
6        Overt Act #24:  On or about September 9, 2013, defendant SHIH
7    caused a check to be issued, written on a PULLMAN LANE bank account,
8    in the amount of $28,750, made payable to MICROEX.
9        Overt Act #25:  On or about September 11, 2013, defendant MAI
10   caused a check to be issued, written on a MICROEX bank account, in
11   the amount of $25,000, made payable to U.S. Company B.
12       Overt Act #26:  On or about November 22, 2013, defendant MAI
13   caused a MICROEX invoice to be issued that billed PULLMAN LANE for a
14   milestone payment -- $40,250 -- for the "NPN, Wideband, High Power
15   GaN MMIC Design, Analysis, Layout & Test Support" provided by U.S.
16   Company B.
17       Overt Act #27:  On or about November 22, 2013, defendant SHIH
18   caused a check to be issued, written on a PULLMAN LANE bank account,
19   in the amount of $41,228, made payable to MICROEX.
20       Overt Act #28:  On or about December 2, 2013, defendant MAI
21   caused a check to be issued, written on a MICROEX bank account, in
22   the amount of $35,000, made payable to U.S. Company B.
23       Overt Act #29:  On or about December 6, 2013, defendant MAI
24   caused a MICROEX invoice to be issued that billed PULLMAN LANE for
25   milestone payment 3 -- $69,000 -- for the "NPN, Wideband, High Power
26   GaN MMIC Design, Analysis, Layout & Test Support" provided by U.S.
27   Company B.
28

Overt Act #30:  On or about December 11, 2013, defendant SHIH caused a check to be issued, written on a PULLMAN LANE bank account, in the amount of $69,000, made payable to MICROEX.

Overt Act #31:  On or about December 16, 2013, defendant MAI sent an e-mail to defendant SHIH informing defendant SHIH that U.S. Company B wanted the last invoice paid before shipping the MMICs, and that defendant MAI would send defendant SHIH the final invoice as soon as defendant MAI received U.S. Company B's invoice.

Overt Act #32:  On or about December 17, 2013, defendant MAI caused a MICROEX invoice to be issued that billed PULLMAN LANE for milestone payment 4 -- $11,500 -- for the "NPN, Wideband, High Power GaN MMIC Design, Analysis, Layout & Test Support" provided by U.S. Company B.

Overt Act #33:  On or about December 18, 2013, defendant MAI sent an e-mail to defendant SHIH informing defendant SHIH, "I remitted payment for the final invoice today, [U.S. Company B] should receive it this week.  I'll check with them by the end of this week for the expected delivery of the wafers."

Overt Act #34:  On or about December 24, 2013, defendant MAI caused $70,000 to be wire-transferred to U.S. Company B.

Overt Act #35:  On or about December 27, 2013, defendant MAI sent an e-mail to defendant SHIH, writing "I have the wafers."

Overt Act #36:  On or about December 27, 2013, defendant SHIH sent an e-mail to defendant MAI, responding to the e-mail described above in Overt Act #35, writing, "Super.  I'm out of town.  I'll pick it up this weekend.  Thanks."

Overt Act #37:  On or about December 29, 2013, defendant SHIH caused a check to be issued, written on a PULLMAN LANE bank account, in the amount of $30,000, made payable to Person 3.

Overt Act #38:  On or about December 30, 2013, defendant SHIH caused a package containing the U.S. Company B MMICs to be shipped from Los Angeles, California, to Person 4 in Northern California, causing the package contents to be valued falsely as $100.00.

Overt Act #39:  On or about December 31, 2013, defendant SHIH sent an e-mail to Persons 3 and 5, with the subject, "RE: Package," writing, "A package was sent from LA should arrive today by FedEx tracking No.: 804546557495.  Please follow up."

Overt Act #40:  On or about January 2, 2014, defendant SHIH caused the package containing the U.S. Company B MMICs to be shipped from Northern California to a freight forwarding service in Hong Kong, and caused the content of the package to be described falsely as "Glass Sample," and the package contents to be valued falsely as "$100.00."

Overt Act #41:  On or about January 2, 2014, defendant SHIH caused a check to be issued, written on a PULLMAN LANE bank account, in the amount of $11,500, made payable to MICROEX.

Overt Act #42:  On or about January 4, 2014, defendant SHIH sent an e-mail to Person 3, with the subject "Re: Package," writing, "Please send me the tracking no.  To follow up."

