1           UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3      HONORABLE JOHN A. KRONSTADT, JUDGE PRESIDING

4    UNITED STATES OF AMERICA,          )
                                        )
5                                       )
                                        )
6                      Plaintiff,       )
                                        )
7                                       )
                                        )
8           Vs.                         )   No.
                                        )   LACR18-00050(B)-JAK
9                                       )
                                        )
10   YI-CHI-SHIH,                       )
                                        )
11                                      )
                                        )
12                     Defendant.       )
                                        )
13   _____   )

14

15

16          REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                JURY TRIAL, DAY 17

18                    VOLUME I

19             LOS ANGELES, CALIFORNIA

20          WEDNESDAY, JUNE 19, 2019

21

22

23          MIRIAM V. BAIRD, CSR 11893
       OFFICIAL U.S. DISTRICT COURT REPORTER
24      411 WEST FOURTH STREET, SUITE 1-053
         SANTA ANA, CALIFORNIA 92701
25              MVB11893@AOL.COM

1                    **A P P E A R A N C E S**

2

3    **IN BEHALF OF THE PLAINTIFF,**      MELANIE ANN HANSON SARTORIS
     **UNITED STATES OF AMERICA:**        JUDITH HEINZ
4                                         JAMES HUGHES
                                          WILLIAM ROLLINS
5                                         AUSA - OFFICE OF US
                                          ATTORNEY
6                                         UNITED STATES DISTRICT
                                          COURTHOUSE
7                                         312 NORTH SPRING STREET
                                          12TH FLOOR
8                                         LOS ANGELES, CA 90012
                                          - AND -
9                                         KHALDOUN SHOBAKI
                                          AUSA - OFFICE OF US
10                                        ATTORNEY
                                          CYBER AND INTELLECTUAL
11                                        PROPERTY CRIMES SECTION
                                          312 NORTH SPRING STREET
12                                        SUITE 1500
                                          LOS ANGELES, CA 90012
13

14

     **IN BEHALF OF THE DEFENDANT,**      JAMES W. SPERTUS
15   **YI-CHI SHIH:**                     JOHN HANUSZ
                                          CRISTA CULVER
16                                        SPERTUS LANDES AND UMHOFER
                                          LLP
17                                        1990 SOUTH BUNDY DRIVE
                                          SUITE 705
18                                        LOS ANGELES, CA 90025

19

20

21

22

23

24

25

**INDEX**

**WITNESS:**                                                    **PAGE:**


   GOVERNMENT'S CLOSING ARGUMENT                            60

                              * * * * *


**EXHIBITS:**

   Exhibit 3561 received                                     14

                              * * * * *

```
 1    LOS ANGELES, CALIFORNIA; WEDNESDAY, JUNE 19, 2019; 8:26 A.M.
 2                              ---
 3              THE COURT:  Good morning.  We're on the record in
 4    CR 18-00050, United States v. Yi-Chi Shih.
 5              Would you state your appearances, please.
 6              MS. HEINZ:  Good morning, Your Honor.  Judith Heinz
 7    on behalf of the United States.  With us at counsel table is
 8    Special Agent Alex Storino of the Federal Bureau of
 9    Investigation.
10              THE COURT:  Good morning to both of you.
11              MR. ROLLINS:  Good morning, Your Honor.  Will
12    Rollins on behalf of the United States.
13              THE COURT:  Good morning, Mr. Rollins.
14              MR. SHOBAKI:  Good morning, Your Honor.  Kal
15    Shobaki on behalf of the United States.
16              THE COURT:  Good morning, Mr. Shobaki.
17              MR. HUGHES:  Good morning, Your Honor.  James
18    Hughes on behalf of the United States.
19              THE COURT:  Good morning, Mr. Hughes.
20              MS. SARTORIS:  Good morning, Your Honor.  Melanie
21    Sartoris on behalf of the United States.
22              THE COURT:  Good morning, Ms. Sartoris.
23              MR. SPERTUS:  Good morning, Your Honor.  James
24    Spertus, Christa Wasserman, and John Hanusz on behalf of
25    Dr. Shih, who is present before the Court.
```

1          THE COURT:  Good morning to all of you.  Please be

2      seated.

3          Is there now an agreed-upon verdict form?

4          MR. SPERTUS:  Yes, Your Honor.

5          MS. HEINZ:  Yes, Your Honor.

6          THE COURT:  Good job.  Thanks for your work on

7      that.

8          Second, with respect to the most recent version of

9      the jury instructions that I sent out following yesterday's

10     hearing, other than the government's proposed change, is

11     there any other issue that is -- I mean, a new issue?

12         MR. SPERTUS:  No new issue.

13         THE COURT:  Is there an objection to the

14     government's proposed change to, I think it's, instruction

15     35?

16         MS. HEINZ:  It's actually 34 and 35, Your Honor.  I

17     apologize.  We caught the needed change in instruction 35

18     this morning.  So they're -- they're very similar changes,

19     and they are in both 34 and 35.

20         THE COURT:  Any objection to those changes?

21         MR. SPERTUS:  They've been described to me, and we

22     don't object to the goals of the changes.  We have not yet

23     reviewed them.

24         THE COURT:  Could you -- all right.

25         MR. SPERTUS:  We'll do it during a break.

```
 1            THE COURT:  But the first step here is going to be
 2    reading instructions.
 3            MR. SPERTUS:  Well, then, Your Honor --
 4            THE COURT:  Sorry to interrupt.  We'll come back to
 5    that in just a minute.
 6            Other than the videos, is there any other issue?
 7            MR. SPERTUS:  No.
 8            MS. HEINZ:  None from the government, Your Honor.
 9            THE COURT:  Mr. Spertus, let me ask you this:  With
10    respect to the videos, are you going to address that?
11            MR. SPERTUS:  I am.
12            THE COURT:  Well, what I'd like to know is the
13    following.  With respect to -- just a minute.  There are two.
14    Are these -- the videos to which I'm referring are
15    Exhibits 3560, 3562, 3557, 3558, 3561, and 3563.
16            The first two that I stated, 3560 and 3562, are
17    what has been referred to as Cree wafers.  Now, let's start
18    there.  On what -- to what are they relevant?
19            MR. SPERTUS:  They are relevant because Cree
20    described its injury from the unauthorized access as making
21    the features of its PDK known.  So the features of the PDK
22    are on YouTube.
23            THE COURT:  I understand.  To the extent -- with
24    respect to the four other videos -- which are not Cree
25    videos; you agree with that?
```

1           MR. SPERTUS:  Yes.

2           THE COURT:  For what are they being offered?

3           MR. SPERTUS:  The exact same issue:  The features

4    of the PDK are not secret, and Cree suffered no injury when

5    Dr. Shih accessed the PDK.

6           THE COURT:  Okay.  Why -- with respect to the four

7    non-Cree videos, why aren't they hearsay?

8           MR. SPERTUS:  Because they're being offered simply

9    for the fact that PDK features are publicly known.  If the

10   speaker is wrong, it's fine with us.  We aren't offering them

11   to prove the words spoken by the speaker.  Simply that the

12   features are public is the only evidentiary purpose for these

13   videos.

14          THE COURT:  With respect to what you referred to as

15   the features in these non-Cree videos, what is the basis for

16   establishing the time when the time at which that Cree portal

17   was in -- was being used?

18          MR. SPERTUS:  So the timing issue is not relevant

19   because Dr. Barner testified that since they offered the PDK,

20   they maintained secrecy of the features.  And that is not

21   true.  So there may have been some modifications to features

22   over time, but we are disproving Dr. Barner's testimony with

23   the videos.

24          THE COURT:  Okay.  Just a minute.  With respect to

25   the speaker on the -- the speakers on these four videos --

```
 1   so, for example, in 3557, Stuart Glen, is the discussion of

 2   developing a GaN MMIC.  Do you agree with that?

 3              MR. SPERTUS:  I believe so, yes.

 4              THE COURT:  And then there's a mention of using

 5   what appears to be the PDK model for a particular design.  Do

 6   you agree with that?

 7              MR. SPERTUS:  Yes.

 8              THE COURT:  So why isn't that being offered for the

 9   truth of this matter, that in designing a GaN MMIC, you can

10   use the Cree portal and here's how you do it?

11              MR. SPERTUS:  So we are not trying to prove that

12   fact with the video.  That's why.  We -- if that's wrong.

13   Let's just make up a world inconsistent with Dr. Barner's

14   testimony, that you can't design a GaN MMIC on the PDK

15   portal.

16              The truth of that speaker's words is irrelevant to

17   the purpose for which they're being offered.

18              THE COURT:  So you're offering these videos for the

19   limited purpose of establishing that through the internet and

20   on YouTube, a person can have access to a video that shows

21   the Cree portal.

22              MR. SPERTUS:  The Cree PDK features, yes,

23   Your Honor.

24              THE COURT:  Are the exhibits cumulative?

25              MR. SPERTUS:  No.
```

1          THE COURT:  Why not?

2          MR. SPERTUS:  Because part of the evidentiary

3    purpose for these videos is to show that there are a lot of

4    them.  So, you know, the fact that the defense couldn't

5    publish them is obviously going to -- it's not going to take

6    any juror time from this trial.

7          So we want to make the point that you can Google

8    the Cree PDK, and there are many, many YouTube videos showing

9    the features.

10          THE COURT:  Exhibit 3563, do you have that one in

11    mind?

12          MR. SPERTUS:  I believe so.

13          THE COURT:  Describing certain products from

14    Agilent?

15          MR. SPERTUS:  I believe so.

16          THE COURT:  Does this show anything about the Cree

17    PDK?

18          MR. SPERTUS:  I believe they're using the Cree PDK.

19          THE COURT:  How do you know that?

20          MR. SPERTUS:  I believe they show it in the video.

21          THE COURT:  Thank you, Mr. Spertus.

22          Who is going to respond?

23          Ms. Heinz.

24          MS. HEINZ:  Yes, Your Honor.  First of all, the

25    government believes that the characterization of Dr. Barner's

1   testimony is incorrect.  Dr. Barner did not say that making

2   certain features of the PDK known was the injury.

3           Dr. Barner freely admitted that Cree offers

4   marketing videos to show how their PDK works and how someone

5   can use a PDK to design something.  What Dr. Barner testified

6   about was that Cree would never have allowed Kiet Mai or

7   MicroEx access to the PDK if it had known that it was not

8   going to comply.  So -- so that's the first thing.

9           The second thing is that seeking to offer videos

10  which are not put out by Cree but are simply put out by third

11  parties is -- is not relevant here because there is -- there

12  is no showing that Cree allowed those videos to be made or

13  was complicit in getting those videos made or is somehow

14  responsible for getting those videos made.

15          In some cases it's not even clear from the video

16  that it is the Cree PDK that is being used or is being spoken

17  about.

18          THE COURT:  In which exhibits do you think that's

19  the case?

20          MS. HEINZ:  I think that that's true in 57 -- I'm

21  using the last numbers -- 57, 58, 60, and 63, because there

22  are only two videos that have been identified as, quote,

23  unquote, Cree videos, meaning that there is a Cree speaker

24  there and -- and who is a Cree employee talking about the

25  videos.

1          Secondly, the government believes the Court is

2    correct.  This is hearsay, and it is not irrelevant that what

3    makes these relevant is if they are true.  So one of the

4    things that has to be true in order to make these things

5    relevant is that actually the Cree PDK video is there and

6    that there are somehow showing in these videos features of

7    the PDK video that are not public, that would not be out

8    there.

9          The fact that they are simply showing how the PDK

10    portal -- it's not even an access to the portal issue.

11    They're simply showing how the design tool would work, and

12    that's all they're showing.

13          And so that part of it, if that is not true, if

14    somehow this is not actually the Cree PDK, then it's not

15    relevant.

16          THE COURT:  All right.  Well, okay.  I understand.

17          MS. HEINZ:  Finally, Your Honor, yes, these are

18    cumulative.  Your Honor has found several things in this

19    trial from the government's point of view to be cumulative.

20    For example, we had to redact ITAR and military off of all of

21    the Honeywell -- a lot of the Honeywell things even though

22    our position is that the fact that the ITAR and military was

23    in several, many of the Honeywell training materials, that

24    that just reinforces the fact that the defendant knew about

25    those.  And yet the Court found that to be cumulative.

1          The same thing is true here.  Showing that there

2    are many videos out there on the internet that show these

3    things is also cumulative.

4          THE COURT:  All right.  Just a minute.

5          MS. HEINZ:  Sorry, Your Honor.  I have one more.

6          THE COURT:  Go ahead.

7          MS. HEINZ:  Finally, Your Honor, also injury to

8    Cree is not an element of the offense here.  So showing

9    injury to Cree is not an element, is not a matter of proof.

10   So it's irrelevant.  And entering this evidence is simply

11   prejudicial under 403.

12         THE COURT:  Briefly, Mr. Spertus.

13         MR. SPERTUS:  First of all, I think counsel is

14   referring to count 9, the unauthorized accessed count.  I'm

15   referring to the fraud count where intent to deprive somebody

16   of property is an essential element.

17         THE COURT:  There's a difference between mail fraud

18   and common law fraud in terms of the element; isn't there?

19         MR. SPERTUS:  In the sense that you have to use

20   a --

21         THE COURT:  No.  I think there's a different

22   standard.

23         MR. SPERTUS:  No.  The element in the federal --

24   for federal wire fraud is an intent to cheat and lie to

25   deprive someone of a material thing.

1          THE COURT:  I understand, but there's a distinction

2     I think in terms of the nature of the damages.  But go ahead.

3          MR. SPERTUS:  The second point that counsel said

4     was that the Court had ruled some defense evidence

5     cumulative, like the redactions out of Honeywell.  That was

6     not the Court's ruling.  That was a 403 ruling that ITAR and

7     military were irrelevant and prejudicial.

8          THE COURT:  Thank you.

9          MR. SPERTUS:  Not cumulative.

10          THE COURT:  Thank you.  Just a minute.

11          MR. SPERTUS:  The last point is just that it

12     doesn't matter whether Cree ratified these videos.  If

13     somebody steals the formula for Coke and puts it on the

14     internet, somebody is not committing a crime by making Coke.

15     So counsel just misstated the ratification issue.

16          Thank you.

17          THE COURT:  Thank you.

18          (Pause in proceedings)

19          THE COURT:  All right.  Here's my view.  With

20     respect to the Exhibits 3560 and 3562, I'll admit them

21     because they are Cree videos.  It's not disputed that these

22     were Cree-produced videos.  They constitute statements

23     therefore by a -- Cree is not a party here, but Cree is

24     presented as an element of the -- element of portions of the

25     case, including that it was -- evidence offered as to its

1    being misinformed and misled allegedly with respect to who

2    would have access to its portal through the arrangements with

3    Mr. Mai.

4            With respect to the -- with respect to 3561 of the

5    videos that were offered that are non-Cree videos, this is

6    the one -- this one I think most clearly refers to Cree.

7    There's a reference to Cree where that's an example given.

8            There's less certainty as to some of the others of

9    these non-Cree videos.  So my view is that I will admit 3561

10   but not the others, and I admit for two reasons:  one,

11   because it's cumulative; and, two, because, as I say, it's

12   less certain that the others are featuring the Cree portal.

13           **(Exhibit 3561 received.)**

14           THE COURT:  These exhibits are admitted for a

15   limited purpose, which is that these are videos that are

16   available on the internet to a person searching the internet.

17           They're not admitted for the truth of any

18   statements made in them by any speaker, and I would so limit

19   that instruction to the jury.

20           I'll also note that with respect to -- and I don't

21   think, Mr. Spertus, you were presenting it for this reason --

22   but some of the statements that are being made by those on

23   the video about how to design a GaN wafer could be construed

24   as statements of an expert because this is not something that

25   is commonly known to a lay person.

1          Do you agree with that?

2          MR. SPERTUS:  Yeah.  We're not offering it for the

3     truth.

4          THE COURT:  I understand, but it's also not being

5     offered as expert -- it's another reason that I'm not

6     permitting it for the truth of the matter asserted.

7          MR. SPERTUS:  I agree.

8          THE COURT:  And it's not offered as expert -- nor

9     is it offered as expert testimony, which is related to the

10    truth of the matter asserted.  Okay.

11         If you could then review the one -- I think it's

12    one jury instruction that has been revised.  It's number 36?

13         MS. HEINZ:  It's 34 and 35, Your Honor.

14         THE COURT:  Please let me know.

15         MR. SPERTUS:  We have no objection, Your Honor.

16         THE COURT:  All right.  Thank you.

17         With respect to excusing juror eight, I think I'll

18    have juror eight come out separately because I don't want to

19    -- well, first, I think it's appropriate to explain to jury

20    eight that she's being excused and not just have her leave

21    without any understanding more than that.

22         Second, I think it's, given -- I just think that's

23    the best way to do this.  Does anyone disagree on that?

24         MR. SPERTUS:  We agree, Your Honor.

25         MS. HEINZ:  We agree, Your Honor.  We just think

1    it's important that juror not go back to the other jurors

2    after she's excused.

3                THE COURT:  Okay.  That's fine.  Just a minute.

4                I'm going to have juror eight come out separately.

5    I don't want to discuss this in front of all the other

6    jurors.  Second, once I finish, which won't take long, then

7    juror eight will be asked to -- will step out of the

8    courtroom and we'll bring in the other jurors.

9                I will ask that another person in our staff stay

10   with juror eight while Ms. Keifer gets the other jurors.  And

11   then Ms. Keifer can take juror eight back to the jury room if

12   she has anything there, any personal things there that she

13   needs to retrieve.

14               Again, thank you for your work on the verdict form.

15   That saved us a lot of time.  Well, it saved me a lot of

16   time.  It didn't save you a lot of time.

17               Mr. Spertus, do you plan to show any of the three

18   videos or portions of them during your closing?

19               MR. SPERTUS:  No, Your Honor.

20               THE COURT:  Okay.  Then I -- so these would be --

21               MR. SPERTUS:  They were intended to be published

22   during the trial.

23               THE COURT:  Okay.  Yesterday -- the last time I

24   think this issue came up, it wasn't clear that you would or

25   wouldn't.

```
 1              MR. SPERTUS:  Yes.  And what I'll do is reference
 2     them.  I'll take the exhibit numbers the Court --
 3              THE COURT:  Okay.
 4              MR. SPERTUS:  -- admitted.  And I may or may not
 5     but likely will reference them in my closing.
 6              THE COURT:  All right.  The reason I ask is I
 7     wanted to know whether I need to instruct the jury on the
 8     limiting instruction.  So if you're going to reference them,
 9     I think I should.
10              MR. SPERTUS:  I believe you should, yes.
11              THE COURT:  All right.  Anything else before we
12     bring out the jurors?
13              MS. HEINZ:  Nothing from the government, Your
14     Honor.
15              THE COURT:  Thanks.  And your time estimate remains
16     two hours; is that correct?
17              MR. SPERTUS:  Yes, Your Honor.
18              THE COURT:  Okay.  The government expects -- what's
19     the government's timing?  Two hours plus?
20              MR. SHOBAKI:  In that neighborhood, Your Honor.  I
21     think that when we last spoke, we were looking at two to two
22     and a half hours tops.  I believe that's what Mr. Spertus
23     said also.
24              MR. SPERTUS:  I agree.  If I run a few minutes
25     over -- I'm targeting two hours, but I may run a little over.
```

1         MR. SHOBAKI:  Same thing, Your Honor, for both the

2    government's opening, close, and rebuttal.