Overt Act #43:  On an unknown date, defendant SHIH provided one of the U.S. Company B MMICs to a researcher at U.S. University A for testing.

Overt Act #44: On or about March 19, 2014, defendant SHIH sent an e-mail to defendant MAI, writing, "[T]he GaN MMIC's are still under evaluation. Some of them have good performance. We are looking [sic] potential customers for the Ku-band chips for satcom applications. Please ask [U.S. Company B] about the pricing for production wafers of the order of 30 to 60 wafers."

Overt Act #45: On or about March 19, 2014, defendant MAI sent an e-mail to defendant SHIH, writing, "In regard to [U.S. Company B], have you checked the ITAR on these parts due to high power?"

Overt Act #46: On or about June 16, 2014, defendant MAI, using a MICROEX e-mail address, sent an e-mail to U.S. Company B, writing, "We'd like to have another wafer run . . . . Please quote with new payment terms for a run same as last run."

Overt Act #47: On or about December 1, 2014, defendant MAI, using a MICROEX e-mail address, sent to U.S. Company B a purchase order from MICROEX, for a payment schedule by milestones of $130,000 total.

Overt Act #48: On or about December 1, 2014, defendant MAI, using a MICROEX e-mail address, answered an e-mail from U.S. Company B, asking "Will you be exporting any of the devices or wafers?" The answer provided by defendant MAI was "No not for export, we're doing development."

Overt Act #49: On or about December 1, 2014, defendant MAI, using a MICROEX e-mail address, sent an e-mail to U.S. Company B, advising that MICROEX would go with the full payment option, and attaching a revised purchase order from MICROEX, for a full payment of $117,000.

Overt Act #50: On or about December 1, 2014, defendant MAI caused a MICROEX invoice to be issued that billed JYS TECH for milestone payment 1 -- $120,000 -- for the "NPN, Wideband, High Power GaN MMIC Design, Analysis, Layout & Test Support" provided by U.S. Company B.

Overt Act #51: On or about December 2, 2014, defendant SHIH sent an e-mail to defendant ISHIANG, writing, "Please prepare to wire the payment of 117K to MicroEx, whose bank account is attached. . . . The funding for this project is being arranged to JYS, but may take some time.  I'll explain to you on the arrangement later."

Overt Act #52: On or about December 2, 2014, defendant ISHIANG sent an e-mail to defendant SHIH, writing, "I will arrange the payment soon."

Overt Act #53: On or about December 10, 2014, defendant MAI, using a MICROEX e-mail address, answered an e-mail from U.S. Company B, asking "Are any of the design[s] you are putting on this next mask subject to US ITAR export regulations?"  The answer provided by defendant MAI was "These are for research study and should not [sic] subject to ITAR."

Overt Act #54: On or about December 12, 2014, defendant ISHIANG caused $120,000 to be wire-transferred from a JYS TECH bank account to a MICROEX bank account.

Overt Act #55: On or about December 17, 2014, defendant MAI caused $117,000 to be wire-transferred to U.S. Company B.

Overt Act #56: On or about December 31, 2014, defendant SHIH sent an e-mail to the Vice-President of CGTC discussing an attached revised proposed business plan, and stating, "We should focus on these tasks for now while we do the detailed planning for

establishing GaStone Technology to be a strong foundry like WIN or [initials of a U.S. company]."

Overt Act #57:  On or about January 12, 2015, defendant SHIH received from a researcher at U.S. University A a copy of a 30-page report summarizing testing conducted on a U.S. Company B GaN MMIC, that defendant SHIH caused to be done.

Overt Act #58:  On or about March 17, 2015, defendant SHIH sent an e-mail to Person 6, with the subject "Package," writing, "I need your help to pick up a package from [defendant MAI] this coming Friday or Saturday, as soon as it arrives. . . . After that, we need to take one out of four pieces and pack it separately for delivery. . . . We'll talk over FaceTime to go through the details when you have the package ready."

Overt Act #59:  On or about March 18, 2015, defendant SHIH sent an e-mail to defendant MAI, telling him to call Person 6 to pick up the package for defendant SHIH when it arrived.

Overt Act #60:  On or about March 23, 2015, defendant MAI sent an e-mail to defendant SHIH, writing "I left [Person 6] voice and text messages for picking up the wafers, which arrived today."