3         THE COURT:  As I said before, I urge both of you to

4    err on the side of less rather than more.

5         (Juror number eight enters the courtroom.)

6         THE JUROR:  I'm scared.

7         THE COURT:  Don't be.  Don't be.  Please be seated.

8         Good morning, Ms. D.  How are you today, other than

9    you just said you were a little scared?

10        I wanted to talk to you briefly to let you know

11   that we're going to thank and excuse you as a juror in this

12   matter.  At the conclusion of the proceedings last week,

13   there was a -- I'm told there was an interaction between you

14   and a person who had been a trial witness here where you

15   touched fists.  And for that reason we're going to thank and

16   excuse you.  We appreciate very much your --

17        THE JUROR:  It's been a pleasure.  I had a good

18   time.

19        THE COURT:  Thank you for your service.  Ms. Keifer

20   is going to take you to another person who is going to be

21   with you until we have the other jurors come in.  Then -- do

22   you have things in the jury room?  We'll take you back to the

23   jury room so you can retrieve your belongings.

24        THE JUROR:  What am I going to do without all of

25   you guys?  Especially you.

1          THE COURT:  Thank you very much, Ms. D.  Thank you

2     for your service.

3          (Juror number eight exits the courtroom.)

4          THE COURT:  One last question.  We had one

5     stipulation on timing of detention and release.  Is there any

6     other stipulation that has not yet been read?

7          MR. SPERTUS:  There is one more, and I will leave

8     Mr. Hughes to address that issue.  But, yes, it's been

9     proposed to us.  We agreed to it.

10          THE COURT:  Do I have it in writing?

11          MR. HUGHES:  Your Honor, I believe we sent it to

12     Ms. Keifer last night.

13          THE COURT:  Do you have a copy of it?

14          MR. HUGHES:  I do not have a copy of it on me right

15     now, Your Honor.  I can get that relatively quickly.

16          THE COURT:  Thank you.

17          MS. SARTORIS:  Your Honor --

18          THE COURT:  Yes.

19          MS. SARTORIS:  -- I think there's one more.  I

20     believe that defense counsel can --

21          THE COURT:  Excuse me for interrupting you.  Is

22     this the stipulation about the records of the IRS?

23          MR. HUGHES:  Yes, Your Honor.

24          THE COURT:  Okay.  I have that.

25          MS. SARTORIS:  I believe that the issues for this

```
 1   morning, the stipulation regarding the release date was
 2   already read during the course of the trial.
 3             THE COURT:  Yes.
 4             MS. SARTORIS:  The IRS stipulation that Your Honor
 5   has and then also the -- the reference or the admonishment
 6   that this Court described yesterday about there is some
 7   evidence that can be considered.
 8             THE COURT:  Yes.
 9             MS. SARTORIS:  Thank you.
10             THE COURT:  Thank you.  Just a moment.  Do you have
11   a copy of the revised instruction 35?  Wait, I have it.  What
12   has been submitted by the government today is a red line.
13   It's identical to what was sent out last night with the
14   exception of the addition of those two instructions; is that
15   right?
16             MS. HEINZ:  That's correct, Your Honor.
17             THE COURT:  Thank you.
18             THE CLERK:  All rise.
19             (Open court - jury present)
20             THE COURT:  Please be seated.  All 12 jurors are
21   present.  Ms. M, thank you -- first, thank you, ladies and
22   gentlemen for being back on time today as usual.
23             Ms. M, prior to now you've been serving as what we
24   called an alternate juror.  As of this time you're no longer
25   an alternate.  You're one of 12 jurors.
```

1        Ladies and gentlemen, I wanted to go over a few

2   matters with you.  After that, I will then be reading

3   instructions to you.  After I've read the instructions to

4   you, counsel will have an opportunity to present what are

5   called closing arguments.  I'll get to that in a minute.

6        After that, I will read some closing instructions

7   to you.  After that, you will begin your deliberations in

8   accordance with my instructions.

9        I think that the closing arguments are going to

10  take -- collectively will take several hours, but they will

11  conclude today.

12       Second, I wanted to let you know the following.

13  During the course of the trial, you have heard that there is

14  certain -- that certain evidence has been offered.  As you

15  recall, sometimes objections are made to evidence, and

16  sometimes I rule sustaining an objection or overruling an

17  objection.

18       As you know, I also instructed you that whether I

19  sustain or overrule an objection has no bearing on your roles

20  here.  Some decisions on the admissibility of evidence were

21  deferred, and we've been working on those.

22       I want to let you know at this time that certain

23  decisions have been made with respect to some of the

24  evidentiary matters where rulings were not finalized, and

25  there may be reference to that evidence in the course of the

1    closing arguments.

2              I just wanted to alert you to that so that the

3    evidence that's going to be discussed by counsel in closing

4    may include some things again as to which rulings were

5    deferred.

6              Second, in that regard I wanted to state that with

7    respect to the following three exhibits, 3560, 3561, and

8    3562, each of which is a video, these exhibits are being

9    admitted for a limited purpose.  That limited purpose is that

10   these are available on the internet to a person searching the

11   internet.

12             These are not being offered as expert testimony or

13   expert statements, nor are they being offered for the truth

14   of any of the statements that you may hear if you listen to

15   these videos.

16             Finally, as I've also told you in the past, one of

17   the evidence in the case is -- can be exhibits, can be

18   testimony.  It can also be facts to which the parties have

19   agreed.

20             I previously read you a stipulation as to certain

21   facts to which the parties here had agreed.  I'm going to

22   read you a further stipulation as to certain facts to which

23   the parties have agreed:

24             The Internal Revenue Service has no record that

25   government witness Judy Chen filed a form 1040 U.S.

 1    individual federal income tax return for either the year 2014

 2    or the year 2015.

 3            Is there anything counsel wish to confer about

 4    before we proceed with the instructions?

 5            MR. SPERTUS:  No, Your Honor.

 6            MS. HEINZ:  No, Your Honor.

 7            THE COURT:  Thank you.

 8            Before I start reading the instructions, ladies and

 9    gentlemen, I want to let you know that copies of these

10    instructions will be provided to you for your use during your

11    deliberation.  If there is any difference between what you

12    hear me read today -- or right now, excuse me -- and what you

13    may later read in a copy, it's what you read in that copy

14    that controls.

15            Members of the jury, now that you've heard all the

16    evidence, it is my duty to instruct you on the law that

17    applies to this case.  A copy of these instructions will be

18    available in the jury room for you to consult.

19            It is your duty to weigh and to evaluate all the

20    evidence received in the case and in that process to decide

21    the facts.  It is also your duty to apply the law as I give

22    it to you to the facts as find them whether you agree with

23    the law or not.

24            You must decide the case solely on the evidence and

25    the law.  Do not allow personal likes or dislikes, sympathy,

```
 1    prejudice, fear, or public opinion to influence you.  You

 2    should also not be influenced by any person's race, color,

 3    religion, national ancestry or gender, sexual orientation,

 4    profession, occupation, celebrity, economic circumstances, or

 5    position in life or in the community.  You will recall that

 6    you took an oath promising to do so at the beginning of the

 7    case.

 8            You must follow all these instructions and not

 9    single out some and ignore others.  They are all important.

10    Please do not read into these instructions or into anything I

11    may have said or done any suggestion as to what verdict you

12    should return.  That is a matter entirely up to you.

13            The second superseding indictment is not evidence.

14    The defendant has pleaded not guilty to the charges.  The

15    defendant is presumed to be innocent unless and until the

16    government proves the defendant guilty beyond a reasonable

17    doubt.

18            In addition, the defendant does not have to testify

19    or present any evidence.  The defendant does not have to

20    prove innocence.  The government has the burden of proving

21    every element of the charges beyond a reasonable doubt.

22            A defendant in a criminal case has a constitutional

23    right not to testify.  In arriving at your verdict, the law

24    prohibits you from considering in any manner that the

25    defendant did not testify.
```

1          Proof beyond a reasonable doubt is proof that

2     leaves you firmly convinced the defendant is guilty.  It is

3     not required that the government prove guilt beyond all

4     possible doubt.

5          A reasonable doubt is a doubt based upon reason and

6     common sense and is not based purely on speculation.  It may

7     arise from a careful and impartial consideration of all the

8     evidence or from a lack of evidence.  If after a careful and

9     impartial consideration of all the evidence you are not

10    convinced beyond a reasonable doubt that the defendant is

11    guilty, it is your duty to find the defendant not guilty.

12         On the other hand, if after a careful and impartial

13    consideration of all the evidence you are convinced beyond a

14    reasonable doubt that the defendant is guilty, it is your

15    duty to find the defendant guilty.

16         The evidence you are to consider in deciding what

17    the facts are consists of:  one, the sworn testimony of any

18    witness; two, the exhibits received in evidence; and three,

19    any facts to which the parties have agreed.

20         The parties here did agree to a fact as to the

21    dates in which the defendant was arrested and released on

22    bond.  They also agreed that the defendant was the subscriber

23    and user of four e-mail accounts and that he was the owner

24    and end user of nine digital devices.

25         Further, they agreed that the Internal Revenue

1   Service has no record that the government witness, Judy Chen,

2   filed a form 1040 U.S. individual federal income tax return

3   for either the year 2014 or the year 2015.

4           In reaching your verdict, you may consider only the

5   testimony and exhibits received in evidence.  The following

6   things are not evidence and you may not consider them in

7   deciding what the facts are:

8           One, questions, statements, objections, and

9   arguments by lawyers are not evidence.  The lawyers are not

10  witnesses.  Although you must consider a lawyer's questions

11  to understand the answers of a witness, the lawyer's

12  questions are not evidence.  Similarly, what the lawyers have

13  said in their opening statements, will say in their closing

14  arguments, and at all other times is intended to help you

15  interpret the evidence, but it is not evidence.  If the facts

16  as you remember them different from the way the lawyers state

17  them, your memory of them controls.

18          Two, any testimony that I have excluded, stricken,

19  or instructed you to disregard is not evidence.  In addition,

20  some evidence was received only for a limited purpose.  When

21  I've instructed you to consider evidence in a limited way,

22  you must do so.

23          Three, anything you may have seen or heard when the

24  court was not in session is not evidence.  You are to decide

25  the case solely on the evidence received at the trial.

1          Evidence may be direct or circumstantial.  Direct

2     evidence is direct proof of a fact such as testimony by a

3     witness about what that witness personally saw or heard or

4     did.

5          Circumstantial evidence is indirect evidence.  That

6     is, it is proof of one or more facts from which you can find

7     another fact.  You are to consider both direct and

8     circumstantial evidence.  Either can be used to prove any

9     fact.

10          The law makes no distinction between the weight to

11     be given to either direct or circumstantial evidence.  It is

12     for you to decide how much weight to give to any evidence.

13          In deciding the facts in this case, you may have to

14     decide which testimony to believe and which testimony not to

15     believe.  You may believe everything a witness says or part

16     of it or none of it.

17          In considering the testimony of any witness, you

18     may take into account:  one, the opportunity and ability of

19     the witness to see or hear or know the things testified to;

20     two, the witness's memory; three, the witness's manner while

21     testifying; four, the witness's interest in the outcome of

22     the case, if any; five, the witness's bias or prejudice, if

23     any; six, whether other evidence contradicted the witness's

24     testimony; seven, the reasonableness of the witness's

25     testimony in light of all the evidence; and eight, any other

1    factors that bear on believability.

2          Sometimes a witness may say something that is not

3    consistent with something else he or she said.  Sometimes

4    different witnesses will give different versions of what

5    happened.

6          People often forget things or make mistakes in what

7    they remember.  Also, two people may see the same event but

8    remember it differently.  You may consider these differences,

9    but do not decide the testimony is untrue just because it

10   differs from other testimony.

11         However, if you decide that a witness has

12   deliberately testified untruthfully about something

13   important, you may choose not to believe anything that

14   witness said.  On the other hand, if you think the witness

15   testified untruthfully about some things but told the truth

16   about others, you may accept the part you think is true and

17   ignore the rest.

18         The weight of the evidence as to a fact does not

19   necessarily depend on the number of witnesses who testify.

20   What is important is how believable the witnesses were and

21   how much weight you think their testimony deserves.

22         You are here only to determine whether the

23   defendant is guilty or not guilty of the charges in the

24   second superseding indictment.  The defendant is not on trial

25   for any conduct or offense not charged in the second

1    superseding indictment.

2          A separate crime is charged against the defendant

3    in each count.  You must decide each count separately.  Your

4    verdict on one count should not control your verdict on any

5    other count.

6          You have heard testimony of a witness who testified

7    in a language other than English.  Witnesses who do not speak

8    English or are more proficient in another language testified

9    through an official interpreter.

10         Although some of you may known the non-English

11   language spoken by the witness, it is important that all

12   jurors consider the same evidence.  Therefore, you must

13   accept the interpreter's translation of the witness's

14   testimony.  You must disregard any different meaning.

15         You must not make any assumptions about a witness

16   or party based solely on the fact that an interpreter was

17   used.

18         You have seen documents in the Chinese language.

19   Translations of these documents have been admitted into

20   evidence.  The government and, for some documents, the

21   defendant have introduced English-language translations of

22   these Chinese-language documents.

23         When both the government and the defendant have

24   introduced English-language translations of a document, the

25   accuracy of the translation is disputed in this case.

Whether a translation is an accurate translation in whole or in part is for you to decide.

In considering whether a translation accurately describes the language in a document, you should consider the testimony presented to you regarding how and by whom the translation was made.

You may consider the knowledge, training, and experience of the translator as well as the nature of the document and the reasonableness of the translation in light of all the evidence in the case.

Although some of you may know the Chinese language, it is important that all jurors consider the same evidence. Therefore, you must not rely in any way on any knowledge you may have of the Chinese language. Your consideration of the translations must be based in the evidence of the case.

From time to time during the trial, it became necessary for me to take up legal matters with the attorneys privately either by having a conference at the bench when the jury was present in the courtroom or by calling a recess. Please understand that while you were waiting, we were working.

The purpose of these conferences was not to keep relevant information from you but to decide how certain evidence was to be treated under the rules of evidence and to avoid confusion and error. Of course, we have done what we

1    could to keep the number and length of these conferences to a

2    minimum.

3             I did not always grant an attorney's request for a

4    conference.  Do not consider my granting or denying a request

5    for a conference as any indication of my opinion of the case

6    or what your verdict should be.

7             The second superseding indictment charges that the

8    offenses alleged were committed, quote, on or about, close

9    quote, certain dates.  Although it is necessary for the

10   government to prove beyond a reasonable doubt that the

11   offenses were committed on a date reasonably near the dates

12   alleged in the second superseding indictment, it is not

13   necessary for the government to prove that the offense was

14   committed precisely on the date charged.

15            You have heard testimony that the defendant made a

16   statement.  It is for you to decide, one, whether the

17   defendant made the statement; and, two, if so, how much

18   weight to give to it.

19            In making those decisions, you should consider all

20   the evidence about the statement, including the circumstances

21   under which the defendant may have made it.

22            You've heard testimony from Kiet Ahn Mai, a witness

23   who, A, pleaded guilty to a crime; B, received a promise from

24   the government not to prosecute him further criminally for

25   violations of federal law arising out of his conduct as

1    alleged in the second superseding indictment; and C, hopes to

2    receive a recommendation of leniency from the government at

3    sentencing.

4         Mr. Mai's guilty plea is not evidence against the

5    defendant, and you may consider it only in determining this

6    witness's believability.  For these reasons, in evaluating

7    the testimony of Kiet Ahn Mai, you should consider the extent

8    to which or whether his testimony may have been influenced by

9    any of these factors.

10        In addition, you should examine the testimony of

11   Kiet Ahn Mai with greater caution than that of other

12   witnesses.

13        You've heard testimony from certain witnesses who

14   testified as experts to opinions and the reasons for their

15   opinions.  This opinion testimony is allowed because of the

16   education or experience of this witness.

17        Such opinion testimony should be judged like any

18   other testimony.  You may accept it or reject it and give it

19   as much weight as you think it deserves considering the

20   witness's education and experience, the reasons given for the

21   opinion, and all the other evidence in the case.

22        You have heard testimony from certain witnesses who

23   testified to both facts and opinions and the reasons for

24   their opinions.  Fact testimony is based on what the witness

25   saw, heard, or did.  Opinion testimony is based on the

education or experience of the witness.

As to the testimony about facts, it is your job to
decide which testimony to believe and which testimony not to
believe.  You may believe everything a witness says or part
of it or none of it.  Take into account the factors discussed
earlier in these instructions that were provided to assist
you in weighing the credibility of witnesses.

As to the testimony about the witness's opinions,
this opinion testimony is allowed because of the education or
experience of this witness.  Opinion testimony should be
judged like any other testimony.  You may accept all of it,
part of it, or none of it.  You should give it as much weight
as you think it deserves considering the witness's education
and experience, the reasons given for the opinion, and all
the other evidence in the case.

During the trial certain charts and summaries were
shown to you in order to help explain the evidence in this
case.  These charts and summaries were not admitted into
evidence and will not go into the jury room with you.  They
are not themselves evidence or proof of facts.

If they do not correctly reflect the facts or
figures shown by the evidence in the case, you should
disregard these charts and summaries and determine the facts
from the underlying evidence.

Certain charts and summaries have been admitted

1    into evidence.  Charts and summaries are only as good as the

2    underlying supporting material.  You should therefore give

3    them only such weight as you think the underlying material

4    deserves.

5          Defendant Yi-Chi Shih is charged in count 1 of the

6    second superseding indictment with knowingly and willfully

7    conspiring to export items from the United States to the

8    People's Republic of China and to Chengdu GaStone Technology

9    Company, Limited, a/k/a Chengdu Jiashi Technology Company,

10   Limited, quote, CGTC, close quote, without having first

11   obtained the required licenses from the United States

12   Department of Commerce and without filing electronic export

13   information to the automated export system, in violation of

14   the International Emergency Economic Powers Act, referred to

15   as, quote, IEEPA, close quote, and related export

16   administration regulations.

17         Defendant Yi-Chi Shih is charged in count 2 of the

18   second superseding indictment with knowingly and willfully

19   causing the export of items from the United States to the

20   People's Republic of China without having first obtained from

21   the United States Department of Commerce required licenses,

22   thereby violating IEEPA and the related export administration

23   regulations.

24         IEEPA makes it unlawful for any person willfully to

25   violate, attempt to violate, conspire to violate, or cause a

1    violation of certain regulations including the export

2    administration regulations.

3         The export administration regulations prohibit the

4    export to specified countries of certain items unless a

5    license is first obtained from the Department of Commerce.

6         The export administration regulations also contain

7    specific license requirements for the export of specified

8    items to certain foreign persons, including businesses and

9    organizations that are on the Department of Commerce's,

10   quote, entity list, close quote.