Overt Act #61:  On or about March 23, 2015, defendant MAI caused a MICROEX invoice to be issued that billed JYS TECH for the final payment -- $14,550 -- for the "NPN, Wideband, High Power GaN MMIC Design, Analysis, Layout & Test Support" provided by U.S. Company B.

Overt Act #62:  On or about March 25, 2015, defendant MAI sent an e-mail to defendant SHIH, writing, "[Person 6] picked-up the wafers today, wafers' data/packing slip attached."  Attached to the e-mail was a U.S. Company B packing slip that listed 4 diced wafers: BU1823-11, HG0752-36, JE0628-20 and JH0727-45, valued at $9,000.

Overt Act #63: On or about April 6, 2015, defendant SHIH sent an e-mail to Person 6, instructing that the package should be sent to defendant ISHIANG, in Canada, and further, "indicate this is a glass sample for testing and evaluation purpose in the description box and declare a value of $50." Defendant SHIH instructed further, "get a box and some packaging materials in preparation for a second sample."

Overt Act #64: On or about April 14, 2015, defendant ISHIANG sent an e-mail to defendant SHIH advising that the sample for tests had been received.

Overt Act #65: On or about April 17, 2015, defendant MAI sent an e-mail to defendant SHIH asking whether JYS TECH would be sending the last payment to MICROEX soon for the U.S. Company B wafers, and attaching a MICROEX invoice to JYS TECH for $14,550.

Overt Act #66: On or about October 19, 2015, defendant SHIH caused to be issued a check, written on a PULLMAN LANE bank account, in the amount of $14,550, made payable to MICROEX.

Overt Act #67: On or about January 6, 2016, defendant SHIH sent an e-mail to the Vice-President of CGTC requesting compensation owed to him by CGTC.

Overt Act #68: On or about January 8, 2016, defendant SHIH sent an e-mail to the Vice-President of CGTC, advising that defendant SHIH "accept[ed] the amount for the portion paid directly by GaStone" and asking "Please make the payment at your earliest convenience."

COUNT TWO

[50 U.S.C. § 1705(a), (c); 18 U.S.C. § 2(b);

15 C.F.R. §§ 742.4, 764.2]

On or about December 30, 2013, to January 2, 2014, in Los Angeles County, within the Central District of California, and elsewhere, defendant YI-CHI SHIH, aka "Yichi Shih," aka "Yuqi Shi," knowingly and willfully attempted to export and caused to be exported from the United States to the People's Republic of China ("PRC"), items under the jurisdiction of the United States Department of Commerce, namely, Monolithic Microwave Integrated Circuit ("MMIC") Amplifiers, without first having obtained the required license from the United States Department of Commerce.

During the above-specified time period, the MMIC Amplifiers were controlled for national security reasons, and a license from the Department of Commerce was required under the EAR for the export or reexport of these items to the PRC.

COUNTS THREE THROUGH SIX

[18 U.S.C. § 1341]

A.   THE FRAUDULENT SCHEME

1.   Beginning on an unknown date but no later than February 15, 2013, and continuing through on or about an unknown date but no earlier than October 30, 2015, in Los Angeles County, within the Central District of California and elsewhere, defendants YI-CHI SHIH, also known as ("aka") "Yichi Shih," aka "Yuqi Shi" ("defendant SHIH"), and KIET ANH MAI ("defendant MAI"), together with others known and unknown to the Grand Jury, knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud U.S. Company B as to material matters, and to obtain money and property from U.S. Company B by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

B.   MEANS TO ACCOMPLISH THE FRAUDULENT SCHEME

2.   The fraudulent scheme was carried out, in substance, as follows:

a.   Defendant SHIH would seek U.S. Company B's MMIC design technology to aid in CGTC's establishment of a foundry in China where MMICs would be designed and manufactured.

b.   With defendant SHIH's knowledge and agreement, defendant MAI would contact U.S. Company B and knowingly represent falsely that defendant MAI's company, MICROEX, was interested in purchasing U.S. Company B's MMIC design service, and that the resulting MMICs would remain in the United States and not be exported.

c.     With defendant SHIH's knowledge and agreement, defendant MAI would also knowingly falsely agree in writing to comply with all of U.S. Company B's contractual requirements for the protection of its proprietary technology in order to gain access to U.S. Company B's design portal.

d.     With defendant SHIH's knowledge and agreement, defendant MAI would, contrary to his written contract with U.S. Company B, knowingly provide to defendant SHIH the user name and password that U.S. Company B provided to defendant MAI alone pursuant to the written contract.