11        Federal laws, including the export administration

12   regulations, also require the filing of electronic export

13   information through the automated export system for the

14   export of certain commodities valued over $2,500 to the

15   People's Republic of China.

16        The electronic export information is required to

17   contain, among other things, the names and addresses of the

18   parties to the transaction and the description of the

19   quantity and value of the items exported.  However, exports

20   made in an intangible form such as presentation slides do not

21   require the filing of electronic export information.

22        The term, quote, export, close quote, means an

23   actual shipment or transmission of items out of the

24   United States.  The term, quote, export-controlled items,

25   close quote, means items for which the Department of Commerce

requires that a license be obtained before the items can

lawfully be exported from the United States to certain

countries, including the People's Republic of China.

        The export administration regulations also provide

for certain exclusions and exceptions to the requirements to

obtain a license and to file electronic export information.

These are addressed in instructions 29 and 30.

        For the defendant Yi-Chi Shih to be found guilty of

count 1, which charges the defendant with conspiring to

export items from the United States to the People's Republic

of China and to Chengdu GaStone Technology Company, Limited,

without having first obtained the required licenses from the

United States Department of Commerce and without filing

required electronic export information through the automated

export system, the government must prove each of the

following elements beyond a reasonable doubt.

        First, beginning on an unknown date but not later

than January 2006 and continuing through at least in or

around January 2016, there was an agreement between two or

more persons to knowingly and willfully do at least one of

the following:

        A, export an item from the United States to the

People's Republic of China without having first obtained from

the Department of Commerce a license required by the export

administration regulations;

1    B, export an item after August 1, 2014, from the

2    United States to Chengdu GaStone Technology Company, Limited,

3    without having first obtained from the Department of Commerce

4    a license required by the export administration regulations;

5    C, export an item from the United States to the

6    People's Republic of China without filing electronic export

7    information through the automated export system if required

8    by the export administration regulations;

9    D, export an item after August 1, 2014, from the

10    United States to Chengdu GaStone Technology Company, Limited,

11    without filing electronic export information through the

12    automated export system if required by the export

13    administration regulations.

14    Second, the defendant became a member of the

15    conspiracy knowing of at least one of its objects and

16    intending to help accomplish it.

17    A conspiracy is a kind of criminal partnership, an

18    agreement of two or more persons to commit one or more

19    crimes.  The crime of conspiracy is the agreement to do

20    something unlawful.  It does not matter whether the crime

21    agreed upon was committed.

22    For a conspiracy to have existed, it is not

23    necessary that the conspirators made a formal agreement or

24    that they agreed on every detail of the conspiracy.  It is

25    not enough, however, that they simply met, discussed matters

of common interest, acted in similar ways, or perhaps helped

one another.

You must find that there was a plan to commit the

crime alleged in count 1 of the second superseding indictment

as an object of the conspiracy with all of you agreeing as to

each particular crime which the conspirators agreed to

commit.

One becomes a member of a conspiracy by willfully

participating in the unlawful plan with the intent to advance

or further some object or purpose of the conspiracy even

though the person does not have full knowledge of all the

details of the conspiracy.

Furthermore, one who willfully joins an existing

conspiracy is as responsible for it as the originators.  On

the other hand, one who has no knowledge of a conspiracy but

happens to act in a way which furthers some object or purpose

of the conspiracy does not thereby become a conspirator.

Similarly, a person does not become a conspirator

merely by associating with one or more persons who are

conspirators nor merely by knowing that a conspiracy exists.

A conspiracy may continue for a long period of time

and may include the performance of many transactions.  It is

not necessary that all members of the conspiracy join it at

the same time.

One may become a member of a conspiracy without

full knowledge of all the details of the unlawful scheme or
the names, identities, or locations of all the members.

Even though a defendant did not directly conspire
with other conspirators in the overall scheme, the defendant
has in effect agreed to participate in the conspiracy if the
government proves each of the following beyond a reasonable
doubt:

One, the defendant directly conspired with one or
more co-conspirators to carry out at least one of the objects
of the conspiracy.

Two, the defendant knew or had reason to know that
other conspirators were involved with those with whom the
defendant directly conspired.

Three, the defendant had reason to believe that
whatever benefits the defendant might get from the conspiracy
were probably dependent on the success of the entire venture.

It is not a defense that a person's participation
in a conspiracy was minor for a short period of time.

Defendant Yi-Chi Shih is charged in count 2 of the
second superseding indictment with knowingly and willfully
causing to be exported on or about December 30, 2013, to
January 2, 2014, from the United States to the People's
Republic of China export controlled items, namely, monolithic
microwave integrated circuit, MMIC, amplifiers without having
first obtained from the Department of Commerce the required

1    license, thereby violating the International Emergency

2    Economic Powers Act and the related export administration

3    regulations.

4            For the defendant to be found guilty of count 2,

5    the government must prove each of the following elements

6    beyond a reasonable doubt:

7            First, the defendant caused to be exported an

8    export controlled item, namely, a monolithic microwave

9    integrated circuit, MMIC, amplifier from the United States to

10   the People's Republic of China.

11           Second, a license was required under the export

12   administration regulations to export the MMIC.

13           Third, the defendant failed to obtain from the

14   Department of Commerce the required license before causing

15   the MMIC to be exported.

16           Fourth, the defendant acted knowingly and

17   willfully.

18           A defendant may be found guilty of knowingly and

19   willfully causing to be exported from the United States to

20   the People's Republic of China an export controlled item

21   without having first obtained a required license from the

22   Department of Commerce even if the defendant personally did

23   not commit the act or acts constituting the export of the

24   item.

25           To prove the defendant caused an export controlled

1   item, namely, a monolithic microwave integrated circuit,

2   MMIC, amplifier to be exported from the United States to the

3   People's Republic of China, quote, PRC, close quote, the

4   government must prove beyond a reasonable doubt that the

5   defendant put in motion or caused the MMIC to be exported

6   from the United States to the PRC.

7           The government is not required to prove precisely

8   who exported the MMIC so long as it proves beyond a

9   reasonable doubt that the defendant caused the export of the

10  MMIC.

11          An act is done knowingly if the defendant is aware

12  of the act and does not act through ignorance, mistake, or

13  accident.  You may consider evidence of the defendant's

14  words, acts, or omissions along with all the other evidence

15  in deciding whether the defendant acted knowingly.

16          For purposes of counts 1 and 2, a defendant acts

17  willfully if he acts voluntarily and intentionally with

18  knowledge that his conduct is unlawful.  Here that means that

19  the defendant knew that a license was required for the export

20  of the items at issue and intended to violate the law by

21  conspiring to export them (count 1) and/or by causing them to

22  be exported (count 2) without such a license.

23          It is not necessary for the government to prove

24  that the defendant had read, was aware of, or it consulted

25  the specific regulations governing his activities.

1      To determine whether the export administration

2  regulations require a license in the filing of electronic

3  export information with respect to an item, it is necessary

4  to determine both, one, the destination to which the item is

5  exported, and, two, whether the item is classified with an

6  export controlled classification number, quote, ECCN, close

7  quote, that requires a license for exports to that

8  destination.

9      If you determine that the defendant intended that

10  the final destination for an item was not one of the

11  destinations described in the instructions for the applicable

12  count (instructions 22 and 25) you must find the defendant

13  not guilty of that count.

14      However, if you find that the defendant intended

15  that an item would arrive at one of the destinations

16  described in the instructions for the applicable count

17  (instructions 22 and 25) after transiting through a different

18  country or countries, the export is deemed to be to the

19  ultimate intended destination.

20      In considering what the defendant intended in this

21  regard, you may consider that an item may be exported to Hong

22  Kong without a license if it is to remain there, its value is

23  less than $3,000, and its intended use is for civil

24  telecommunications.

25      Certain evidence has been presented that items

1    involved in this case were classified with ECCNs in the 3A001

2    category.  In determining whether the 3A001 category applies,

3    you should consider the following matters:

4         One, the 3A001 category applies to, quote,

5    commodities, close quote, but not to, quote, technology,

6    close quote.  Commodities are articles, materials, or

7    supplies other than technology or software.

8         Technology is specific information necessary for

9    the development, production, or use of a product.  This

10   includes such information that is publicly available.

11        Two, the 3A001 category does not apply to MMICs

12   that are, quote, specially designed, close quote, for a

13   telecommunications application.  An item is, quote, specially

14   designed, close quote, for a telecommunications application

15   if as a result of design research analysis, testing a

16   prototype, or similar type steps involved in developing a

17   product, it is properties peculiarly designed to achieve or

18   exceed certain performance levels, characteristics, or

19   functions necessary for telecommunications purposes.

20        The export administration regulations do not

21   require a license for certain, quote, temporary exports,

22   close quote.  To qualify as a, quote, temporary export, the

23   item must be, one, exported only for inspection, testing,

24   calibration, or repair; and two, within one year of the date

25   of export the item is either, A, consumed or destroyed in the

1  normal course of temporary use abroad or, B, returned to the

2  United States.

3        Further, an item is not a, quote, temporary export,

4  close quote, if the exporter has prior knowledge that the

5  item will stay abroad for more than one year.

6        Three, a purchase order to acquire the item from a

7  source within the United States must not have been received

8  by that source before the item is shipped.

9        In considering whether such an order was received,

10 you may consider the evidence presented as to what person or

11 entity actually caused the purchase order to be made.

12       Defendant Yi-Chi Shih is charged in counts 3

13 through 6 of the second superseding indictment with mail

14 fraud in violation of Section 1341 of Title 18 of the United

15 States Code.

16       For the defendant to be found guilty on counts 3

17 through 6, the government must prove each of the following

18 elements beyond a reasonable doubt:

19       First, the defendant knowingly participated in a

20 scheme or plan to defraud Cree or a scheme or plan for

21 obtaining money or property from Cree by means of false or

22 fraudulent pretenses, representations, or promises.

23 Deceitful statements or half truths may constitute false or

24 fraudulent representations.

25       Second, the statements made as part of the scheme

1    are material; that is, they had a natural tendency to

2    influence or capable of influencing a person to part with

3    money or property.

4            Third, the defendant acted with the intent to

5    defraud; that is, the intent to deceive or cheat.

6            Fourth, the defendant used or caused to be used the

7    mails to carry out or attempt to carry out an essential part

8    of the scheme.

9            In determining whether a scheme to defraud exists,

10   you may consider not only the defendant's words and

11   statements but also the circumstances in which they are used

12   as a whole.  You need not unanimously agree that a specific

13   material false statement was made.

14           A mailing is caused when one knows that the mails

15   will be used in the ordinary course of business or when one

16   can reasonably foresee such use.  It does not matter whether

17   the material mail was itself false or deceptive so long as

18   the mail was used as part of the scheme.  Nor does it matter

19   whether the scheme or plan was successful or that any money

20   or property was obtained.

21           If you decide that the defendant was a member of a

22   scheme to defraud and that the defendant had the intent to

23   defraud, the defendant may be responsible for other

24   co-schemers' actions during the course of and in furtherance

25   of the scheme even if the defendant did not know what they

said or did.

For the defendant to be guilty of an offense
committed by a co-schemer in furtherance of the scheme, the
offense must be one that the defendant could reasonably
foresee as a necessary and natural consequence of the scheme
to defraud.

Defendant Yi-Chi Shih is charged in counts 7 and 8
of the second superseding indictment with wire fraud in
violation of Section 1343 of Title 18 of the United States
Code.

In order for the defendant to be found guilty on
counts 7 and 8, the government must prove each of the
following elements beyond a reasonable doubt:

First, the defendant knowingly participated in a
scheme or plan to defraud Cree or a scheme or plan for
obtaining money or property from Cree by means of false or
fraudulent pretenses, representations, or promises.
Deceitful statements or half truths may constitute false or
fraudulent representations.

Second, the statements made as part of the scheme
were material; that is, they had a natural tendency to
influence or were capable of influencing a person to part
with money or property.

Third, the defendant acted with the intent to
defraud; that is, the intent to deceive or cheat.

1          Fourth, the defendant used or caused to be used an

2    interstate wire communication to carry out or attempt to

3    carry out an essential part of the scheme.

4          In determining whether a scheme to defraud exists,

5    you may consider not only the defendant's words and

6    statements but also the circumstances in which they are used

7    as a whole.  A wire communication involves the use of wire,

8    radio, or television communication in interstate or foreign

9    commerce.  You need not unanimously agree that a specific

10   material false statement was made.

11         A wiring is caused when one knows that a wire will

12   be used in the ordinary course of business or when one can

13   reasonably foresee such use.  It need not have been

14   reasonably foreseeable to the defendant that the wire

15   communication would be interstate in nature.

16         Rather, it must have been reasonably foreseeable to

17   the defendant that some wire communication would occur in

18   furtherance of the scheme and an interstate wire

19   communication must have actually occurred in furtherance of

20   the scheme.

21         Defendant Yi-Chi Shih is charged in count 9 of the

22   second superseding indictment with conspiring to

23   intentionally access without authorization a protected

24   computer and thereby obtain information in violation of

25   Section 1030(a)(2)(C), (c)(2)(B)(i)-(iii) of Title 18 of the

1    United States Code.

2              In order for the defendant to be found guilty of

3    that charge, the government must prove each of the following

4    elements beyond a reasonable doubt:

5              First, beginning on or about an unknown date but no

6    later than February 15, 2013, and ending on or about an

7    unknown date but no earlier than October 19, 2015, there was

8    an agreement between two or more persons to intentionally

9    access without authorization a protected computer and thereby

10   obtain information in furtherance of a criminal act in

11   violation of United States laws, namely, the International

12   Emergency Economic Powers Act, mail fraud, or wire fraud, in

13   violation of Section 1030(a)(2)(C), (c)(2)(B)(ii) of Title 18

14   of the United States Code.

15             Second, the defendant became a member of the

16   conspiracy knowing of at least one of its objects and

17   intending to help accomplish it.

18             Third, one of the members of the conspiracy

19   performed at least one overt act for the purpose of carrying

20   out the conspiracy.

21             A conspiracy is a kind of criminal partnership, an

22   agreement of two or more persons to commit one or more

23   crimes.  The crime of conspiracy is the agreement to do

24   something unlawful.  It does not matter whether the crime

25   agreed upon was committed.

1          For a conspiracy to have existed, it is not

2     necessary that the conspirators made a formal agreement or

3     that they agreed on every detail of the conspiracy.  It is

4     not enough, however, that they simply met, discussed matters

5     of common interest, acted in similar ways, or perhaps helped

6     one another.

7          You must find that there was a plan to

8     intentionally access without authorization a protected

9     computer and thereby obtain information in violation of

10    Section 1030(a)(2)(C), (c)(2)(B)(i)-(iii) of Title 18 of the

11    United States Code.

12         One becomes a member of a conspiracy by willfully

13    participating in the unlawful plan with the intent to advance

14    or further some object or purpose of the conspiracy even

15    though the person does not have full knowledge of all the

16    details of the conspiracy.

17         Furthermore, one who willfully joins an existing

18    conspiracy is as responsible for it as the originators.  On

19    the other hand, one who has no knowledge of a conspiracy but

20    happens to act in a way which furthers some object or purpose

21    of the conspiracy does not thereby become a conspirator.

22         Similarly, a person does not become a conspirator

23    merely by associating with one or more persons who are

24    conspirators, nor merely by knowing that a conspiracy exists.

25         An overt act does not itself have to be unlawful.

1    A lawful act may be an element of a conspiracy if it was done

2    for the purpose of carrying out the conspiracy.  The

3    government is not required to prove that the defendant

4    personally did one of the overt acts.

5              As I just told you, defendant Yi-Chi Shih is

6    charged in count 9 with conspiring to intentionally access

7    without authorization a protected computer and thereby obtain

8    information in violation of Section 1030(a)(2)(C),

9    (c)(2)(B)(i)-(iii) of Title 18 of the United States Code.

10             In order for the defendant to be found guilty of

11   that charge, the government must prove each of the following

12   elements beyond a reasonable doubt:

13             First, the defendant intentionally accessed without

14   authorization a computer.

15             Second, by accessing without authorization a

16   computer, the defendant obtained information from a computer

17   that was used in or affected commerce or communication

18   between one state and another state.

19             Third, the information was obtained in furtherance

20   of a criminal act in violation of the United States laws,

21   namely, the International Emergency Economic Powers Act, mail

22   fraud, or wire fraud, in violation of Section 1030(a)(2)(C),

23   (c)(2)(B)(ii).

24             Whether the defendant was authorized to access the

25   computer in this case depends on the actions taken by Cree to

1    grant or deny permission to defendant to use the computer.  A

2    person uses a computer, quote, without authorization, close

3    quote, when the person has not received permission from Cree

4    to use the computer for any purpose (such as when a hacker

5    accesses the computer without any permission), or when Cree

6    has rescinded permission to use the computer and the person

7    uses the computer anyway.

8          Defendant Yi-Chi Shih is charged in count 10 of the

9    second superseding indictment with aiding and abetting the

10   transport of funds to promote unlawful activity in violation

11   of Section 1956(a)(2)(A) of Title 18 of the United States

12   Code.

13          In order for the defendant to be found guilty of

14   that charge, the government must prove each of the following

15   elements beyond a reasonable doubt:

16          First, the defendant aided and abetted the

17   transport of money to a place in the United States from or

18   through a place outside the United States.

19          Second, the defendant acted with the intent to

20   promote the carrying on of fraud and related activity in

21   connection with computers or mail fraud or wire fraud or

22   violations of the International Emergency Economic Powers

23   Act.

24          Aiding and abetting is defined in instruction 37.

25          A defendant may be found guilty of transporting

1    funds to promote unlawful activity in violation of

2    Section 1956(a)(2)(A) of Title 18 of the United States Code

3    even if the defendant personally did not commit the act or

4    acts constituting the crime but aided and abetted in its

5    commission.

6              To, quote, aid and abet, close quote, means

7    intentionally to help someone else commit a crime.

8              To prove a defendant guilty of transporting funds

9    to promote unlawful activity by aiding and abetting, the

10   government must prove each of the following beyond a

11   reasonable doubt:

12             First, someone else committed the crime of

13   transporting funds to promote unlawful activity.

14             Second, the defendant aided, counseled, commanded,

15   induced, or procured that person with respect to at least one

16   element of the crime of transporting funds to promote

17   unlawful activity.

18             Third, the defendant acted with the intent to

19   facilitate the crime of transporting funds to promote

20   unlawful activity.

21             Fourth, the defendant acted before the crime was

22   completed.  It is not enough that the defendant merely

23   associated with the person committing the crime or

24   unknowingly or unintentionally did things that were helpful

25   to that person or was present at the scene of the crime.

1          The evidence must show beyond a reasonable doubt

2     that the defendant acted with the knowledge and intention of

3     helping that person commit the crime of transporting funds to

4     promote unlawful activity.

5          A defendant acts with the intent to facilitate the

6     crime when the defendant actively participates in a criminal

7     venture with advanced knowledge of the crime.

8          The government is not required to prove precisely

9     which defendant actually committed the crime and which

10    defendant aided and abetted.

11         Defendant Yi-Chi Shih is charged in count 11 of the

12    second superseding indictment with knowingly and willfully

13    making a false statement in a matter within the jurisdiction

14    of a governmental agency or department in violation of

15    Section 1001(a)(2) of Title 18 of the United States Code.

16         The false statements defendant is charged with

17    making are:  No Cree wafers, also known as MMIC amplifiers,

18    went to China.