e.     With defendant MAI's knowledge and agreement, defendant SHIH would, without authorization, knowingly access the design portal in U.S. Company B's computer, using the user name and password provided to him by defendant MAI.

f.     With defendant MAI's knowledge and agreement, defendant SHIH would complete the design for the MMICs by knowingly accessing without authorization the design portal, and U.S. Company B would manufacture the MMICs as designed by defendant SHIH.

g.     With defendant SHIH's knowledge and agreement, defendant MAI would knowingly cause U.S. Company B to ship the manufactured MMICs to defendant MAI, and defendant MAI would then knowingly provide the MMICs to defendant SHIH.

h.     Defendant SHIH would knowingly cause at least one of the MMICs to be shipped to Hong Kong, knowing it would be transported from there to China, and at least one of the MMICs to be shipped to Canada, and defendant SHIH would knowingly cause false statements about the description and value of the MMICs to be made on the airway bills for these shipments.

1        i.   Defendant MAI, through MICROEX, would knowingly pay
2   U.S. Company B for the design service and the MMICs, and defendant
3   SHIH would knowingly cause PULLMAN LANE and JYS TECH to repay
4   defendant MAI for the cost of the design service and the MMICs, plus
5   additional money to compensate defendant MAI for his role in the
6   transactions.

7        3.   At the time defendants SHIH and MAI knowingly made and
8   caused the above-described material false and fraudulent pretenses,
9   representations, and promises, and concealed and omitted and caused
10  to be concealed and omitted material facts as set forth above,
11  defendants SHIH and MAI knew that the material pretences,
12  representations, and promises were false, that material information
13  was concealed and omitted, and that their acts and omissions were
14  fraudulent and deceptive.

15       4.   The above-described false and fraudulent pretenses,
16  representations, and promises, and concealment and omissions made by
17  and caused by defendants SHIH and MAI were material because if U.S.
18  Company B had known that defendant MAI intended to provide defendant
19  SHIH access to its MMIC design portal in its computer, and that the
20  resulting MMICs would not remain in the United States, it would not
21  have done one or more of the following: allowed defendant MAI to
22  access its design portal; provided defendant MAI its design services;
23  or allowed defendant MAI to purchase the resulting MMICs.

24  D.   RESULTS OF THE FRAUDULENT SCHEME

25       5.   As a result of the fraudulent scheme, CGTC was able to
26  obtain access to U.S. Company B's proprietary technology to use in
27  establishing a MMIC foundry in China, which caused U.S. Company B to

28

1  lose future profits and a commercial advantage over foreign-based
2  competitors.

3  E.   THE USE OF THE MAIL TO EXECUTE THE FRAUDULENT SCHEME

4       6.   On or about the dates set forth below, defendants SHIH and
5  MAI, together with others known and unknown to the Grand Jury, for
6  the purpose of executing and attempting to execute the above
7  described scheme to defraud, caused to be deposited the following
8  items to be sent and delivered by a commercial interstate carrier
9  according to the directions thereon:

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| THREE | 12/26/13 | 4 MMICs from U.S. Company B to Torrance, California via FedEx |
| FOUR | 1/2/14 | At least 1 MMIC from California to Hong Kong via DHL Express |
| FIVE | 3/20/15 | 4 MMICs from U.S. Company B to Torrance, California via FedEx |
| SIX | 4/6/15 | At least 1 MMIC from California to Canada via UPS |

COUNTS SEVEN THROUGH EIGHT

[18 U.S.C. §§ 1343, 2(b)]

The Grand Jury incorporates by reference and re-alleges the allegations in Counts Three through Six, Sections A through D, into Counts Seven through Eight as though fully alleged therein.