19         No Cree B wafers, also known as MMIC amplifiers,

20    went to Hong Kong.

21         Defendant Shih was not working on GaN in China.

22         In order for the defendant to be found guilty of

23    the charge in count 11, the government must prove each of the

24    following elements beyond a reasonable doubt:

25         First, the defendant made a false statement with

1  all of you agreeing as to which statement was false and

2  material.

3         Second, the statement was made in a matter within

4  the jurisdiction of the Federal Bureau of Investigation,

5  quote, FBI, close quote.

6         Third, the defendant acted willfully; that is, the

7  defendant acted deliberately, i.e., intentionally and with

8  knowledge both that the statement was untrue and that his

9  conduct was unlawful.

10         Fourth, the statement was material to the

11  activities or decisions of the FBI; that is, it had a natural

12  tendency to influence or was capable of influencing the

13  agency's decisions or activities.

14         Defendant Yi-Chi Shih is charged in counts 12

15  through 14 of the second superseding indictment with filing a

16  false tax return in violation of Section 72061 of Title 26 of

17  the United States Code.

18         In order for defendant to be found guilty of those

19  charges, the government must prove each of the following

20  elements beyond a reasonable doubt:

21         First, the defendant signed and filed a tax return

22  for the year 2011, count 12; the year 2012, count 13; and the

23  year 2013, count 14, that he knew contained incorrect

24  information as to a material matter, i.e., the amount of

25  total income earned by the defendant during the 2011 and

2012 calendar years and the amount of ordinary dividends

earned by the defendant during the 2000 [sic] calendar year.

Second, each tax return contained a written

declaration that it was being signed subject to the penalties

of perjury.

Third, in filing each false tax return, the

defendant acted willfully.

A matter is material if it had a natural tendency

to influence or was capable of influencing the decisions or

activities of the Internal Revenue Service.

In order to prove that the defendant acted

willfully, the government must prove beyond a reasonable

doubt that the defendant knew federal tax law imposed a duty

on him, and the defendant intentionally and voluntarily

violated that duty.

A defendant who acts on a good-faith

misunderstanding as to the requirements of the law does not

act willfully even if his understanding of the law is wrong

or unreasonable.

Nevertheless, merely disagreeing with the law does

not constitute a good-faith misunderstanding of the law

because all persons have a duty to obey the law whether or

not they agree with it.

Thus in order to prove that the defendant acted

willfully, the government must prove beyond a reasonable

doubt that he did not have a good-faith belief that he was complying with the law.

You have heard evidence that the federal income tax returns at issue in counts 13 and 14 of the second superseding indictment were filed electronically with the Internal Revenue Service.

In the case of an electronically filed return, an electronic signature made in accordance guidance published by the Internal Revenue Service is for all purposes the same as a written signature on a paper tax return.

For individual federal income tax returns filed for the taxable years 2012 and 2013, applicable IRS guidance permitted third-party tax return preparers to electronically file returns on behalf of their client upon securing client authorization via a signed and dated IRS form 8879.

Defendant Yi-Chi Shih is charged in counts 15 through 18 of the second superseding indictment with knowingly and willfully concealing a material fact from the United States Department of Treasury via trick, scheme, or device in violation of Title 18 of the United States Code Section 1001(a)(1).

Count 15 charges that on or about May 6, 2014, defendant submitted to the Department of the Treasury a report of foreign bank and financial accounts, FinCEN form 114, commonly referred to as, quote, FBAR, close quote, that

concealed that during calendar year 2013 he had a financial

interest in and a signature authority over bank, securities,

and other financial accounts at Standard Chartered Bank (Hong

Kong), Limited, in Hong Kong with an aggregate value in

excess of $10,000; and that during calendar year 2013 he had

a financial interest in and signature authority over bank,

securities, and other financial accounts at the Hong Kong

branch of Coutts & Company, Limited, in Hong Kong with an

aggregate value in excess of $10,000.

Count 16 charges that on or about June 18, 2015,

defendant submitted to the Department of Treasury an FBAR

that concealed that during calendar year 2014 he had a

financial interest in and signature authority over bank,

securities, and other financial accounts at Standard

Chartered Bank Hong Kong, Limited, in Hong Kong with an

aggregate value in excess of $10,000; and that during

calendar year 2014, he had a financial interest in and

signature authority over bank, securities, and other

financial accounts at the Hong Kong branch of Coutts &

Company, Limited, in Hong Kong with an aggregate value in

excess of $10,000.

Count 17 charges that on or about April 9, 2016,

defendant submitted to the Department of Treasury an FBAR

that concealed that during calendar year 2015 he had a

financial interest in and signature authority over bank,

securities, and other financial accounts at Standard
Chartered Bank Hong Kong, Limited, in Hong Kong with an
aggregate value in excess of $10,000.

Count 18 charges that on or about April 12, 2017,
defendant submitted to the Department of Treasury an FBAR
that concealed that during calendar year 2016 he had a
financial interest in and signature authority over bank,
securities, and other financial accounts at Standard
Chartered Bank Hong Kong, Limited, in Hong Kong with an
aggregate value in excess of $10,000.

In order for the defendant to be found guilty of
these charges, the government must prove each of the
following elements beyond a reasonable doubt:

First, defendant Yi-Chi Shih knowingly concealed by
trick, scheme, or device in his FBAR for calendar year 2013,
count 15; calendar year 2014, count 16; calendar year 2015,
count 17; and calendar year 2016, count 18, a fact which he
had a legal duty to report.

You must all agree as to the specific act of
concealment undertaken by defendant Yi-Chi Shih and the fact
concealed.

Second, the fact concealed was in a matter within
the jurisdiction of the Department of Treasury.

Third, the defendant, Yi-Chi Shih, acted willfully;
that is, defendant Yi-Chi Shih acted deliberately, i.e.,

1    intentionally and with knowledge both that the fact had been

2    concealed and that his conduct was unlawful.

3        Fourth, the fact concealed was material to the

4    activities or decisions of the Department of the Treasury;

5    that is, it had a natural tendency to influence or was

6    capable of influencing the agency's decisions or activities.

7        The phrase, quote, concealed a fact by any trick,

8    scheme, or device, close quote, means any deliberate plan or

9    course of action or any affirmative act or any knowing

10   omission designed to deceive others by preventing or delaying

11   the discovery of material information.

12       Let me confer briefly with counsel, please.

13       (Begin sidebar conference)

14       THE COURT:  Any objection to the instruction -- the

15   manner in which the instructions were read?

16       MR. SHOBAKI:  No.

17       MR. SPERTUS:  No, Your Honor.

18       MS. HEINZ:  No, Your Honor.  There's just a typo

19   that should be changed in the written ones.

20       MR. SPERTUS:  The Cree --

21       MS. HEINZ:  The Cree B.

22       MR. SPERTUS:  It escaped all of our attention.  We

23   can correct it off the record.

24       THE COURT:  That's fine.  There's a couple other

25   typos that I instructed the jury in the final version.

```
 1            MR. SPERTUS:  We agree.

 2            MS. HEINZ:  Thank you.

 3            (End sidebar conference)

 4            THE COURT:  Ladies and gentlemen, as I said

 5     earlier, we will now hear arguments by counsel.

 6            We're going to start with the government.  Then

 7     that will be followed by the defense.  And then after the

 8     defense presents its argument, the government may respond.

 9            I want to remind you again that what the attorneys

10     say during argument is not evidence.

11            So would the government please proceed.

12            MR. SHOBAKI:  Yes, Your Honor.

13            May I have a moment to set up?

14            THE COURT:  Yes.

15            (Pause in proceedings)

16            MR. SHOBAKI:  Thank you.

17                    GOVERNMENT'S CLOSING ARGUMENT

18            MR. SHOBAKI:  Good morning, ladies and gentlemen.

19     This is a case about greed, lies, and monolithic microwave

20     integrated circuits, also known as MMICs.

21            As you've learned during this trial, MMICs and

22     specifically the high-powered gallium nitride MMICs that

23     operate in wide frequency bands are an important part of the

24     case.  GaN MMIC power amplifiers are at the heart, they're

25     the engines that drive state-of-the-art communications,
```

1   radar, electronic warfare, and missile guidance systems.

2            They have extensive military uses, and they are

3   export controlled for purposes of the United States national

4   security.

5            Defendant knew all of that.  He knew it because

6   he's an expert in microwave circuit design.  He knew it

7   because he spent decades working at his own company, MMCOMM,

8   and at United States defense contractors on microwave

9   circuits.

10           He knew it because he had training and experience

11   in the export laws as they relate to MMIC power amplifiers.

12   What defendant also knew was that there was great demand for

13   high-power GaN MMIC amplifiers in the People's Republic of

14   China, in part because of this export restriction that the

15   United States and European countries have on the export of

16   these high-powered items.

17           In that demand, defendant and his co-conspirators

18   saw opportunity.  They saw opportunity in that market, and

19   they approached that opportunity in a two-pronged approach.

20   One was developing MMIC design expertise in the People's

21   Republic of China.  That's what Chengdu RML did.

22           The second was developing a factory or foundry as

23   you have heard about to build both gallium nitride and

24   gallium arsenide MMICs in the People's Republic of China.

25   That company was Chengdu GaStone, a company that defendant

1    ultimately became the president of in 2011.

2         Now, executing the plan to develop this capability

3    in the People's Republic of China required a lot of money and

4    it required the willingness to violate the United States

5    export laws.  That's what defendant and his co-conspirators

6    did, and that's what the evidence has shown in this case.

7         They developed expertise, worked to build foundries

8    with production lines, and also exported custom MMICs that

9    they tricked American manufacturer Cree into building for

10   them.

11        Defendant was richly rewarded for his efforts.

12   Defendant's conduct is why you're here today.

13        Now, as the Court told you, the defendant is

14   charged with 18 counts in what's called the second

15   superseding indictment.  This morning I'll explain to you how

16   the government has proved that defendant is guilty with

17   respect to each and every one of those counts, guilty beyond

18   a reasonable doubt.

19        After you hear arguments, as the Court told you,

20   the case will be yours to decide.  When you go back to that

21   jury room, you're not going to have a copy of the indictment.

22   You're also not going to have a copy of this presentation or

23   any of the notes in this presentation about the exhibits that

24   helped and testimony that helped prove the case.

25        What you will have is the jury instructions which

1    incorporate in part the indictment to help explain the

2    charges which the Court just read to you.  You'll have a copy

3    of a verdict form which calls for a verdict on each of the 18

4    counts.  You'll have the exhibits from trial.  You'll have

5    your recollection of the testimony from trial, and you have

6    your common sense.

7            Now, this is technically the sixth week of this

8    trial.  You have heard a lot of testimony and you've seen a

9    lot of exhibits.  There have been a lot of documents in this

10   case.

11           I'm not going to in this presentation rehash every

12   single exhibit that came in during the six weeks.  I'm not

13   going to rehash every piece of testimony that proves each

14   charge.  However, I will be highlighting the evidence that

15   goes to each element of each charge and shows that the

16   government proved that charge beyond a reasonable doubt.

17           Now, there is a lot of evidence, and it will take

18   some time to go through it, as the Court indicated to you.

19   So please bear with me as we step through the proof that the

20   government has presented in this case.

21           Now, the Court talked to you about the charges, and

22   those charges are discussed in the jury instructions.  The

23   charges are export conspiracy.  This charge, count 1, covers

24   the full length of the conduct that you heard testimony

25   about, dating back to somewhere around 2006 up through a few

1    years ago.

2            This count encompasses almost all of the conduct

3    that relates to the other 17 counts in the indictment.  So in

4    the discussion of evidence for the conspiracy count, you will

5    hear evidence of the other counts.  I'll try and call that

6    out to you, and then we'll explain it when we get to those

7    counts, too.

8            Count 2 is the illegal export.  This specifically

9    relates to what has been talked about in this trial as the

10   export of the wafer containing MMICs from Cree run one to

11   Chengdu RML in Chengdu, China.

12           Counts 3 through 6 and 7 through 8 are fraud

13   counts.  They both relate to a scheme to defraud.  In this

14   case the scheme to defraud that is charged is a scheme to

15   defraud Cree.

16           The scheme was to get Cree's services, to get Cree

17   to manufacture the wafers containing MMIC power amplifiers

18   designed by Chengdu RML and to do it through subterfuge,

19   through a trick, that trick being the trick that it was

20   actually work done for Kiet Mai and his company, MicroEx, and

21   not for defendant and his co-conspirators in China and the

22   designers at Chengdu RML.

23           So the scheme, the lie, the trick on Cree, there

24   really is -- who Cree was doing the work for.  And with

25   respect to the mail and wire fraud counts, there are four

1    mail counts.  They relate to the shipment of Cree run one

2    from Cree to Kiet Mai, the shipment of Cree run one wafer out

3    of the United States to Hong Kong, the shipment of the second

4    run of wafers from North Carolina to California to Kiet Mai,

5    and then the shipment to Canada of at least one wafer from

6    that run.

7            Now, the wire fraud counts both relate to the use

8    of interstate wires.  In this case it's interstate bank

9    transfers.  There are two payments made from Morgan Stanley

10   accounts by Kiet Mai to Cree.  The first payment was with

11   respect to Cree run one, and the second payment was with

12   respect to Cree run two.

13           The computer fraud conspiracy, this relates to the

14   access to Cree's portal.  Kiet Mai working with defendant got

15   access to Cree's services, which included access to the Cree

16   portal and specifically access to download Cree manuals and

17   the Cree process design kit which you heard testimony about.

18   That's software downloaded from Cree's computers that allows

19   a designer who is designing MMIC power amplifiers to design

20   those amplifiers in a manner that allows them to be

21   manufactured by Cree.

22           In other words, it's all the rules and information

23   necessary to use Cree's foundry.  That software is what was

24   available on the portal for authorized customers of Cree.

25           Count 10 is a money-laundering count.  It's what's

called promotional money laundering.  It relates to causing

money to come from outside the United States into the

United States to facilitate criminal activity.  Here the

criminal activity being facilitated was the export

conspiracy, the fraud, and computer fraud.

The specific transaction here that's charged in

that count is when defendant instructed his co-conspirator

and brother, Ishiang Shih, to wire $120,000 from JYS

Technologies bank account held in Canada to Kiet Mai's bank

account held in the United States at Bank of America.

It's that transfer of money, money that was used

ultimately for the second Cree run, that's charged in

count 10.

Count 11 relates to three false statements made by

the defendant to the FBI when he was interviewed after his

arrest, those statements being that Cree wafer or MMICs did

not go to China, did not go to Hong Kong, and that he was not

working on gallium nitride in China.

Counts 12 through 14 are tax return counts.  They

relate to defendant's failure to report the income that he

was receiving in 2011 and 2012 and 2013.  In 2011 that income

was the $67,000 a month deposited into his secret Hong Kong

bank account beginning in August of that year.

In 2012 that income was that same $67,000 a month

deposited over the course of the entire year and dividends

1    paid on the money sitting in that Hong Kong bank account.

2           Finally, the last tax charge relates just to

3    dividends that were paid on money sitting in the Hong Kong

4    bank account.

5           Finally with respect to counts 15 through 18, as

6    the Court instructed you, those are FBAR counts.  As you

7    heard during the trial, there is -- the FBAR requirement

8    requires a -- requires the reporting of foreign bank accounts

9    that hold on aggregate more than $10,000.

10          That aggregate is actually aggregate for all bank

11   accounts.  In this case the evidence showed defendant

12   regularly reported to China CITIC Bank bank accounts but

13   concealed from his accountant and concealed on his FBARs the

14   existence of the Standard Chartered Hong Kong bank account

15   and the Coutts bank account also in Hong Kong.

16          So let's talk about the specifics of each charge.

17   Now, you received the jury instruction on conspiracy.  This

18   relates to the export conspiracy.

19          The export conspiracy in this case, it's a long

20   instruction.  There's a lot of text -- is that defendant and

21   at least one other person -- here a number of other

22   co-conspirators are charged -- agreed to knowingly and

23   willfully to do at least one of the following, which is to

24   export from the United States an export controlled item

25   without a license; to do so, to export any item, an item from

the United States to Chengdu GaStone after it was placed on

the entity list without a license, and in both instances to

do so without filing electronic export information.

So there's an agreement.  And then there's -- the

second part of the conspiracy instruction requires that the

defendant become a member of the conspiracy knowing of at

least one of its objects.

As you've seen throughout this case, defendant was

intimately involved in this conspiracy and was driving its

object.

So what is a conspiracy?  Again, the jury

instructions on this tell you what a conspiracy is.  Jury

instruction 23 specifically describes a conspiracy.  It is a

criminal partnership.  It is an agreement to commit one or

more crimes.

It isn't the commission of the crime.  That's a

separate crime.  It's the agreement.  And it doesn't matter

whether the agreement was actually successful.  Here the

evidence shows at least with respect to one export the

agreement did bear fruit, and that is charged in count 2, the

export of the Cree run one wafer containing high-powered

MMICs from the United States to the People's Republic of

China.

Now, in the conspiracy how do you know that there's

an agreement?  There are a lot of ways to tell that

      1    conspirators have agreed.  You can tell through their words,

      2    through their actions.  In this case their actions involved

      3    early plotting.  Their actions involved wafer runs and

      4    shipments that you saw evidence about, wafer runs and

      5    shipments that transited the globe on their way back to

      6    China.

      7            You saw evidence about money and secrets.  You saw

      8    business plans.  This conspiracy involving Chengdu GaStone,

      9    the establishment of a foundry in China, and the building up

     10    the MMIC design capabilities at Chengdu RML involved a series

     11    of business plans.

     12            Those are documents that were mailed around between

     13    the conspirators.  So in those documents, you see in the

     14    conspirators' and in defendant's own words the plans, the

     15    intent, what it was they were agreeing to do.

     16            Finally, in engaging in the fraud on Cree, to

     17    actually get Cree to manufacture MMICs, you also see the

     18    concert of action between the members of the conspiracy to

     19    accomplish that goal.

     20            Now, let's discuss early plotting.  Now, defendant

     21    was the president of a company called MMCOMM.  You heard

     22    testimony about this.  You heard from people who worked with

     23    defendant at MMCOMM, including Jesse Lu.  At MMCOMM the

     24    defendant got to know his co-conspirator, Yaping Chen.

     25            Yaping Chen was a businessman who operated Dingtian

Micro in Chengdu, China.  This is the first evidence back in

July of 2005 of defendant and Yaping Chen coming together.

You recall Lilie Chen talked about his father meeting

defendant for the first time around this time, and you saw a

presentation about Dingtian Micro and MMCOMM working together

on a KA 10-watt power amplifier module, a module that Yaping

Chen and defendant are holding in this photo.

So this is the early stages of defendant and Yaping

Chen getting to know each other and beginning to develop

plans in connection with microwave technology.

You also saw and heard about somebody call Ye Fei,

another of the conspirators in this case.  Ye Fei, as you

saw, used a variety of names and e-mail addresses -- Michael

Anderson, Michael Ye, Michael Jackson, Michael Dixon, all of

these different names, all these different e-mails in

communications with the defendant.

Those communications related to the shipment of

parts to Dingtian Micro in China through a variety of routes.