THE USE OF INTERSTATE WIRES

On or about the dates set forth below, defendants YI-CHI SHIH, also known as ("aka") "Yichi Shih," aka "Yuqi Shi" ("defendant SHIH"), and KIET ANH MAI ("defendant MAI"), together with others known and unknown to the Grand Jury, for the purpose of executing and attempting to execute the above described scheme to defraud, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below for each count:

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| SEVEN | 12/24/13 | a wire transfer of $70,000, from a Morgan Stanley account number ending in -053 to a U.S. Company B bank account |
| EIGHT | 12/17/14 | a wire transfer of $117,000, from a Morgan Stanley account number ending in -361 to a U.S. Company B bank account |

COUNT NINE

[18 U.S.C. § 371; 18 U.S.C. § 1030(a)(2)(C), (c)(2)(B)(i)-(iii)]

A.   THE OBJECT OF THE CONSPIRACY

1.   Beginning on an unknown date but no later than February 15, 2013, and continuing through on or about an unknown date but no earlier than October 19, 2015, in Los Angeles County, within the Central District of California and elsewhere, defendants YI-CHI SHIH, also known as ("aka") "Yichi Shih," aka "Yuqi Shi" ("defendant SHIH"), and KIET ANH MAI ("defendant MAI"), together with others known and unknown to the Grand Jury, knowingly combined, conspired, and agreed to intentionally access without authorization a protected computer as that term is defined in Title 18, United States Code, Section 1030(e)(2)(B), and thereby obtain information (1) for purposes of commercial advantage and private financial gain, (2) in furtherance of a criminal act in violation of United States laws, namely, violations of the International Emergency Economic Powers Act, mail fraud, and wire fraud, and (3) the value of which information exceeded $5,000, all in violation of Title 18, United States Code, Section 1030(a)(2)(C) and (c)(2)(B)(i)-(iii).

B.   THE MANNER AND MEANS OF THE CONSPIRACY

2.   The object of the conspiracy was carried out, and to be carried out, in substance, as follows:

a.   Defendant MAI would, by misrepresentations and concealment of material facts, obtain from U.S. Company B confidential information, including a unique user identification and password, that enabled defendant MAI to access a computer owned by U.S. Company B that contained U.S. Company B's proprietary information.

28

1          b.   Defendant MAI would provide this unique user

2   identification and password to defendant SHIH to enable defendant

3   SHIH to access a computer owned by U.S. Company B that contained U.S.

4   Company B's information without U.S. Company B's knowledge or

5   authorization.

6          c.   Defendant SHIH would, without authorization, access a

7   computer owned by U.S. Company B and obtain U.S. Company B's

8   information.

9   C.   OVERT ACTS

10       3.   In furtherance of the conspiracy, and to accomplish its

11  object, defendants SHIH and MAI, together with others known and

12  unknown to the Grand Jury, committed the following overt acts, among

13  others, in the Central District of California and elsewhere:

14       Overt Act #1:   On or about February 15, 2013, defendant MAI,

15  using a MICROEX e-mail address, sent an e-mail to U.S. Company B,

16  with the subject "Foundry service," stating "I'm interested in the

17  Full-Wafer Service for GaN, 0.25um process.   Please send documents

18  to: Kiet Mai, President, MicroEx Engineering."

19       Overt Act #2:   On or about February 15, 2013, defendant MAI,

20  sent an e-mail to defendant SHIH, stating "Please answer the attached

21  for me, I don't want to make any mistakes."   Attached to the e-mail

22  was a "[U.S. Company B] Export Compliance Questionnaire" that

23  defendant MAI had received from U.S. Company B in response to the e-

24  mail described in Overt Act #1.

25       Overt Act #3:   On or about February 15, 2013, defendant SHIH

26  sent an e-mail to defendant MAI, attaching the completed U.S. Company

27  B Export Compliance Questionnaire.   The space provided for a "no"

28  response was checked in response to questions as to whether the

1  product would be subject to "U.S. export control regulations,
2  specifically EAR and ITAR."

3      <u>Overt Act #4</u>:  On or abour February 18, 2013, defendant MAI
4  signed U.S. Company B's Process Design Kit ("PDK") on behalf of
5  MICROEX as the customer.  The PDK covered, among other things, the
6  license and restrictions on use, export and import requirements, and
7  written assurances, that included, among other conditions, that
8  "Customer's rights may not be transferred, leased, assigned, or
9  sublicensed to any other party.  Customer may not allow any other
10  party to use the Licensed Program."

11      <u>Overt Act #5</u>:  On or about February 18, 2013, defendant MAI,
12  using a MICROEX e-mail address, e-mailed U.S. Company B and returned
13  the completed U.S Company B Export Questionnaire and the signed PDK.

14      <u>Overt Act #6</u>:  On or about February 18, 2013, defendant MAI,
15  using a MICROEX e-mail address, sent an e-mail to U.S. Company B
16  answering "yes," in response to the question, "Will your company be
17  doing the design, testing and use of the MMIC's?"