First, there is discussions about shipping TriQuint parts,

TriQuint power amplifiers, through a company called Augar

International.  You saw e-mails about this.

Jesse Lu also testified about it, that materials

were being sent to Augar International in Singapore on behalf

of Dingtian Micro.

Fei Ye also in e-mails asked defendant to bring

parts with him to China.  And you know that defendant did go

to China and meet with Fei Ye because in e-mails defendant

referenced going to China and giving purchase orders to Fei

Ye and discussing the use of Augar.

Now, Fei Ye and defendant also very early on talked

about some of the plans that would ultimately lead to the

establishment of Chengdu GaStone.  Back in 2006 they were

discussing building up MMIC design capability in China and

building a foundry in China, things that didn't exist.

Again, the design portion ultimately became Chengdu

RML, which is Yaping Chen's company.  The foundry project

ultimately became Chengdu GaStone, the company which

defendant was the president of and which was placed on the

United States entity list in August of 2014.

They were already working at this point on plans

for developing MMIC power amplifiers.  And because there was

no capability to really build those in Chengdu at the time,

to use WIN.

You've heard a lot of testimony about WIN.  WIN

Semiconductors operates a foundry in Taiwan and at this time

was making gallium arsenide processed MMICs.

Now, Yaping Chen became the general manager and

technical director of Chengdu RML Technology.  You saw that

in his visa application documents when he was applying to

come to the United States and on his resumes.

1    You also saw documents that showed that defendant

2    was a part owner of Chengdu RML.  He had shares in Chengdu

3    RML held through a third party, through another person but

4    defendant's shares.

5    You saw evidence that defendant worked on designs

6    with and for RML and on producing wafer runs for RML from

7    2007 to at least 2016, over a very lengthy period of time.

8    Defendant was tied in with RML and his co-conspirator, Yaping

9    Chen.

10    Exhibit 2010.  You saw this exhibit a lot, and it's

11    an important exhibit.  It's an exhibit, a document that came

12    off of defendant's laptop.  It's a document that was in this

13    directory, RML works summary 2016 February 01.  This document

14    details much if not all of the work that defendant was doing

15    with RML and on projects for China.

16    Now, as part of the early plotting with Yaping Chen

17    and Fei Ye, defendant participated in designing and

18    facilitating WIN wafer runs.  You saw this, for example, in

19    2009 working for a customer.  Defendant was helping produce

20    wafers for customers.  Hope the customer was impressed.

21    Defendant started asking Yaping Chen to send money,

22    instructing him to send money, sending $100,000 to JYS in

23    Canada, his brother, Ishiang Shih, and co-conspirator's

24    company bank account.

25    And also at that time $100,000 to a China Trust

1    Bank account in the United States held by defendant's

2    brother-in-law.

3            You also saw and heard testimony about Air China

4    pilots as part of this early time in the process.  Fei Ye

5    e-mailed repeatedly with defendant and on three different

6    occasions, in August, October, and December 2009, e-mailed

7    with him about meeting Air China pilots at hotels near LAX

8    and giving them things, giving them things to take to China.

9            For example, on December 3rd, an e-mail about a

10   Chinese pilot.  You tell him that it's just a module made of

11   some metal for him to carry.  Don't mention anything about

12   MMIC.  So this is what defendant was doing, traveling,

13   meeting Air China pilots, and sending things to China.

14           Now, you also heard testimony about these WIN wafer

15   runs.  We saw in the communications that WIN would not ship

16   to Hong Kong.  Defendant e-mailed Yaping Chen in August 2009:

17   WIN cannot drop ship to Hong Kong.  Hong Kong, as you heard

18   from Eric Lin and as you saw in the evidence, is a gateway to

19   China.

20           Shipments to Hong Kong, if you want to ship to

21   China, that's the place you ship.  Ship to Hong Kong.  Can't

22   ship to Hong Kong.  May want to try Singapore.  You remember,

23   Singapore is where Augar International was, the other path

24   that defendant used to ship things to China.

25           WIN also e-mailed defendant's co-conspirator

1    brother at around the same time.  Sorry, we can't ship these

2    to China.  So defendant arranged to pick up at least one of

3    the wafers in Taiwan because he happened to be there.

4           Now, you saw and heard in testimony from Special

5    Agent Willie Lo a compilation of information about shipments

6    from WIN that ultimately made their way back to Hong Kong.

7           This chart, which is Exhibit 5004, summarizes those

8    records.  It's drawn off of WIN shipment records and

9    invoices, shipping records for the packages sent from WIN to

10   JYS Technologies; border crossing records for two employees

11   of JYS Technologist, Jack Yu and Yu Mo Chen; records from a

12   company in Champlain, New York, Freeport Forwarding; and

13   information from Oclaro, which is a company where one of

14   Lilie Chen's friends worked, Hao Chen.  And he testified

15   about receiving packages and then sending them on to China,

16   helping his friend Lilie out.

17          Now, defendant and Yaping Chen, Lilie Chen

18   testified that defendant and Yaping Chen both told him they

19   were unable to place orders for wafers to be manufactured at

20   WIN from China.  Lilie Chen was instructed by them to ship

21   packages he received or his friends received on his behalf in

22   the Bay Area to Hong Kong and to mark them as low-value glass

23   samples.  You saw this over and over and over again.

24          Shipments traveled from WIN in Taiwan to JYS

25   Technologies in Montreal to Freeport Forwarding to San Jose

and then to Hong Kong.  The records compiled in that chart,

Exhibit 5004, show that for 13 shipments.

Now, Montreal, Canada, and Champlain, New York, are

about 35 miles apart.  These wafers were shipped to JYS,

driven across the border, shipped to San Jose, and then

shipped to Hong Kong, zipping right past Taiwan on the way.

Now, WIN does ship to Canada.  Here's an example of

a WIN invoice.  This is a WIN to JYS invoice for $84,000, six

wafers, in October of 2013.  Then shipped, taken across the

border, shipped to San Jose.  In San Jose it was sent out.

This one was sent by Eric Lin, who you also heard from at

trial from Elite Performance, and sent to Austin Yu at SDV

Hong Kong.

Now, those six wafers that were $84,000 on the

invoice from WIN to JYS suddenly became $1,200 of glass

samples when they were shipped to Hong Kong.  Again, this is

a method that you saw used again and again in the evidence to

move things from Taiwan to Canada to the United States and

back to China.

You later saw that this same method of shipment was

used to ship the Cree run one wafer from California to China.

Now, that same wafer run spreadsheet, Exhibit 2010, on

defendant's laptop had entries for these wafers.  It had

entries that showed them as part of wafer run 39.  It showed

the dates of shipment.

 1          This spreadsheet contained a lot of information,

 2     and you'll see it again.  But it contained information about

 3     how much the project budget was, how much defendant got paid,

 4     where the money was sent, the dates of invoicing, the dates

 5     of shipment, and descriptions of what the project was.

 6          So let's talk about payment destinations.  A number

 7     of different payment destinations are identified in

 8     defendant's wafer project spreadsheet.  Those are ICB,

 9     Industrial Commercial Bank in China, JYS, JYS Technologies

10     account at TD Bank in Canada.  YWL you will recall is

11     defendant's brother-in-law's account here in the

12     United States.

13          HK was defendant's secret Standard Chartered bank

14     account.  That's the bank account that we'll talk about that

15     in a bit, but that's the bank account he opened using his

16     Taiwanese passport, not his American passport.

17          Now, the final account is Pullman Lane Productions.

18     That's defendant's company here in the United States.  They

19     also have bank accounts into which money was deposited.

20          Now, the wafer run spreadsheets include entries for

21     couple of runs that are of particular importance in this

22     case.  Those are what was called the Z5 project.  The Z5

23     project was the project involving the design of GaN MMIC

24     power amplifiers and transistors in Cree run two to be built

25     by Cree.  Those entries are here.  We'll talk about this in

the context of Cree a little bit later.

This spreadsheet, soup to nuts, covered from the
beginning all the way through 2016 all of the wafer runs that
defendant was involved with working on with RML as part of
the conspiracy.

Now, another part of the conspiracy and where you
can see agreement is the money and the secrets. So Jieru
Deng, you heard about Jieru Deng. You saw a picture of her.
She's also sometimes called Deng Jieru. I'm sorry if I
switch the names around, but they can be switched. It's
common with Chinese names.

You saw pictures of her at UCLA at some point. She
became involved somewhere around 2010 with the conspiracy and
became a co-conspirator. In November of 2010 you saw that
she sent confirmation that a million dollars had been sent
and deposited into defendant's Pullman Lane bank account in
the United States.

In 2011 in April, Yaping Chen forwarded information
that almost $400,000 had been sent by Deng Jieru to an
account in defendant's name at ICBC in Chengdu. The
documents attached to that show that it's an account in
defendant's name at that bank in Chengdu, China.

Now, later that year, a couple of weeks after that
payment into the account in Chengdu, China, defendant did
something that is very important for this case. Defendant

opened accounts at Standard Chartered Bank in Hong Kong.  He

used his Taiwanese passport to open the account and on the

documents claimed he's not a United States citizen.

        This secret bank account in Hong Kong is where

defendant received vast sums of money during the course of

the conspiracy, vast sums of money that was not taxed, as you

heard from Judy Chen, by any tax authority.  There were no

withholdings.

        Now, Judy Chen, you heard about Mystical Optimism

from Judy Chen.  Judy Chen talked about Mystical Optimism as

a company that her father had set up as a British Virgin

Islands company.  It had a bank account in Hong Kong.  It had

a bank account at HSBC Bank, which is a bank in Hong Kong.

        That account had been set up by her father.  It was

used by her father, she testified, and she was a signatory on

the account.  Now, Judy Chen also told you that Yaping Chen

approached her because he knew about this bank account.  He

knew her father.

        He knew about this bank account in Hong Kong, a

bank account held by a British Virgin Islands company that

wasn't really being used for anything.  That bank account

became the first big slush fund for the conspiracy.

        So in 2011 defendant resigned from Honeywell

effective July 1st, 2011, and became the president of Chengdu

GaStone Technology on July 3rd.  His annual salary there, he

was paid a salary of approximately $300,000 as the president of Chengdu GaStone.

Now, speaking of Mystical Optimism, you saw the spreadsheet that Judy Chen maintained for Mystical Optimism's finances and for the finances of the conspiracy. It detailed payments she was instructed to make by Yaping Chen, and she sent that spreadsheet to Yaping Chen regularly.

In fact, the spreadsheet that you've seen in evidence, 608A, is attached to an e-mail to Yaping Chen, and it details her payments, payments she made at his instruction on behalf of the project or the conspiracy.

Now, that spreadsheet is backed up by HSBC Bank records. Judy Chen got those bank records from Hong Kong. Those records are Exhibits 1101 and 1102. Those are the actual bank records from Hong Kong that cross-check against the spreadsheet.

So in 2011 Yaping Chen instructed Judy Chen to pay defendant $67,000 a month from the Mystical Optimism HSBC Hong Kong account into defendant's secret Standard Chartered Hong Kong bank account. Those payments were made regularly every month from then through the end of 2012.

This was compensation, not reimbursement for projects, not payment for expenses on other things. As you'll see, those kinds of expenses were categorized differently in her spreadsheet.

1          Other co-conspirators also received regular

2    salaries from the Mystical Optimism account.  Jieru Deng,

3    Yaping Chen, Ishiang Shih, and others all also got monthly

4    payments out of that account.

5          Now, Special Agent Carlos Tropea from the IRS went

6    through a lot of financial documents with you, and he

7    demonstrated how Deng Jieru was associated with sending money

8    to defendant's accounts.  Judy Chen also testified that Deng

9    Jieru was involved with financing the project.

10          You saw money coming from QTC, which was added to

11    the entity list in August of 2014.  You saw money from Zhuhai

12    Trading, from Zeon Mau Trading.  You saw e-mails with Deng

13    Jieru about money being sent from Dragon Gain Enterprises.

14          You also saw Deng Jieru copied later on on e-mail

15    requests for payment from the defendant where he was

16    ultimately paid by a company called One Five Nine Investment

17    Holding, Limited.

18          THE COURT:  Mr. Shobaki, if you could talk a little

19    more slowly, please.

20          MR. SHOBAKI:  Yes, Your Honor.  Sorry.

21          THE COURT:  Thank you.

22          MR. SHOBAKI:  Now, Special Agent Tropea prepared a

23    series of charts.  We're not going to go back over all these

24    charts.  What these charts showed is the sophisticated web of

25    payments that were made from these Chinese front companies to

1  defendant's accounts, to JYS Technologies' account, and to

2  Mystical Optimism.

3          The records showed that those three companies put

4  approximately $5.8 million into Mystical Optimism's Hong Kong

5  account.  About 1.6 million went into Pullman Lane in the

6  United States, and about 2.9 million went into JYS

7  Technologies, Canada.

8          That money was funneled from those front companies

9  through Pullman Lane.  Some of it was funneled through

10 Pullman Lane to UCLA in the form of those checks that you

11 saw.  Some of the money was funneled through JYS

12 Technologies, a lot of it to WIN to pay for the wafer runs.

13         The JYS Technologies account in Canada was used for

14 a lot of sort of operations expenses.

15         Now, this chart doesn't include cross payments

16 between the accounts because Mystical Optimism also sent

17 money to JYS.

18         Now, how else do you know that there was agreement?

19 You saw business plans.  As early as 2009, defendant sent a

20 13-page preliminary plan to establish an advanced three five

21 wafer manufacturing facility.

22         You recall Dr. Sandison and some of the other

23 witnesses explained to you that that three five refers to the

24 table, the periodic table of elements and that this is a

25 discussion about gallium arsenide and gallium nitride

1    manufacturing.

2        Yaping Chen and defendant's communications again

3    showed that this idea that had -- that you saw the first

4    evidence of with Fei Ye has been -- began developing into an

5    actual plan to build the foundry and to develop the

6    expertise.

7        You also saw shortly thereafter a plan document

8    sent by co-conspirator Ishiang Shih to defendant.  That was

9    in January of 2010.  That was about epitaxy.  You remember

10   that Dr. Sandison explained that -- and Dr. Nordquist -- that

11   when manufacturing wafers, whether they're gallium arsenide

12   or gallium nitride, that you begin with a wafer.  It looks a

13   little bit like a compact disk.  That wafer is specially

14   grown in a manner that makes it suitable to build your

15   electronic circuitry on top of.

16       THE COURT:  One moment.  When you get to a

17   convenient place, could you let me know so we can take a

18   short break, please.

19       MR. SHOBAKI:  Yes, Your Honor.  I'll just finish

20   talking about epitaxy.

21       THE COURT:  Thank you.

22       MR. SHOBAKI:  So the defendant's brother and

23   co-conspirator sent a discussion about an epitaxy plan.  Now,

24   you recall again this is the first part, the first kind of --

25   if you think of it as a raw material that goes into building

1    MMICs onto a wafer, it's the plate that you build it onto.

2            So if you're building -- if you're setting up to

3    build a foundry, one of your inputs is going to be the

4    epitaxial material, the plates.  Defendant's brother

5    identified the issue that it was difficult to get these from

6    the United States and European countries and that a project

7    to develop an epitaxy plant in China would be a necessary

8    part of the plan.

9            He also described in that document affiliate

10   businesses, joint venture, downstream factories in Chengdu.

11   That would include Chengdu GaStone, the foundry which would

12   use these wafers, and 29S and other military units.  29S is

13   CTC29 which you heard testimony about from Peter Mattis, is a

14   Chinese government-controlled institute in China.

15           Stop there.

16           THE COURT:  Ladies and gentlemen, we're going to

17   take a short break here, about ten minutes, and then resume.

18   Please don't discuss anything to do with this matter during

19   the break.

20           Thank you.

21           THE CLERK:  All rise.

22           (Open court - jury not present)

23           THE COURT:  As soon as the jurors are ready, we'll

24   resume.

25           (Recess taken from 10:34 a.m. until 10:51 a.m.)

1          THE COURT:  Mr. Shobaki, if you could please slow

2    down, it will help the reporter, especially with respect to

3    some of the challenging words.

4          MR. SHOBAKI:  Thank you.  We've spoken, and I'm

5    going to provide her a copy of the presentation also to aid

6    with that.

7          THE CLERK:  All rise.

8          (Open court - jury present)

9          THE COURT:  Please be seated.  All 12 jurors are

10   back.  All counsel and parties and party representatives are

11   here.

12         Please proceed, Mr. Shobaki.

13         MR. SHOBAKI:  I'm not sure where I left off.

14   Should I start from the beginning or start with epitaxy

15   again?

16         Now, we left off talking about defendant's brother

17   and co-conspirator, Ishiang Shih, sending this epitaxy

18   proposal.  This was part of a series of plans that were

19   mailed around and concluding with some really big ones,

20   including a 95-page PowerPoint plan shared between defendant

21   and co-conspirator Yaping Chen in July of 2010.

22         That document -- again, these are documents that

23   are the conspirators' documents.  These are not presentations

24   made by the government.  These are their words.  This is

25   their discussion of their plan.  They again have now

1    developed and -- you notice these slides have defendant and

2    his brother co-conspirator's names on the bottom of them.

3    The executive summary, a plan to build a semiconductor

4    capability in China.  Again, that capability relates to both

5    the manufacture and design and discusses having the right

6    team.

7            This presentation also focuses, discusses both

8    gallium arsenide and gallium nitride.  It discusses the

9    gallium nitride device market forecast.  This is a slide that

10   you have seen that was discussed by, among other people,

11   Dr. Sandison when he was speaking to you about what these

12   presentations meant or, like, how to understand them.

13           In this circumstance, as you can see, there's a

14   projected large growth in the GaN market which is part of why

15   the co-conspirators wanted to get in on that market.  That

16   market is driven by, as you can see, a large part of that is

17   military.  There are also other civilian uses of technology.

18           To be clear, in this case the evidence shows that

19   defendant and his co-conspirators were interested in making

20   money, and they could make money both in the civilian and the

21   military market.  But many of the presentations and early

22   discussions focused on the special customers, special

23   domestic customer market.

24           At the front end a lot of the demand and planning

25   was towards military products, but there's also certainly

1    civilian applications for both gallium arsenide and gallium

2    nitride that are money-making applications that Chengdu RML

3    and Chengdu GaStone would be able to take advantage of.

4           Again, there's discussions about the growth in the

5    GaN market.  For the -- one of the first times you see

6    identified key competitors in the GaN market, competitors --

7    these are companies with GaN foundries, again none of these

8    in China.  And Cree is identified here.

9           You also saw a series of board minutes.  You will

10   recall that Lilie Chen, when he testified, talked about a

11   variety of meetings that he was present at in Chengdu, China,

12   where he lived for some period of time.  His father, of

13   course, Yaping Chen, is a member of the conspiracy.

14          Those meetings took place on the 29th floor of

15   Renheng, which is the offices of GaStone.  You see minutes

16   from back in 2010 of a different company, Chengdu Ganide

17   Technology that are held in the same place.

18          They have a five-person board of directors

19   including defendant and co-conspirators Yaping Chen and Jieru

20   Deng.  It's a discussion about establishing a business.  This

21   is one of the precursor discussions for the conspiracy's

22   business in GaStone.  It includes five-year plan that talk

23   about among other things the specialty market.