18      <u>Overt Act #7</u>:  On or about March 19, 2013, defendant MAI, sent
19  an e-mail to defendant SHIH advising him that defendant MAI would
20  forward to defendant SHIH the information he had received from U.S.
21  Company B and stating further, "The only issues would be end user and
22  itar and you already are aware of those."

23      <u>Overt Act #7</u>:  On or about March 19, 2013, defendant MAI sent an
24  e-mail to SHIH, stating "Here's design access," that provided to
25  defendant SHIH the internet address for the design portal on U.S.
26  Company B's computer, as well as the user name and password necessary
27  to access that design portal.

28

Overt Act #8:  Between March 19, 2013 and March 18, 2015, defendant SHIH accessed, without authorization, U.S. Company's B's protected computer.

Overt Act #9:  On or about August 29, 2013, defendant MAI sent an e-mail to defendant SHIH informing SHIH that U.S. Company B wanted to know when they would place a purchase order, and that defendant MAI told U.S. Company B, "we're finalizing the layout and [would] get back to them early next week."

Overt Act #10:  On or about August 29, 2013, defendant SHIH sent an e-mail to defendant MAI responding to the e-mail in Overt Act #8, writing, "Good answer!  We do plan to release the PO [purchase order] next week."

Overt Act #11:  On or about September 4, 2013, defendant MAI e-mailed U.S. Company B, attaching a purchase order from MICROEX that listed payment milestones totaling $130,000 for "Delivery of 4 good wafers [MMICs]."

Overt Act #12:  On or about September 6, 2013, defendant MAI caused a MICROEX invoice to be issued that billed PULLMAN LANE for milestone payment 1 -- $28,750 -- for the "NPN, Wideband, High Power GaN MMIC Design, Analysis, Layout & Test Support" provided by U.S. Company B.

Overt Act #13:  On or about September 10, 2013, defendant SHIH caused a check to be issued, written on a PULLMAN LANE bank account, in the amount of $28,750, made payable to MICROEX.

Overt Act #14:  On or about September 11, 2013, defendant MAI caused a check to be issued, written on a MICROEX bank account, in the amount of $25,000, made payable to U.S. Company B.

Overt Act #15:  On or about November 22, 2013, defendant MAI caused a MICROEX invoice to be issued that billed PULLMAN LANE for a milestone payment -- $40,250 -- for the "NPN, Wideband, High Power GaN MMIC Design, Analysis, Layout & Test Support" provided by U.S. Company B.

Overt Act #16:  On or about November 22, 2013, defendant SHIH caused a check to be issued, written on a PULLMAN LANE bank account, in the amount of $41,228, made payable to MICROEX.

Overt Act #17:  On or about December 2, 2013, defendant MAI caused a check to be issued, written on a MICROEX bank account, in the amount of $35,000, made payable to U.S. Company B.

Overt Act #18:  On or about December 6, 2013, defendant MAI caused a MICROEX invoice to be issued that billed PULLMAN LANE for milestone payment 3 -- $69,000 -- for the "NPN, Wideband, High Power GaN MMIC Design, Analysis, Layout & Test Support" provided by U.S. Company B.

Overt Act #19:  On or about December 11, 2013, defendant SHIH caused a check to be issued, written on a PULLMAN LANE bank account, in the amount of $69,000, made payable to MICROEX.

Overt Act #20:  On or about December 16, 2013, defendant MAI sent an e-mail to defendant SHIH informing defendant SHIH that U.S. Company B wanted the last invoice paid before shipping the MMICs, and that defendant MAI would send defendant SHIH the final invoice as soon as defendant MAI received U.S. Company B's invoice.

Overt Act #21:  On or about December 17, 2013, defendant MAI caused a MICROEX invoice to be issued that billed PULLMAN LANE for milestone payment 4 -- $11,500 -- for the "NPN, Wideband, High Power

GaN MMIC Design, Analysis, Layout & Test Support" provided by U.S. Company B.

Overt Act #22:  On or about December 18, 2013, defendant MAI sent an e-mail to defendant SHIH informing defendant SHIH, "I remitted payment for the final invoice today, [U.S. Company B] should receive it this week.  I'll check with them by the end of this week for the expected delivery of the wafers."

Overt Act #23:  On or about December 24, 2013, defendant MAI caused $70,000 to be wire-transferred to U.S. Company B.