24          There's also discussion of commercial market, but

25   there's certainly discussion of specialty market.

1          Now, the GaStone business plan, also sent by

2     defendant and involving Yaping Chen and HB Zhao, both RML

3     e-mail addresses.  It includes a writeup for a business plan.

4     This is a Chinese-language document.

5          You saw many Chinese-language documents which are

6     translated.  So when you have an Exhibit 144, for example,

7     144A is the translated version of it.  And for a few of them

8     where there's a dispute about translation, there's a B, and

9     that's the defense's proposed translation.

10          Now, this document details among other things a

11     plan for GaStone to surpass WIN and TriQuint, which is a U.S.

12     foundry, within ten years.  There's discussion in this

13     document about export control laws.  It discusses the fact

14     that European Union, EU, and the United States export

15     licenses greatly hinder the development of communications in

16     a remote sense in aviation and aerospace.

17          There aren't fewer words that can be put on a slide

18     to convey this, so for a few of these slides that involve

19     plan documents, I apologize, but there's going to be a lot of

20     words.  And the words are important.  That's why they're up

21     there.

22          Again, this presentation discusses GaN technology

23     as moving from lab to market.  It talks about the DARPA

24     support.  That the United States Defense Advanced Research

25     Projects Agency.  You heard about that again when

1    Dr. Sandison was talking about that very large PowerPoint,

2    Exhibit 2017A.  There are a number of slides there that

3    discuss DARPA's role in helping advance GaN technology

4    because of its importance and strategic importance to the

5    United States.

6         Now, this document also shows defendant as the

7    president and head on the organizational chart for GaStone.

8    And in the context of GaStone, recall there's design and

9    manufacture.  In manufacturing there are also controls that

10   are discussed by defendant and co-conspirators with respect

11   to some of the equipment that you need to start a foundry.

12        So not only are the things that a foundry makes

13   potentially export controlled like the GaN MMICs in this

14   case, but also the equipment that you would use to build a

15   foundry.  Some of the equipment you would have in place that

16   you need.

17        Recall Dr. Sandison talked about the plans for the

18   foundry.  He talked about the architectural drawings, the

19   huge spaces, the equipment that was necessary.  These are

20   large factories.  And certain portions of the equipment used

21   in manufacture of gallium arsenide and gallium nitride MMICs

22   are also controlled.

23        The document lays out again that these two

24   processes, gallium arsenide and gallium nitride

25   manufacturing, are principally regulated by European and U.S.

1    export license controls.

2         You will recall Mr. Monroy talked about the

3    Wassenaar arrangement, the arrangement between the

4    United States and NATO allies and some other nations, notably

5    not including China, that relates to how they decide on the

6    ECCNs and how to decide on the performance levels for various

7    equipment to control.

8         Those controls are the controls that are being

9    discussed here, the European and U.S. export controls, the

10   agreement among those various nations on what equipment and

11   what devices they are going to restrict for export.

12        Now, those documents and business plans both show

13   the agreement of the conspirators.  They also show something

14   else which we'll talk about more in a couple of minutes.  But

15   the knowing and willful nature, what you can see in these

16   documents is numerous discussions about export controls,

17   about the restrictions on bringing things into China.

18   Clearly the conspirators are aware of the fact that the area

19   they're working in is one where there are tight controls on

20   many aspects of the business.

21        Now, the fraud on Cree.  The first inklings of this

22   project are actually seen on a file on defendant's -- one of

23   defendant's digital devices.  It's a file that was found at

24   -- it's document 2106, found at this file path on one of his

25   devices, again in an RML directory, project with RML.

1          That document is -- the translated version is

2    2106A.  The GaN chip project Z5 implementation plan.  And Z5

3    as we've seen in the evidence is what's used to refer to the

4    project involving Cree and the plan involving getting Cree to

5    manufacture certain gallium nitride MMICs.

6          This plan discusses Chengdu RML and the 607

7    Institute developing a Z5 chip.  The customer identified in

8    the document is a 607 Institute of China Avionics.  It

9    discusses a wideband high frequency GaN chip which is exactly

10   what was designed and manufactured in Cree run one.  Not just

11   one chip but a variety of designs that were wideband and high

12   frequency -- sorry, and high power.

13         It sets out a project timeline with various phases

14   from 2013 to 2015.  The document discusses addressing the

15   airborne needs of the 607, which is AVIC 607 Institute.  You

16   heard testimony from Mr. Mattis that AVIC 607 is a company in

17   China that develops missiles and missile guidance systems.

18         This is a project developing chips for a company

19   that makes missiles and missile guidance systems.  It also

20   identifies Ye Yuan, another one of the co-conspirators, and

21   defendant involved in providing guidance on the design.

22         This project notably talks about using -- and it's

23   highlighted here -- high performance .25 micrometer GaN

24   processing line from overseas for the short term -- in other

25   words, making the Z5 chips using an overseas foundry.

It also talks about taking advantage of the
experience accumulated by RML in the area of high-power,
active, electronically steered antennas.  That's something
you've seen elsewhere that Dr. Sandison discussed, those
antennas.

This slide, if you remember, is from that 2017A
presentation, the big business presentation that Dr. Sandison
talked through with you.  And this slide showed that in the
bottom right part what Dr. Sandison described as an airborne
electronically steered array.  That is a radar array that is
steered electronically that uses transmit receive modules
which incorporate MMIC power amplifiers like the ones
manufactured by Cree.

So here, again going back, you see there's a
discussion about developing GaN chips, TR transmit receive
modules that use those chips.  And those are transmit receive
modules that go into active electronically steered radars
which, as this slide prepared as part of defendant's business
presentation, includes examples of Japanese missiles and
Raytheon radar technology.

This same presentation, the Chengdu GaStone
business presentation, also includes a variety of plans
related to sales numbers, major customers, and statistics,
planning out forward from the time of the presentation and
included discussing the GaN first batch of specialty

products, major customers, again AVIC 607.  That's the
customer for the Z5 project.

Now, in early 2013 defendant directed
co-conspirator Yuan Ye who was at that time visiting at UCLA
to attempt to purchase Cree parts through UCLA.  You saw the
e-mail communications.  That didn't pan out.  He wasn't able
to purchase any Cree parts through UCLA.

So defendant then around that same time met with
Kiet Mai who you heard from.  He talked about going to lunch
with defendant and defendant's proposal that Kiet Mai could
get services from Cree for defendant for a 20 percent
commission.

Kiet Mai turned around and contacted Cree.  He
contacted Cree and specifically Dr. Barner at Cree asking
about full wafer service for GaN .25 micrometer.  That is
almost exactly the same description that was given for the Z5
project in the file on defendant's computer.  The Z5 project
was Cree.

Dr. Barner sent -- and you saw these documents and
they were talked about a lot, the export compliance
questionnaire, the brochure about Cree's foundry services,
and the product development kit agreement.

There's also been a lot of talk about the product
development kit.  Again, I touched on this at the beginning.
That is a piece of software, a collection of pieces of

1    software that plugs into a design program.  So, for example,

2    if you have a program for doing architectural layouts of a

3    house and you -- Kohler, the kitchen company, has special

4    faucets and special toilets and shapes.  And you want to be

5    able to design using those.  You would get that information

6    from them, plug it into your program, and be able to lay it

7    out.

8            This is the same thing.  A product development kit

9    includes specific information about the rules and processes

10   for laying out MMIC designs to build using Cree's processes.

11           Now, you see and you've seen a series of e-mail

12   communications.  Again, way too many to publish, but these

13   e-mail communications demonstrate again and again and again

14   that defendant was using Kiet Mai as a go-between to hide the

15   involvement of defendant and his co-conspirators, including

16   the designers at RML, from Cree as part of this process.

17           Kiet Mai sent the export control questionnaire and

18   PDK agreement to the defendant.  He asked him to answer the

19   attached.  They spent a variety of e-mails back and forth on

20   this.  Kiet Mai told you defendant provided the answers for

21   the questionnaire.  That export questionnaire, other than

22   Kiet Mai's name and MicroEx's address, was filled out with

23   information from the defendant.

24           He e-mailed it back.  Dr. Barner testified that

25   looking at the questionnaire, it struck him that it was

possible that some -- that it would involve some export

controlled MMIC designs.  But as he further discussed from

talking with Kiet Mai and from doing some diligence on

MicroEx, he determined that it looked like MicroEx was a

company, a small company out in California that was doing

MMIC design.  There are no export restrictions on sending

things to California from North Carolina.  It's within the

United States.

So this is the form.  This form indicated

essentially every single answer necessary to say no problem,

nothing to see here.  Don't worry about it.  Not dual use.

Not going to be exported.  Not subject to the EAR, nothing.

Now, Dr. Barner testified that Cree -- that he

specifically asked for more information about MicroEx, got

some documents showing that it was incorporated in

California, and then asked an important question.  And this

is an important question in the context of the fraud that was

perpetrated on Cree:  Will your company be doing the design,

testing, and use of the MMICs?  Kiet Mai said yes.

Now, the evidence at trial has shown that MicroEx

and Kiet Mai did nothing other than relay e-mails back and

forth and collect money from defendant and move that money on

to Cree to pay for services and for the MMICs ultimately.

Now, Dr. Barner testified that it was important for

Cree -- the reason he was asking these questions is it was

1    important for Cree to know who was working using their

2    technology, who was using the PDK agreement, and ultimately

3    where any devices manufactured by Cree would go, because if

4    there was -- if any indication suggested that there would be

5    export issues with the MMICs that Cree would be building on

6    these wafers, then Cree would have a much more in-depth

7    conversation with Kiet Mai.

8            But Kiet Mai's answers were all calculated to

9    deflect that concern from Cree.  So Cree entered into a

10   business relationship with Kiet Mai, but really that was a

11   business relationship on behalf of defendant and his

12   co-conspirators.

13           So there's a few more e-mails.  And then in

14   March -- another important point -- that's when Dr. Barner

15   e-mailed Kiet Mai the user name and password for the Cree

16   portal.

17           You recall the Cree portal was a website where it

18   -- you logged on -- it's a secure website -- with a user name

19   and password to log on and to do a few things, to be able to

20   download software including the PDK, to be able to download

21   documentation like the manuals, and also ultimately a

22   location where, as you saw in the e-mails, files could be

23   shared.

24           So, for example, the design files that were

25   ultimately created, they're called GDS files.  Dr. Nordquist

```
1     explained about this, that GDS files are basically a file

2     with the layout, the whole design of the circuit.  It's that

3     file which Cree needs to manufacture the circuits.  Those

4     files were exchanged using the portal.

5              So Kiet Mai got it and then turned around and sent

6     it to the defendant.  Here's the design access.

7              And you saw in the e-mails -- again, I'm not going

8     to go through every single one, but every single e-mail

9     communication Kiet Mai got a substantive question from Cree.

10    He would relay it back to defendant.  Defendant would send

11    him the answers.  Kiet Mai would send those answers to Cree

12    as though it was him that was answering the questions that

13    Cree was asking.

14             So defendant ultimately sent the reticle plan,

15    which is -- the reticle, as you recall, is essentially the

16    stamp that was replicated across these wafers.  Reticle one

17    is where the three MMICs that Dr. Nordquist talked about and

18    testified about testing were located.

19             He sent an initial reticle plan over, and the

20    conversation began to involve not just Dr. Barner but

21    somebody called Dan Fritz at Cree.  Dan Fritz worked to make

22    sure that the layout files actually complied with Cree's

23    rules and that the layout files, the GDS files for the

24    designs, could be built and that they would comply with

25    Cree's rules and would work as designed.
```

1          There is innumerable e-mails back and forth.

2   Defendant is answering all the questions, and Kiet Mai is

3   just passing on the information.  There's also evidence that

4   shows defendant was using the Cree portal.  For example, in

5   September of 2013, Kiet Mai wasn't able to log on to the

6   portal.  So he e-mailed defendant to ask if he changed the

7   password.

8          There's also evidence that was found on defendant's

9   digital devices, exhibits -- those exhibits are actually

10  documents with the login information for the portal and the

11  Kiet Mai account.

12         There are portal -- there are additional portal

13  documents downloaded from the portal on the computer which

14  include the foundry manual and a listing of the files located

15  in the process design kit.

16         Now, as the design started to mature for the Cree

17  run one wafer, RML designers and engineers became more

18  involved in the communications.  You saw this again and again

19  in the e-mails.  Kiet Mai would communicate with Dr. Barner

20  and Dan Fritz at Cree.

21         He would do that using usually his MicroEx e-mail

22  account.  He would communicate with defendant on one of

23  defendant's U.S. accounts, Google, *Yahoo!* one of his accounts

24  on those types of providers, and then defendant would turn

25  around and send those substantive communications internally

1    at RML using his Chengdu RML e-mail.

2            Now, those Chengdu RML e-mails, as you heard, came

3    off of defendant's computer here in Los Angeles, which was

4    seized and searched.  Those are Chinese e-mails, company

5    e-mails that were downloaded to defendant's computer and

6    stored locally here in the United States, which is how they

7    were seized by the FBI during this case.

8            They discussed many technical issues.  And just for

9    an example, in October 4th, 2013, Dan Fritz sent Kiet Mai a

10   list of issues with reticle one and reticle two designs.

11           Then you see in Exhibit 2733, five days later, a

12   chain of internal e-mails within Chengdu RML on their e-mail

13   addresses that includes co-conspirators Ye Yuan and other RML

14   employees and has a copy of that exact same list that was

15   sent by Dan Fritz.

16           So Dan Fritz's e-mails with Kiet Mai are just

17   making it over to RML where they're being discussed, changes

18   are being made to designs, and then they're being funneled

19   back as though they're coming from Kiet Mai.

20           The e-mails make it clear that Chengdu RML was

21   doing the design work.  Now, the total cost for Cree run one

22   was $130,000.  That was paid -- that was to be paid in five

23   installment payments.  And you saw records related to these.

24   You saw checks related to these.

25           And $130,000 plus the commission for Kiet Mai was

1    sent from the Pullman Lane account to MicroEx.  And then

2    MicroEx transmitted ultimately $130,000 to Cree in a series

3    of payments to pay for run one.  The final payment for run

4    one was actually done using a wire transfer on December 24th,

5    2013.  That's a transfer from a Morgan Stanley bank account.

6    That's the wire transfer charged as count 7 in the wire fraud

7    scheme.

8           So we'll come back to that in terms of the wire

9    fraud scheme, but that is the transaction that is charged, a

10   use of interstate wires to transfer that money.

11          Now, Cree run number one you also saw was shipped

12   to Kiet Mai.  It was shipped on December 26th, 2013, from

13   North Carolina to Torrance.  That's count 3.  That is a

14   mailing.  That mailing from Cree is charged as part of the

15   mail fraud scheme.

16          Kiet Mai let defendant know that the wafer had --

17   that the wafers had arrived.  Defendant picked them up.  You

18   heard that from Kiet Mai.  Defendant -- then you saw e-mails

19   with defendant and Lilie Chen confirming Eric Lin's e-mail

20   address, saying I'll send the package.  Then FedEx records

21   show that defendant sent a package to Eric Lin.

22          Eric Lin in turn on January 2nd, 2014, shipped a

23   package to Austin Yu at SDV Hong Kong, the same Austin Yu who

24   was on the receiving end of all those WIN shipments that you

25   saw in earlier slides and that you've seen in earlier

1    evidence.

2            Again, the contents were described as a glass

3    sample valued at $100.  That is both count 4, which is the

4    mail count, mailing out of the United States, and is also

5    count 2, the export.  That was the export of a Cree wafer

6    containing MMIC power amplifiers without a license.

7            There's a variety of e-mails exchanged.  Defendant

8    was asking Lilie Chen for tracking information.  Then you see

9    an internal RML e-mail chain involving Lilie Chen talking

10    about the airway bill for Z5.  Again, Z5, Cree project, the

11    607 project.  And the DHL tracking number, Lilie Chen sent

12    for that.

13            It's the same DHL tracking number received from

14    Eric Lin.  What Eric Lin mailed was the Z5.  There's more

15    e-mails asking about it.  At this point defendant also sent

16    the same DHL tracking number to Ye Yuan for the Z5 shipment.

17            Then on the January 15, 2014, important e-mail

18    chain.  Defendant wrote:  The first run from C, being Cree,

19    is being tested at UCLA and soon at RML.  In response

20    co-conspirator Ye Yuan wrote:  We already have get the first

21    C, first Cree, and been starting test from yesterday.

22            Cree wafer and the MMICs on that wafer were in

23    Chengdu, China.  There's a lot more evidence of this which

24    I'll discuss in connection with count 2, which is evidence

25    that also is proof for count 1.

1              Defendant's wafer spreadsheet, 2010-7.  You see the

2    Z5 payments made to Pullman Lane.  Ship date for the wafer is

3    listed there, 1/5/2014, right in this time frame.  You see

4    again that defendant is directing payment to be made from

5    various companies to his Pullman Lane account for Z5.

6              Now, at this point defendant had achieved the first

7    run of Cree wafers and at least one Cree wafer -- the MMICs

8    it contained had been sent to Chengdu, China.  Kiet Mai

9    testified that defendant had -- about some e-mails with

10   defendant talking about doing further business with Cree.

11             The -- those discussions carried on through 2014,

12   but then another event happened in 2014 which is on

13   August 1st, 2014.  Three entities, these three entities and

14   others, were added to the United States entity list.  And

15   they were specifically added as having been determined by the

16   U.S. government to be acting contrary to the national

17   security or foreign policy interest of the United States.

18             Those companies, Chengdu GaStone Technology, the

19   company that beginning in 2011 defendant had been president

20   of.  There's been various testimony about whether he remained

21   the president of Chengdu GaStone at this time.  Documents are

22   contradictory.  It appeared that he had possibly been moved

23   to a role of a technical consultant.

24             Nonetheless, the company that he had been the

25   president of for the preceding three years was added to the

entity list.  CETC 29 was also an investor in Chengdu
GaStone, and a Chinese government controlled entity was added
to that list as was QTC, the company in which Deng Jieru, you
saw testimony, was a manager, and where she had directed
payment to come from for the conspiracy.

QTC specifically was called out by the end use
review committee, which is a committee of various departments
of the United States government, for being involved in the
illicit procurement of commodities and technologies for
unauthorized end use in China.

Now, the fraud on Cree didn't stop with run one.
Run two planning and implementation took place later that
year.  Now, the funding this time didn't come through Pullman
Lane, didn't come through defendant's accounts.  Instead,
ended up coming through JYS Technologies' account in Canada.

Kiet Mai invoiced defendant for $117,000 for Cree
run number two.  This was a lump sum payment this time
instead of a series of payments.  They paid a bit less and
paid it all up front.

Again, Kiet Mai made representations to Cree:  No,
not for export.  We're doing development.  And Kiet Mai sent
an invoice for Cree run two to defendant and his brother,
Ishiang Shih.  You remember that included -- Kiet Mai said
defendant told him that JYS Technologies would be paying him.