Overt Act #24:  On or about December 27, 2013, defendant MAI sent an e-mail to defendant SHIH, writing "I have the wafers."

Overt Act #25:  On or about December 27, 2013, defendant SHIH sent an e-mail to defendant MAI responding to the e-mail described above in Overt Act #24, writing, "Super.  I'm out of town.  I'll pick it up this weekend.  Thanks."

Overt Act #26:  On or about January 3, 2014, defendant SHIH caused a check to be issued, written on a PULLMAN LANE bank account, in the amount of $11,500, made payable to MICROEX.

Overt Act #27:  On or about March 19, 2014, defendant SHIH sent an e-mail to defendant MAI, writing, "[T]he GaN MMIC's are still under evaluation.  Some of them have good performance.  We are looking [sic] potential customers for the Ku-band chips for satcom applications.  Please ask [U.S. Company B] about the pricing for production wafers of the order of 30 to 60 wafers."

Overt Act #28:  On or about March 20, 2014, defendant MAI sent an e-mail to defendant SHIH, writing, "In regard to [U.S. Company B], have you checked the ITAR on these parts due to high power?"

Overt Act #29:  On or about June 16, 2014, defendant MAI, using a MICROEX e-mail address, sent an e-mail to U.S. Company B, writing, "We'd like to have another wafer run . . . . Please quote with new payment terms for a run same as last run."

Overt Act #30:  On or about December 1, 2014, defendant MAI, using a MICROEX e-mail address, sent to U.S. Company B a purchase order from MICROEX, for a payment schedule by milestones of $130,000 total.

Overt Act #31:  On or about December 1, 2014, defendant MAI, using a MICROEX e-mail address, answered an e-mail from U.S. Company B, asking "Will you be exporting any of the devices or wafers?"  The answer provided by defendant MAI was "No not for export, we're doing development."

Overt Act #32:  On or about December 1, 2014, defendant MAI, using a MICROEX e-mail address, sent an e-mail to U.S. Company B, advising that MICROEX would go with the full payment option, and attaching a revised purchase order from MICROEX, for a full payment of $117,000.

Overt Act #33:  On or about December 1, 2014, defendant MAI, caused a MICROEX invoice to be issued that billed JYS TECH for milestone payment 1 -- $120,000 -- for the "NPN, Wideband, High Power GaN MMIC Design, Analysis, Layout & Test Support" provided by U.S. Company B.

Overt Act #34:  On or about December 10, 2014, defendant MAI, using a MICROEX e-mail address, answered an e-mail from U.S. Company B, asking "Are any of the design[s] you are putting on this next mask subject to US ITAR export regulations?"  The answer provided by

defendant MAI was "These are for research study and should not [sic] subject to ITAR."

Overt Act #35:  On or about December 17, 2014, defendant MAI caused $117,000 to be wire-transferred to U.S. Company B.

Overt Act #36:  On or about March 18, 2015, defendant SHIH sent an e-mail to defendant MAI, telling him to call Person 6 to pick up the package for defendant SHIH when it arrived.

Overt Act #37:  On or about March 23, 2015, defendant MAI, sent an e-mail to defendant SHIH, writing "I left [Person 6] voice and text messages for picking up the wafers, which arrived today."

Overt Act #38:  On or about March 23, 2015, defendant MAI, caused a MICROEX invoice to be issued that billed JYS TECH for the final payment -- $14,550 -- for the "NPN, Wideband, High Power GaN MMIC Design, Analysis, Layout & Test Support" provided by U.S. Company B.

Overt Act #39:  On or about March 25, 2015, defendant MAI, sent an e-mail to defendant SHIH, writing, "[Person 6] picked-up the wafers today, wafers' data/packing slip attached."  Attached to the e-mail was a U.S. Company B packing slip that listed 4 diced wafers: BU1823-11, HG0752-36, JE0628-20 and JH0727-45, valued at $9,000.

Overt Act #40:  On or about April 17, 2015, defendant MAI, sent an e-mail to defendant SHIH asking whether JYS TECH would be sending the last payment to MICROEX soon for the U.S. Company B wafers, and attaching a MICROEX invoice to JYS TECH for $14,550.

Overt Act #41:  On or about October 19, 2015, defendant SHIH caused to be issued a check, written on a PULLMAN LANE bank account, in the amount of $14,550, made payable to MICROEX.