There was this weird development agreement that

1    Kiet Mai said he downloaded off the internet and had a bunch

2    of parts in it about Indian law.  Anyway, that's the document

3    there.  Kiet Mai did testify that he never did any work for

4    JYS Technologies.

5            Now, on December 2nd, 2014, defendant e-mailed his

6    brother and co-conspirator, Ishiang Shih, sent him bank

7    information for Kiet Mai's company, MicroEx, which was a

8    d/b/a, doing business as, L2 Contemporary, which is his other

9    business.  You recall he has an art galley and then a

10   clothing shipment business.

11           Defendant instructed Ishiang to wire money to Kiet

12   Mai's account.  And on December 12th, 2014, a wire transfer

13   of $120,000 was made from JYS Technologies' bank account in

14   Canada to MicroEx's bank account in the United States.  That

15   is the money-laundering count, is that transfer of money from

16   Canada to the United States in order to pay for Cree run two,

17   which was part of the fraud on Cree and part of the computer

18   fraud and also part of the conspiracy.

19           You saw records that show the incoming wire into

20   Kiet Mai's bank account.  Then the money had a little bit of

21   a circular route to get to Cree.  It moved from his Bank of

22   America account to his Morgan Stanley account.  Then he moved

23   it to a portfolio loan account also at Morgan Stanley.

24           Then on December 17, 2014, from that portfolio loan

25   account, he wired $117,000 to Cree to pay for Cree run two.

1    That's count 8.  That's the other wire fraud.  The two wire

2    frauds, 7 and 8, are the payments from Morgan Stanley made by

3    Kiet Mai on behalf of defendant for Cree services.

4           Now, Cree manufactured the run two wafers and on

5    March 20th, 2015, shipped them.  That's count 5.  Mail --

6    that's another mail fraud count, another part of the fraud on

7    Cree.  Then defendant's daughter picked them up, and

8    defendant instructed her to send them to co-conspirator

9    Ishiang Shih, his brother in Canada.

10          They were then shipped to Canada by her boyfriend

11   actually.  That's count 6.  That's the last mailing of the

12   four mailings that were part of the mail fraud count.  So

13   that wasn't the end for run two, however.  In 2015 defendant

14   e-mailed RML and Jieru Deng after coming back from a vacation

15   and said:  I just found out we haven't gotten the money.  As

16   the delivery of the GaN wafer is pending full payment, please

17   help process the fund at your earliest convenience.

18          Later that year he e-mailed with his brother and

19   co-conspirator about the GaN wafers.  You can see the e-mail

20   there:  I don't recall if we discussed the two diced GaN

21   wafers.  If you brought them with you, please do not give

22   them to anyone yet.  Please hold them until I return to CD.

23          As you heard during this trial, CD is Chengdu.  His

24   brother replied:  I'll keep the samples with me until you are

25   here -- that is, until defendant is in Chengdu.

1          Records show that defendant traveled from

2    Los Angeles to China a little bit later that summer.  Then

3    shortly after his return, two payments were made to Pullman

4    Lane from One Five Nine Investment Holding.  Those payments

5    totaling $259,000 were booked in the wafer run spreadsheet on

6    Z5 for the entry in the spreadsheet corresponding to the

7    second Z5 run, the second Cree run.

8          So you've seen a lot of proof of agreement.  The

9    co-conspirators were working together to achieve a variety of

10   goals, and you've seen them in their documents.  You've seen

11   them in their own words.

12         Now, in order to prove the conspiracy count in this

13   case, it's necessary that the government show that defendant

14   and his co-conspirators were knowingly and willfully engaged

15   in this conduct.  How do you know that it was knowing and

16   willful?  Again, defendant is a businessman.  He's worked for

17   decades in the microwave industry.  He's familiar with the

18   ins and outs of this business and with the issues that arise

19   internationally.

20         At MMCOMM defendant was the export specialist.  You

21   heard the testimony of Jesse Lu.  MMCOMM did export MMICs,

22   and defendant understood the laws.  He was the ultimate

23   authority at MMCOMM.  Remember, Jesse Lu said he would always

24   go to defendant with those export questions, and defendant

25   knew what to do and what not to do.

1          Indeed when MMCOMM was purchased by Honeywell,

2    documents related to that purchase which were found at

3    defendant's home show that there was a due diligence

4    checklist for MMCOMM when Honeywell bought them.

5          Among the questions on there were:  Does the

6    company export goods or technology?  Yes.  Does it have

7    goods, products, or technology controlled under the EAR?

8    Yes.  Does it have a program to ensure compliance?  Yes.  Who

9    are designated to ensure compliance?  Jesse Lu and defendant.

10          Going on.  Had procedures in place to determine

11    whether U.S. export controls apply for exports or reexports.

12    Product classifications, the ECCNs that you've heard about.

13    Destinations.  End user, ultimate end user.  Defendant was in

14    charge of audit and review for export at the company where he

15    was president.

16          Jesse Lu told you defendant was a knowledgeable

17    person about export controls.  He also received training when

18    he worked at Honeywell.  You saw Mr. Pasco went through some

19    of those presentations, talked about defendant's training.

20          At defendant's house a number of documents were

21    found including, for example, BIS major cases list which

22    described cases that BIS had been involved with, one of which

23    was an export of amplifier chips to China.

24          He had notebooks with notes on export controls.  He

25    had a copy of the commerce control list.  He had a copy of

the Wassenaar arrangement.  He had copies of the entity list and country charts.  Defendant was knowledgeable about export laws.  He knew about export laws.

Defendant's brother and co-conspirator also in 2010 sent him a variety of documents about specifically China issues and the BIS's China policies.  And defendant's brother and co-conspirator highlighted parts of those documents, including revisions related to items destined for the PRC that are controlled for reasons of national security, exports that would enhance the military capabilities of the PRC, further discussion of items controlled for national security, and concerns about denying exports that would make a direct and significant contribution to China's military capabilities.

Now, you saw in presentations that defendant highlighted in presentations.  Those circles, red circles highlighted some civilian uses but also military uses in these sales pitches for the company.  And that fact that these -- this technology -- sorry, that these MMICs would be used potentially in military applications and indeed in the case of Z5 were for a company that made missile and missile guidance systems.

If anything would enhance the knowledge and concern about possible export issues, defendant knew that these were high-powered MMICs and that the items that they were involved

1    with developing in the United States with Cree were subject

2    of export controls.

3           You also see on this slide that those two entity

4    lists, companies, were the major investors in Chengdu

5    GaStone.

6           Now, again, you have seen some of these documents

7    before.  You've seen them above.  These are the documents

8    that talk about how China is locked out of certain

9    technological areas by export controls.  Those documents show

10    knowledge.

11           Again, you've seen these earlier in this

12    presentation, but these documents sent between

13    co-conspirators show their knowledge.  Indeed the Chengdu

14    GaStone presentation includes a slide titled embargoed

15    equipment.  Embargoed equipment, that's equipment that can't

16    be exported to China.

17           And you also know that defendant's conduct was

18    knowing and willful because of the misrepresentations that he

19    made in the export compliance questionnaire for Cree.  You've

20    seen testimony -- and we'll talk about it in just a minute --

21    about the power ratings for these power amplifiers.

22           There are a number of them that are higher than ten

23    watts, and all of these representations about whether things

24    would be controlled are untrue.

25           So with respect to count 1 -- thanks for bearing

1    with me through all of that -- the evidence shows that there

2    was an agreement between defendant and a variety of

3    co-conspirators beginning with Yaping Chen and Ye Fei and

4    continuing on through, and that defendant and his

5    co-conspirators agreed to knowingly and willfully export

6    controlled items without a license to China, and that

7    defendant became a conspirator, knowing of the objectives.

8         In fact, that was the objective, as you see in the

9    documents.  Defendant is guilty of count 1.

10         Now, count 2, this is the Cree run one.  Now, for

11    count 2, defendant is required to have exported or caused to

12    be exported an export controlled item, MMIC amplifier, from

13    the United States to China.  A license was required for that

14    export.  Defendant failed to obtain a license, and defendant

15    acted knowingly and willfully.

16         That's the same knowingly and willfully we just

17    talked about with respect to the conspiracy.

18         Now, we've already gone through evidence that the

19    MMIC was shipped to China.  You've seen that before.  We

20    won't go through it again.  You've heard testimony from Eric

21    Lin about shipment and about how Hong Kong is the gateway to

22    China.

23         You've heard similar testimony from Lilie Chen

24    about how he was instructed to ship and down-value items.

25    And you heard testimony from Special Agent Alex Storino of

1    the FBI about how Austin Yu was questioned about the specific

2    shipment, and Austin Yu said that it was picked up and

3    hand-carried into China.

4            Now, was an export license required?  Way back at

5    the beginning of the case, you heard from Dr. Chris Nordquist

6    from Sandia National Lab.  He conducted tests on some of the

7    MMIC power amplifiers from a wafer that was recovered from

8    UCLA.  That's a Cree run one wafer, one of the four that was

9    at UCLA.

10           He tested three of the power amplifier designs, and

11   they all far exceeded the power and frequency performance to

12   be restricted under the commerce control list.  And there are

13   two ECCNs, two export classifications both within that 3A001

14   category that the Court instructed you about in instruction

15   29.

16           Both of those -- all three of those designs far

17   exceeded the performance characteristics listed in those

18   ECCNs.  In fact, the charts that Dr. Nordquist put together

19   showed that the performance over a wide band of frequencies

20   for those three power amplifiers was more than ten times the

21   power limit that would make them restricted.

22           That was true for each of these power amplifiers,

23   showing the performance here from eight to somewhere in the

24   neighborhood of 13 gigahertz, and for this last one at higher

25   frequencies.

1          Now, you heard testimony from Carlos Monroy, who is

2     an electronics engineer.  He's worked for 13 years at the

3     BIS.  He works in the area of licensing and licensing

4     determinations.  Mr. Monroy testified that all three MMIC

5     power amplifiers were controlled, all three of those designs,

6     and that they required an export license to be sent to China;

7          Now, Mr. Monroy also testified that no exceptions

8     applied.  He said -- he told you that a license was required,

9     that MMICs are a commodity.  They're a thing.  They're a

10    physical thing, that it was sent, that these MMICs were not

11    specially designed for telecommunications.

12         You'll see in jury instruction 29 some discussion

13    of specially designed for telecommunications.  However, the

14    testimony that you have from Mr. Monroy is that these were

15    not specially designed for telecommunications.  These were

16    not narrow band amplifiers.  They were not tuned for special

17    frequency.  They were wideband, high-power amplifiers.

18         He also -- he also talked about another exception

19    which you have an instruction on, which is the TMP, the

20    temporary exception.  That's jury instruction 30.  Now, these

21    MMICs were purchased from Cree.  They are subject to purchase

22    order.

23         The temporary exception does not apply when goods

24    are purchased in that manner, and you'll see that in the

25    instruction.  These were purchased.  These were not a

1    temporary export.

2          Now, there was no license to send Cree MMIC power

3    amplifiers to China, and specifically these ones.  You heard

4    very briefly, possibly on the first day of trial, from Thomas

5    Andrukonis at the Bureau of Industry and Security.  His

6    responsibilities include the database that includes

7    information about export licenses.

8          There were no export licenses for MMIC power

9    amplifiers from the United States to China for any of the

10   individuals involved in the conspiracy.  And there were

11   similarly no licenses for any of the companies involved in

12   the conspiracy.  That was testimony that he gave.

13         Now, recall Dr. Nordquist explained to you the

14   layout of the Cree run one wafers.  There were two reticles;

15   that is, two different kinds of stamps that were built onto

16   the wafer.  Reticle one had nine different MMIC designs on

17   it, and that reticle was copied 80 times across each wafer.

18         So three -- the three MMICs that Dr. Nordquist

19   tested were found on reticle one.  Those three MMICs then

20   would have been replicated 80 times, which means every single

21   one of those wafers had 240 export controlled MMICs on it.

22         Dr. Nordquist also testified that -- and you also

23   heard this from Dr. Barner -- that Cree's design -- Cree's

24   manufacturing process is very precise, that they do testing

25   using their process control modules, the PCMs, to ensure that

1    every wafer that they make with a certain design has the same

2    performance characteristics across all of them.

3           In other words, each one of those four wafers was

4    the same.  It would perform the same.  The MMICs on that

5    wafer would perform the same.  So each of the power

6    amplifiers, regardless of which of the four wafers it was on,

7    would perform the same.

8           Now, you recall these e-mails about the wafer going

9    to Hong Kong and then China.  There's more evidence that the

10   Cree run -- at least one Cree run one wafer made its way to

11   Chengdu RML in Chengdu, China.  On January 22nd, which was

12   about a week after the initial e-mail saying that the first C

13   had arrived and was being tested, Yuan Ye sent a couple of

14   files with an e-mail.

15          There was a file that showed the reticles for Cree

16   run one and some of the names for the power amplifiers,

17   frequencies and simulation data.  He also sent an attachment

18   showing test data.  So this is the translation of that

19   document, Exhibit 2803, and 2803A is the translation.

20          That again is dated -- so that document is dated

21   six days after the e-mail saying that the first C had

22   arrived.  And that document includes a photograph of

23   HG0701-24.  That's one of the Cree run one wafers.

24          You heard testimony from Dr. Nordquist that that

25   picture was one of the Cree run one refers.  You heard

1    testimony from Dr. Barner that that picture shows one of the

2    Cree run one wafers.   That's a wafer in Chengdu, China.

3         The presentation discusses testing methodology.   It

4    has a microscopic picture of one of the other power amps on

5    that wafer and discusses the chips that have been tested,

6    which include PA2-1020-A1, which is one of the chips that was

7    also tested by Dr. Nordquist.

8         Indeed the test results for PA2-1020-A1 were

9    attached, were also found in another e-mail.   These test

10   results showed test versus simulation.   That is, the

11   simulation of the design that was done based on the way it

12   was designed and the actual testing data.

13        And Dr. Nordquist talked about how the test results

14   that were shown in these presentations from Chengdu RML were

15   consistent with his testing and that the performance of these

16   MMICs was consistent with their design.

17        He and Dr. Barner both talked about how the

18   sophisticated tools that are part of the Cree PDK and part of

19   some of the modeling tools used by MMIC designers allowed

20   designers to come up with a concept for what it is they want

21   to build in terms of a power amplifier, to design to those

22   performance specifications, and then to run computer

23   simulations and modeling to ensure that, yes, this design

24   looks like it's going to do what we want it to do before they

25   do the physical manufacturing.

1          Dr. Barner and Dr. Nordquist both talked about

2     that, that building these things is expensive.  So you do a

3     lot of modeling beforehand in order to be sure that what

4     you're building performs the way that you intend it to.  And

5     these power amplifiers did.

6          In April of that year Li Yuan Yuan also at RML

7     e-mailed defendant a file called Z5 analysis that attached a

8     series of photographs.  This is an individual who is on a lot

9     of the e-mails during the design process.  There's a series

10    of photographs here in this presentation.

11         The photograph on the left is a microscope photo

12    sent from Chengdu RML of a power amplifier.  The photograph

13    on the right is a photograph taken at Sandia National Lab of

14    the same design taken off of the Cree run one wafer.

15         Those -- you will recall Dr. Nordquist testified

16    about doing these wire bonds.  Those little black marks are

17    attachments to the MMIC that were part on there as part of

18    the testing process.

19         So power amplifier one, 1020, this is one of the

20    export controlled power amplifiers.  There's a picture from

21    Chengdu RML and a picture from Sandia.  Same thing for power

22    amplifier two, the two-stage amplifier.  And same for 1615,

23    another two-stage amplifier.  These pictures shows that the

24    MMIC power amplifiers were in Chengdu.

25         Now, there's been a lot of theatrics in this case

1    about wafers appearing in court, and don't be fooled by that.

2    You saw in Exhibit 2803A where this wafer was in January of

3    2014 and thereafter and where MMICs from those wafers were in

4    those photographs.

5            Now, you've seen a wafer that Dr. Barner told you

6    is the same wafer here in court, and he also -- this is a

7    photograph of that wafer.  He also -- and that's the

8    photograph of the wafer in Los Angeles in 2019.

9            Now, Dr. Barner told you this wafer is picked

10   clean.  So if you look at that photograph, you'll see there's

11   not a single power amplifier left on that wafer, not a single

12   one.  January 2014 in China, full of power amplifiers.

13   Los Angeles, 2019, empty.

14           And you haven't heard any testimony about where

15   this wafer was in between other than the testimony from the

16   paralegal who recovered it last year from defendant.  So

17   what's important is where this wafer was and where the power

18   amplifiers on it were in 2014.  Don't be distracted.  Where

19   it is today doesn't bear on this charge.

20           Again, defendant knew.  This was willful.  He knew

21   that he was working on a high-power wide bandwidth parts for

22   a client that builds missiles and missile guidance systems.

23   All the evidence for count 1 that showed knowledge about

24   export control laws and export restrictions also applies

25   here.

1        The designs as you heard from Dr. Nordquist were

2   intended to be wideband and high power MMICs.  And both

3   Dr. Nordquist and Dr. Barner testified, again as I noted,

4   that they performed as designed and that they were built to

5   perform as they did.

6        There's also a very important e-mail in this

7   respect about defendant's knowledge.  During the design

8   process for the Cree run one wafers, defendant exchanged this

9   e-mail with Li Yuan Yuan, the person who sent those

10  photographs, and Yuan Ye at RML about the GaN reticle design:

11  For the circuit naming, let's avoid any frequency-related

12  words, KU or X.  Recall those are bands that Dr. Nordquist

13  identified as microwave bands typically associated with

14  radar.  And don't include power units.

15       Defendant's e-mail gives the naming scheme for

16  these and the way that they were named and the names that you

17  saw.  Those names were designed to avoid references to the

18  frequency range at which the chips operated and the power

19  with which they operated.

20       And as you've heard during this case, frequency

21  range and power and performance are key factors in whether a

22  MMIC power amplifier is export controlled.  Defendant knew

23  that these designs were for making export controlled MMICs.

24       Defendant exported or caused to be exported

25  controlled items.  A license was required.  Failed to obtain

1    a license and acted willfully.

2          Now, that brings us out of the export crimes and

3    into the balance of the indictment.  You've already heard a

4    lot of the evidence for the balance of the indictment, so

5    this part will move a little bit more quickly.  I'm not going

6    to repeat all the evidence.

7          So the mail fraud and wire fraud counts both --

8    they're different because mail fraud requires use of the

9    mails.  Wire fraud requires use of a wire.  But other than

10   that -- and you'll see this in the jury instructions 31 and

11   33 -- they're essentially parallel except for the last part,

12   which is whether he used mail or wire as part of the fraud.

13         These all require a scheme or plan to defraud; that

14   is, to obtain money or property from Cree by means of false

15   or fraudulent pretenses.  They require statements made in the

16   course of the scheme that were material; that is, statements

17   that would cause Cree to part with money or property.  That

18   defendant acted with the intent to defraud; that is, the

19   intent to deceive.  And use of the mails or of an interstate

20   wire.

21         So the scheme was a scheme to acquire MMICs

22   manufactured using Cree's 0.25 micrometer GaN process.  That

23   is, the scheme to get Cree to manufacture these MMICs for

24   defendant and his co-conspirators in China for AVIC 607.

25         Now, Cree was paid for its services.  But if you

1    look at the jury instructions, that's not an element.  Was

2    Cree not paid?  That's not an element.  The scheme was to

3    cause Cree to do something to part with property that it

4    wouldn't have parted with if it had known the truth.  That is

5    the essence of a scheme to defraud.