COUNT TEN

[18 U.S.C. §§ 1956(a)(2)(A), 2(a)]

On or about December 12, 2014, in Los Angeles County, within the Central District of California, and elsewhere, defendants YI-CHI SHIH, also known as ("aka") "Yichi Shih," aka "Yuqi Shi" and KIET ANH MAI knowingly aided, abetted, counseled, commanded, induced, and procured another person to transport, transmit, and transfer a monetary instrument and funds, that is, USD $120,000, to a place in the United States, within the Central District of California, specifically, a MICROEX bank account, from or through a place outside the United States, specifically, a JYS TECH bank account in Canada, with the intent to promote the carrying on of specified unlawful activity, specifically, violations of Title 18, United States Code, Sections 1030 (fraud and related activity in connection with computers), 1341 (mail fraud), and 1343 (wire fraud), and Title 50, United States Code, Section 1705 (violations of the International Emergency Economic Powers Act).

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461]

1.    Pursuant to Rule 32.2(a), of the Federal Rules of Criminal Procedure, notice is hereby given to defendants YI-CHI SHIH, also known as ("aka") "Yichi Shih," aka "Yuqi Shi," ISHIANG SHIH, aka "I-Shiang Shih," and KIET ANH MAI (collectively, "defendants") that the United States will seek forfeiture as part of any sentence in accordance with COUNTS ONE through SIX, and NINE of this Indictment. Each defendant so convicted shall forfeit to the United States:

> a. all property, real or personal, which constitutes or is derived from proceeds traceable to the underlying violation; and
>
> b. to the extent such property is not available for forfeiture, a sum of money equal to the total value of such property.

2.    Pursuant to Title 21, United States Code, Section 853(p), defendants shall forfeit substitute property, if, by any act or omission of defendants, the property described in COUNTS ONE through SIX, and NINE, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to, or deposited with a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 982(a)(2)]

1.     Pursuant Rule 32.2(a), Fed. R. Crim. P., notice is hereby given to defendants YI-CHI SHIH, also known as ("aka") "Yichi Shih," aka "Yuqi Shi," and KIET ANH MAI (collectively, "defendants"), that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 982(a)(2), in the event of any defendant's conviction under COUNTS SEVEN and EIGHT of this Indictment.

2.     Each defendant so convicted shall forfeit to the United States the following property:

     a.     Any property constituting, or derived from, proceeds obtained, directly or indirectly, as the result of such violation.

     b.     To the extent such property is not available for forfeiture, a sum of money equal to the total value of such property.

3.     Pursuant to Title 21, United States Code, Section 853(p), and Title 18, United States Code, Section 982(b)(1), any defendant so convicted shall forfeit substitute property, up to the total value of the property described in the preceding paragraph, if, as a result of any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof, (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION THREE

[18 U.S.C. § 982(a)(1)]

1.     Pursuant to Rule 32.2(a), of the Federal Rules of Criminal Procedure, notice is hereby given to defendants YI-CHI SHIH, also known as ("aka") "Yichi Shih," aka "Yuqi Shi," and KIET ANH MAI (collectively, "defendants") that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 982(a)(1), in the event of any defendant's convictions under COUNT TEN this Indictment.

2.     Each defendant so convicted shall forfeit to the United States the following property:

     (a)   all right, title, and interest in any and all property, real or personal, involved in or traceable to any transaction set forth in COUNT TEN of this Indictment; and

     (b)   th the extent such property is not available for forfeiture, a sum of money equal to the total value of such property.

3.     Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), each defendant shall forfeit substitute property, up to the value of the total amount described in paragraph 2, if, as the result of any act or omission of a defendant, the property described in paragraph 2, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the

//
//
//
//

court; (d) has been substantially diminished in value; or (e) has
been commingled with other property which cannot be divided without
difficulty.

                                          A TRUE BILL


                                          _____/S/_____
                                          Foreperson


NICOLA T. HANNA
United States Attorney


PATRICK R. FITZGERALD
Assistant United States Attorney
Chief, National Security Division

CHRISTOPHER GRIGG
Assistant United States Attorney
Chief, Terrorism and Export
   Crimes Section

JUDITH A. HEINZ
Assistant United States Attorney
Senior Litigation Counsel
National Security Division

MELANIE SARTORIS
Assistant United States Attorney
Terrorism and Export Crimes
   Section

KHALDOUN SHOBAKI
Assistant United States Attorney
Cyber and Intellectual Property
   Crimes Section