6          Defendant using Kiet Mai deceived Cree about the

7    ultimate client, about the nature of designs.  Recall the

8    naming conventions, the export compliance questionnaire,

9    about the intended use of the MMICs.  These MMICs were to be

10   exported.  About the intended destination, China.

11         Didn't tell Cree any of that.  Didn't tell Kiet Mai

12   to tell Cree that either.  And you heard Cree would not have

13   entered agreements with MicroEx if it had known the truth.

14         Cree was defrauded.  Cree never would have done

15   business with MicroEx if it knew it was really doing business

16   with defendant and his co-conspirators and a team of

17   designers at Chengdu RML.

18         There are too many exhibits to list in terms of the

19   concealment.  The defendant constantly communicated using

20   Kiet Mai as a sock puppet to hide behind for more than two

21   years.  The lies.  Will there be design testing and use of

22   the MMICs?  It will all be done by MicroEx.  Yes.

23         That was very important.  Dr. Barner told you that

24   was very important to Cree in terms of agreeing to do

25   business with MicroEx.  No, not for export.  We're doing

    1    development.  Again, these are misrepresentations made in the

    2    course of the conspiracy -- or, I'm sorry, in the course of

    3    the fraud to induce Cree to do business, to induce Cree to

    4    build the MMICs and to ship them to Kiet Mai, who then gave

    5    them to defendant.

    6             And you see in jury instruction 32 that a defendant

    7    can be liable for the misrepresentations of a co-schemer.

    8    Here the co-schemer is Kiet Mai.  So these -- these

    9    representations by Kiet Mai are as good as representations by

   10    the defendant.

   11             You also heard from Dr. Jeff Barner.  The lies

   12    matter.  They were material.  This was all information that

   13    if Cree had known it, they would've not entered business with

   14    Kiet Mai and MicroEx.

   15             Why use -- why else use Kiet Mai and MicroEx?

   16    MicroEx didn't do any design work.  Kiet Mai didn't do any

   17    design work.  Defendant clearly is capable of using e-mail to

   18    communicate with people.  He could just as easily have

   19    e-mailed with Dr. Barner.

   20             But as you know from the evidence in this case,

   21    Cree would not have manufactured MMIC power amplifiers for

   22    Chengdu RML or Chengdu GaStone and would not have shipped

   23    these to China.

   24             So you have the scheme.  You have material

   25    misrepresentations.  And you have the intent to defraud, the

1    intent to hide from Cree.  So you have the four counts.  So

2    these are counts 3 through 6.  Count 3 is the mailing of Cree

3    run one to Kiet Mai.  Count 4 is the mailing of Cree run one

4    to Hong Kong by Eric Lin.  Count 5 is the second run.

5    Count 6 is the mailing of the second run out of the

6    United States to Ishiang Shih.

7            Now, you also see in the instructions that the

8    mailing itself or the wire itself doesn't have to be somehow

9    fraudulent, just that it's done in furtherance of the scheme.

10   Specifically it doesn't matter whether the material mailed

11   was itself false or deceptive so long as the mail was used as

12   part of the scheme.

13           Indeed it doesn't even matter if the scheme was

14   successful.  The scheme was successful here.  So on the mail

15   fraud counts, the evidence plainly demonstrates that the

16   defendant is guilty of mail fraud on all four counts.

17           Now, with respect to wire fraud, it's the same

18   evidence that supports the scheme to defraud, materiality and

19   intent to defraud.  But in this instance the two payments or

20   the two uses of the wire or the wire payments for Cree run

21   one and Cree run two, both made with money, in the first

22   instance money received from Pullman Lane to Kiet Mai and

23   MicroEx, and the second instance money that was wired from

24   JYS Technologies bank account in Canada to Kiet Mai to pay

25   for run two.

1          Again, wire fraud.  Evidence shows defendant is

2     guilty.

3          Now, there's a second conspiracy count in the

4     indictment, and this relates to access to the Cree portal.

5     The charge is an agreement -- it requires an agreement again,

6     in this case to authorize a protected computer and thereby

7     obtain information in furtherance of a criminal act.

8          And those criminal acts are the ones that we've

9     talked about, the export control violation and the mail and

10    wire fraud.

11         Now, again, this conspiracy is -- just the

12    agreement itself is a crime.  But here the agreement to

13    access the protected computer is a crime.  The protected

14    computer is Cree's computer.  You saw Cree's portal.

15         You heard testimony from Mr. Whitlock and Dr.

16    Barner about the lengths to which Cree went to protect its

17    computer systems, about the fact that there were only -- you

18    could only access the system as an authorized user, that

19    authorized users had limited access.

20         And the only authorized user in this case was

21    MicroEx and Kiet Mai.  MicroEx signed up with Cree.  MicroEx

22    was Cree's employee -- I'm sorry.  MicroEx was Cree's

23    customer, not employee.  And Kiet Mai gained access to the

24    Cree portal, to manuals and to the process design kit through

25    the business relationship with Cree, a business relationship

1    entered into by Kiet Mai under false pretenses on behalf of

2    defendant.

3         And notably defendant wasn't an employee of

4    MicroEx.  Defendant didn't work for Kiet Mai.  Defendant just

5    paid Kiet Mai to get access.

6         Now, Dr. Barner e-mailed the access.  You have seen

7    these before.  Defendant received access from Kiet Mai.  Now,

8    you heard this testimony about the portal secure system.

9    Every user has an account and password.

10        If another designer at MicroEx needed an account,

11   Dr. Barner said they would be given an account so that they

12   could access it.  And there's different levels of access

13   depending on your type of user account.

14        You saw the e-mails.  Defendant was using the Cree

15   portal.  We've spoken about this evidence before.  The Cree

16   portal logins were found on defendant's computer.  Foundry

17   manuals were found on his computer.  PDK listings were found

18   on defendant's computers.

19        And importantly, Chengdu RML designers were

20   designing MMICs using the Cree process, which means they were

21   using the Cree PDK.  And Kiet Mai said the only person he

22   gave the login to was defendant.

23        Again, here it's not required that the actual crime

24   be committed for a conspiracy.  It's just the agreement to

25   get the access that is the crime itself.

1          Now, count 10 we've spoken about already, is a

2     money-laundering count.  In order to find defendant guilty on

3     this count, you need to find someone transported funds to

4     promote unlawful activity, that defendant aided and abetted

5     that transportation, that defendant intended to facilitate

6     the crime to promote the unlawful activity, and that

7     defendant acted before the crime was committed.

8          Now, here there are several crimes that this money

9     was used to promote.  This payment was in December of 2014.

10    It was made before the wire payment to Cree.  In fact, it was

11    made in order to facilitate that wire payment to Cree.  It

12    was made before the two mailings related to Cree runs, Cree

13    run two, which both happened in 2015.  And it was made during

14    the course of the IEEPA conspiracy and the computer fraud

15    conspiracy.

16         So I've listed the counts here that this relates

17    to.  It's 1, 5, 6, 8, and 9.  You've seen this e-mail before.

18    Defendant e-mailed his brother and instructed him to wire

19    money, and defendant's brother did wire money.  That money

20    went from JYS to MicroEx, and that money was used pay for

21    Cree run two.  $120,000 sent, and 117,000 of it went to Cree.

22         The evidence demonstrates the defendant is guilty

23    on count 10.

24         Count 11.  Count 11 is a count charging defendant

25    with making false statements to the FBI.  There are three

1    false statements you've heard about.  Now, first, it's

2    necessary that defendant know it's untrue and know that it

3    was unlawful to lie to the FBI.  You recall defendant was

4    given advice of his rights and given advice in the recordings

5    you've heard.  And you've seen documents that show that he

6    was told that lying to the FBI was a crime.

7         During his January 19th, 2018, interview, defendant

8    is charged with making three false statements:  No Cree

9    wafers went to China.  No Cree wafers went to Hong Kong.  The

10   defendant was not working on GaN in China.

11        Evidence related to those, the advice of rights,

12   and you also heard in the recordings the advice of rights.

13   The recordings of statements, Exhibit 1613, has the two

14   claims about whether wafers and specifically those wafers,

15   the Cree wafers containing GaN MMICs, went to China or Hong

16   Kong.  And 1621, defendant's claim that he was not working on

17   GaN in China.

18        You heard testimony of Special Agents Robert Berger

19   and Alex Storino related to the interview and the recordings.

20   You've seen that Cree run one wafer indeed went to China, and

21   that Cree run one wafer went to China through Hong Kong

22   through Austin Yu.

23        There are just too many exhibits to list that show

24   the defendant was working on GaN in China.  All the

25   presentations, e-mails, communications about designing the

GaN MMICs with Chengdu RML in China, all of those show that
defendant was working on GaN in China.

The defendant is guilty of lying to the FBI.

Now, let's talk about taxes.  The tax counts relate
to defendant's tax returns for 2011, 2012, and 2013.  The
government needs to show to prove this that defendant signed
a false tax return.  You saw the instruction about electronic
filing is the same as signing under penalty of perjury, and
that defendant acted willfully.

Now, the tax returns are these:  count 12, 2011;
count 13, 2012; count 14, 2013.  The returns were false.
You've seen evidence in this case that defendant didn't
report $335,000 of income on his 2011 tax return.  That was
the income paid in to the secret Hong Kong Standard Chartered
bank account by Mystical Optimism.

That was in addition to the salary that defendant
was receiving for his role as the president of Chengdu
GaStone.  He did report that income, the Chengdu GaStone
income.

Count 13, more money from Mystical Optimism and
also dividends on the money in that account.  Count 14,
dividends received.  That is money received based on money
already held in the accounts.

Now, for defendant to have to report it, the
$67,000 a month had to be income to the defendant.  It was

income.  The evidence has shown conclusively that it was

income.  It was regular payments made every month, the same

amount every month, $67,000.  Judy Chen at the direction of

Yaping Chen, co-conspirator, his longtime co-conspirator,

explained that it was monthly compensation for defendant and

others and that project payments were separate.

The Mystical Optimism payments were untaxed.  Judy

Chen didn't withhold taxes for China, for the United States,

for anything from this account held by a British Virgin

Islands company.

Exhibit 608A shows the transactions related to

these payments.  It also includes a chart, a chart of

recipients of money, how much money they were going to get,

if they were paid monthly or quarterly.

Defendant was paid $67,000 a month.  That was his

pay, and it was the most that anybody was getting.  And it

was paid over and over and over again like clockwork.  You

see in the spreadsheet, over and over again, entries with

other co-conspirators each getting their monthly payout.

This was income.

There was -- project payments and other things were

treated differently.  May 2012, for example, defendant got

his $67,000.  And then there was a payment to defendant for

tape-out expenses.  You recall there was testimony that

tape-out is the process when you actually manufacture the

1    wafers based on some design.

2           September 2012 you see the same thing.  There was a

3    payment to defendant and then there's project payments, in

4    this case to JYS for projects.  So, income, $67,000 a month

5    was income.  Here's an example from the exhibits.  This is a

6    payment sent to defendant, Exhibit 1102.  This is the advice

7    on -- advice related to the transfer in November 2012.

8           At the same time this is defendant's statement from

9    his secret Standard Chartered Hong Kong bank account.  In

10   that bank account you see the same deposit.  It's listed in

11   Hong Kong dollars, which is why it says 518,432.  If you look

12   back here, you can see that same number.  The U.S. dollar

13   amount was converted to Hong Kong dollars because that

14   account is a Hong Kong dollar account.

15          You also see on this statement dividends that were

16   paid in to that account.  Those dividends are just based on

17   the balances that are held.  Now, you also know that it's

18   income because of the way defendant treated it.  Defendant

19   treated it like it was his money.  He used it for

20   investments.

21          You saw e-mails about allocations of that money in

22   that account and in a Coutts account for investments.  He put

23   it in a secret Hong Kong account that was held in his and his

24   wife's name.

25          You can see the bank statements.  These were all

UNITED STATES DISTRICT COURT

1   recovered from defendant's computer here in the United States

2   which was searched by the FBI.  Bank statements from Standard

3   Chartered, October 2012 to July 2014.  The only large

4   transfers out of those accounts were to another account at

5   Coutts in Hong Kong, which is another secret bank account

6   held by defendant.

7           And you know that defendant -- that this money was

8   income and compensation to the defendant because he treated

9   it like that.  Again, this file was located on defendant's

10  computer.  Documents, personal, personal to Shihs, the Shihs'

11  assets.  This is an Excel spreadsheet listing the assets.

12          This document, Exhibit 2785, includes things like

13  cars, homes, U.S. bank accounts, credit cards, retirement

14  account, and Coutts and Standard Chartered.  Those bank

15  accounts contained money that belonged to defendant.  They

16  were Shih's assets.  They were defendant's assets.

17          As such, because they were his assets and they were

18  compensation that was paid to him, he needed to pay taxes on

19  them.

20          And defendant acted willfully.  We've already

21  talked about this.  We'll talk about it again.  Defendant

22  opened an account at Standard Chartered Bank in Hong Kong.

23  He used his Taiwanese passport to open the account, and he

24  claimed he wasn't a U.S. citizen.

25          Defendant did not report his Hong Kong accounts on

his FBARs.  We've seen that testimony.  You heard from

Mr. Tremaglio from FinCEN.

Now, defendant concealed his income and his bank

accounts when he talked to his accountant.  He sent little

spreadsheets with all of his assets and his income and

everything each year to his accountant to help in the

preparation of his tax returns, and each year he lied to his

accountant about his income.

You see that in the spreadsheets that defendant

shared with his accountant, and you see that in the answers

defendant gave to his accountant.  And defendant lied about

his foreign income when he was questioned by federal agents.

He again identified the two China CITIC Bank accounts.

Didn't identify any other bank accounts or assets.

Defendant knew he had to report foreign income.  He

knew, and he did report foreign income.  He reported his

income from GaStone Technology.  He reported his salary as

the president of GaStone.

And he knew he had to report foreign bank accounts.

He filed FBARs every year in which he listed the two China

CITIC accounts, but he didn't list the secret Hong Kong

accounts.

Now, as you saw in the documents, reporting his

GaStone income had little effect on the taxes defendant owed.

That's in part because he was working abroad, and that's in

```
 1    part because he was getting credit for Chinese taxes he paid

 2    on that salary.  So the impact that defendant felt from

 3    disclosing the existence of his Chinese income was very

 4    little.

 5              You see in Exhibit 1411 his 2012 return.  The tax

 6    owed before credits was $67,000.  He got $56,000 of credit

 7    for Chinese taxes.  So the impact of reporting that Chinese

 8    income was very low.

 9              But you saw the analysis done by Special Agent

10    Carlos Tropea of what the impact of reporting his income into

11    this secret Hong Kong bank accounts would have been.  And the

12    impact of reporting that income and those dividends would

13    have been almost $363,000 in additional tax owed.

14              This was material.  Defendant signed and filed tax

15    returns under penalty of perjury, and he acted willfully.  He

16    knew that he needed to report foreign income.  He knew he

17    needed to report foreign bank accounts, and he didn't do it.

18              Now, the last four counts are what are called the

19    FBAR counts.  I'll just keep calling them FBAR accounts

20    because that's easier.  Now, for those you can look at the

21    jury instructions.  The defendant had to knowingly conceal a

22    fact which he had a duty to report by any trick, scheme, or

23    device.

24              Within the jurisdiction of the Treasury Department,

25    you heard from Mr. Tremaglio.  FinCEN is part of the Treasury
```

1    Department.  The defendant acted willfully, and the statement

2    was material.

3            Now, FinCEN maintains FBARs.  The FBAR form itself

4    as you saw said that it should be used to report a financial

5    interest, signature authority, or other authority over one or

6    more financial accounts in foreign countries.  That is when

7    the accounts as a total contain $10,000 or more.

8            So that would -- if there was five accounts and

9    they all had $9,000, that would be $45,000.  You would have

10   to report those because the total is more than 10,000.

11           Now, here defendant filed an FBAR on May 6, 2014.

12   Again, he sent his accountant a spreadsheet that was false.

13   It listed only the two China CITIC accounts.  FBAR was filed.

14   You can see from other evidence in this case that the secret

15   Standard Chartered account had almost a million U.S. dollars

16   in it in 2013.  And so did the Coutts Hong Kong account.  So

17   those were not reported.

18           Again in 2014 the spreadsheet identifies just those

19   two China CITIC accounts.  There is no other foreign asset,

20   defendant wrote to his accountant.  That's not true.  There

21   is this Standard Chartered Hong Kong account and this Coutts

22   account that the evidence shows he had approximately a

23   million dollars and over a million dollars in Standard

24   Chartered in 2014.

25           Count 17, another spreadsheet that doesn't list

Standard Chartered account.  There weren't records for the

Coutts account, so only the Standard Chartered account is

listed here.  And that had over a million dollars in it in

2015.

Same in 2016.  Same spreadsheet that lists the

Chinese CITIC accounts and nothing about the Standard

Chartered account.  Nothing about the Standard Chartered

account in any of the FBAR filings for any of those four

years.  So on each of the FBAR counts, counts 15 through 18,

defendant is guilty, guilty of failing to disclose those bank

accounts.

Now, the evidence has shown that Cree MMICs were

acquired by defendant through fraud and deceit, fraud and

deceit on Cree, and were shipped to Chengdu, China, where

they were part of the Z5 project, a project that defendant's

own documents indicate was for AVIC 607, a company engaged in

development of missiles and missile guidance systems.

The evidence has also shown that the fraud on Cree

was part of defendant's larger conspiracy to establish a

gallium arsenide and gallium nitride foundry in China to

compete with Cree and other companies and to conquer the

world market.  Those are the words from the presentations.

The evidence has shown the defendant had a large

financial reason to engage in this conduct.  He was paid a

lot of money for his role in this conspiracy, much of it to

1    his secret Standard Chartered account in Hong Kong.  That's

2    the greed.

3           And then there are the lies, lies on export

4    paperwork claiming that the wafers were glass samples, lies

5    on export paperwork about the value of the goods being

6    shipped, lies to Cree about who is buying their services,

7    lies to his accountant, lies to the IRS about income, lies to

8    the Treasury Department about foreign bank accounts, lies to

9    the FBI about what defendant was doing in China.

10          Greed, lies, and MMICs.  The evidence is

11   overwhelming.  On each count of the indictment, the evidence

12   shows that defendant is guilty beyond a reasonable doubt.

13          THE COURT:  Thank you, Mr. Shobaki.

14          Ladies and gentlemen, we'll take a 20-minute break

15   here, and then we'll here from Mr. Spertus.

16          THE CLERK:  All rise.

17          (Open court - jury not present)

18          THE COURT:  Please be seated.

19          Anything we need to discuss before your response?

20          MR. SPERTUS:  No, Your Honor.

21          THE COURT:  Thanks.

22                 (Recess taken at 12:13 p.m.)

23

24

25

UNITED STATES DISTRICT COURT

1                        CERTIFICATE

2   I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

3   TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS IN

4   THE ABOVE MATTER.

5   FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

6   REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

7   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

8

9   /s/ Miriam V. Baird            07/09/2019

10  MIRIAM V. BAIRD                       DATE
    OFFICIAL REPORTER
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25